```
 1                 UNITED STATES OF AMERICA

 2                EASTERN DISTRICT OF MICHIGAN

 3                     SOUTHERN DIVISION

 4    UNITED STATES OF AMERICA

 5          V                    Case No. 16-20062

 6    MARTEL STRONG - D-5,

 7    WILLIAM STEELE - D-12,

 8              Defendants.

 9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

10                 EXCERPT FROM JURY TRIAL

11            BEFORE CHIEF JUDGE DENISE PAGE HOOD

12                   U.S. DISTRICT COURT

13          231 W. LAFAYETTE STREET, COURTROOM 730

14                    DETROIT, MICHIGAN

15                  FRIDAY, JULY 14, 2017

16    APPEARANCES:

17    FOR THE GOVERNMENT:          SHANE CRALLE,

18                                 MICHAEL HEESTERS,

19                                 U.S. DEPARTMENT OF JUSTICE

20                                 211 W. FORT ST., STE. 2001

21                                 DETROIT, MI 48226

22

23

24

25
```

```
 1                   (APPEARANCES CONTINUED)

 2   FOR THE DEFENDANT STRONG:        JOSEPH A. NISKAR,

 3                                    1 NORTH SAGINAW ST.,

 4                                       SUITE 201

 5                                    PONTIAC, MI 48342

 6   FOR THE DEFENDANT STEELE:        SEYMOUR BERGER,

 7                                    24901 NORTHWESTERN

 8                                       SUITE 411

 9                                    SOUTHFIELD, MI 48075

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    I N D E X              PAGE

2  ADDITIONAL INSTRUCTIONS OF THE COURT        8

3  OPENING STATEMENT BY MR. HEESTERS           9

4  OPENING STATEMENT BY MR. NISKAR            33

5  GOVERNMENT'S CASE IN CHIEF

6    JOSEPH NETHER

7    DIRECT EXAMINATION BY MR. CRALLE         43

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              E X H I B I T S                    PAGE

 2   GOVERNMENT'S

 3     1              MAP                            66

 4     7-7-F          PHOTOGRAPHS                    70

 5     2-2-E      PHOTOS OF RSC MEMBERS              92

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    Friday, July 14, 2017

3                    Detroit, Michigan

4                    At approximately 1:30 p.m.

5                    (Prior proceedings held in open court were

6      stenographically reported but not ordered transcribed.)

7                    THE CLERK:  Recalling Case No. 16-20062,

8      United States of America versus Martel Strong and

9      William Steele.

10                    MR. CRALLE:  Shane Cralle for the United

11     States.

12                    MR. HEESTERS:  Good afternoon, Your Honor.

13     Michael Feesters for the United States.

14                    THE COURT:  And please identify who is at

15     counsel table with you.

16                    MR. CRALLE:  Would you like for me to do

17     that every time?

18                    THE COURT:  Yes, please.

19                    Absolutely.  Thank you, Your Honor.

20                    Sherita Gentry and Special Agent Joseph

21     Nether.

22                    THE COURT:  Thank you.

23                    MR. NISKAR:  Good afternoon, Your Honor.

24     Joseph Niskar appearing on behalf of and with

25     Mr. Strong.

1           MR. BERGER:  Seymour Berger on behalf of

2    Mr. Steele.

3           THE COURT:  I think that you all received a

4    copy of the schedule?

5           MR. CRALLE:  Yes, Your Honor.

6           MR. NISKAR:  Yes, Your Honor.

7           THE COURT:  I'm going to give this copy to

8    the jury, and I'm also going to read them the

9    instruction on notetaking and then you can begin, okay?

10          MR. NISKAR:  Yes.  Thank you.

11          THE COURT:  Very good.  Let's bring them out

12   if you're ready.

13          MR. NISKAR: We're ready.

14          We would ask for a mutual sequestration

15   during trial.

16          THE COURT:  I think that Mr. Cralle is going

17   to call Special Agent Nether first?

18          MR. CRALLE: That's right.

19          THE COURT:  He's likely to be asked to stay

20   at the table, but he knows not to speak to any witnesses

21   about the testimony of other witnesses.

22          MR. NISKAR: And there is one other exception

23   that we've agreed on and that is my client's wife,

24   Ms. Weekes, who is in the front row, may be called as

25   only a character witness and not a fact witness.

1               THE COURT:  So she can stay?

2               MR. NISKAR:  We've agreed upon that.

3               MR. CRALLE:  That's fine, Your Honor.

4               THE COURT:  And do you have any other

5   witnesses here in court, Mr. Cralle?

6               MR. CRALLE:  No, Your Honor.

7               THE COURT: How about you, Mr. Niskar, do you

8   have anybody else?

9               MR. NISKAR:  No.

10              THE COURT: Mr. Berger, do you have any

11  witnesses in court?

12              MR. BERGER:  No, Your Honor, none other than

13  the Defendant maybe.

14              THE COURT: So you all know there are some

15  many interns, and they will come in and go, and whoever

16  is sitting up here with me will probably kind of look to

17  see if they have a tag on so we can tell if they're

18  somebody like that.  But if you notice anybody who's not

19  and you think they're a witness, let us know, okay?

20              MR. NISKAR:  Yes.

21              THE COURT:  I think we're ready to bring out

22  the jury, are we?

23              MR. NISKAR:  Yes.

24              MR. CRALLE: Yes.

25              THE COURT:  Okay.  Let's bring out the jury.

```
 1                    (Whereupon at 1:35 p.m. the Jury was brought
 2    into the courtroom.)
 3                    THE COURT:  Are you satisfied the Jury is
 4    present and properly seated?
 5                    MR. CRALLE: Yes, Your Honor.
 6                    MR. NISKAR:  Yes, Your Honor.
 7                    MR. BERGER:  Yes, Your Honor.
 8                    THE COURT:  I am going to give you, if you
 9    didn't get it already, a schedule of the day.  You
10    already got it?  And it is subject to my changing it
11    depending on the other schedule of the Court.
12                    And I see some of you have pads.  And what
13    else?  Anything else?  No.
14                    I'm going to give you an instruction on
15    notetaking.  If you want to take notes during the course
16    of the trial, you may do so; however, it is difficult to
17    take detailed notes and pay attention to what the
18    witnesses are saying at the same time.
19                    If you do take notes, be sure that your
20    notetaking does not interfere with your listening to and
21    considering all of the evidence.
22                    Also, if you do take notes, do not discuss
23    them with anyone before you begin your deliberations.
24    Do not take your notes with you at the end of the day,
25    be sure to leave them with the court officer.
```

1          And if you choose not to take notes,

2     remember that it is your own individual responsibility

3     to listen carefully to the evidence.  You cannot give

4     this responsibility to someone else who is taking notes.

5          We depend on the judgment of all members of

6     the Jury.  You all must remember the evidence in the

7     case.

8          Now, I know some people have sweaters.  I

9     told the jurors who were here yesterday that it is

10    either cold or hot, and so for now we're opting for

11    cold.  So if you're feeling cold, please bring a sweater

12    on Monday.

13         I'm ready to begin if you're ready to make

14    your opening statements.

15         MR. HEESTERS:  Thank you, Your Honor.

16         Good afternoon, ladies and gentlemen.

17         This case is about the Detroit Rollin 60s

18    Crips.

19         In during the course of this trial, the

20    Government is going to prove to you that they are who

21    they say they are.  All I know is smoke weed, rob,

22    steal, sell dope, roll dice, get money, and gang bang

23    with my Crips.  Handguns, choppers, can't find you, then

24    we dump it on your mama.

25         Choppers are AK-47s, and this is a post from

1    Defendant Martel Strong's Facebook page, and it

2    accurately depicts the Detroit Rollin 60s Crips.

3                This case is about a violent street gang.

4    It's about a violent street gang that operated in and

5    terrorized the City of Detroit.

6                It's about a violent street gang that

7    committed murder, robberies, arson, drug trafficking and

8    possession and use of illegal firearms.

9                It's about a violent street gang who used

10   fear and intimidation in order to control territories

11   within the city, commit crimes, and make money for

12   themselves within that territory.

13               It's about a violent street gang that these

14   two Defendants willingly joined, actively participated

15   in, never withdrew from, and reaped the benefits of

16   until they were arrested.

17               Ladies and gentlemen, over the course of

18   this trial, you're going to be able to delve deeply

19   inside of the world of Detroit Rollin 60s Crips.

20               You're going to see numerous exhibits and

21   hear from many witnesses, some of whom are former gang

22   members themselves, that's going to expose you to the

23   violence, drugs, and guns that were commonplace within

24   the Detroit Rollin 60s Crips.

25               More specifically, you're going to hear

1   evidence that the gang existed, that these Defendants

2   were members of the gang, and these Defendants committed

3   crimes on behalf of the gang.

4           And you're also going to hear how they

5   benefitted through their membership, and they benefitted

6   through membership, ladies and gentlemen, through

7   territorial control and protection of one another; that

8   enabled these Defendants to commit crimes like selling

9   drugs within the gang's territory and increase their

10  standing within the gang itself.

11          But before I get to these specific

12  Defendants, I'm going to give you a background and an

13  overview of the evidence you're going to hear about the

14  gang in general.

15          So what are the Detroit Rollin 60s Crips?

16  You're going to hear testimony that the Detroit Rollin

17  60s Crips are a subset of the national Rollin 60s Crips

18  street gang.  That the Rolling 60s street gang was

19  originally found in Los Angeles, but in Detroit, they

20  control a relatively well-defined territory which you

21  can see on this screen.  It's primarily around Seven

22  Mile Road and Tracy Street which is located in northwest

23  Detroit, but they also control other areas of the city

24  as well which you can see on this screen.

25          You're going to learn from former gang

1    members that they controlled this area through fear and

2    intimidation.  And they marked their territory through a

3    possess called tagging.  And tagging means essentially

4    spray painting Rollin 60s symbols and other drawings on

5    buildings, signs and other structures to mark the

6    territory so that people that lived in the neighborhood

7    and other gangs know whose territory it is.

8            And here's an example you can see on the

9    screen now.  And one of the former gang members are

10   going to walk you through during trial each and every

11   one of these tags on this building.

12           So let me give you a little primer on it.

13           If you look on the left at the top it says

14   "Seven Mile."  That's the gang's territory.  Below that,

15   it says "Neighborhood Crips," NHC.  That's how they

16   refer to themselves as.  They're neighborhood Crips, and

17   there's differentiation between different types of Crips

18   that you'll hear about at trial.

19           If you look further down, you see the

20   letters "WRSC" where the "S" is a money symbol.  That

21   stands for west side Rollin 60s Crips.  That's the

22   Detroit Rollin 60s Crips.

23           If you look further along, you see "Post

24   Crip, Crippin Ain't Dead."  The Detroit Rollin 60s are

25   part of the Crips street gang.

1          The former gang members are also going to

2    tell you that clear demarcation of the gang's territory

3    is important, and it's important because it allows gang

4    members to commit crimes, like selling drugs and

5    robberies, within the territory with impunity.

6          It provides the safe haven where gang

7    members will look out for each other and make money for

8    themselves, and we're going to prove that to you at

9    trial.

10          How do gang members identify themselves?

11    They do so in several basic ways.  They use distinct

12    gang sign hand gestures; they obtain similar tattoos;

13    they wear similar colors; and they even talk in a

14    specialized gang language.

15          More specifically, as you can see here, gang

16    members wear royal blue and sky blue color of clothing,

17    bandanas, and beaded necklaces.

18          They affiliate with the University of North

19    Carolina's Tarheels and the Seattle Mariners.  And it's

20    not because they're fans of the teams, it's because of

21    the colors, royal blue and sky blue.

22          And you're going to see numerous examples of

23    that all throughout trial and it will be explained to

24    you by the cooperators, but let me show you some

25    examples.

1          If you look closely at this picture, you'll
2     see blue bandanas, you'll see blue shirts, and you'll
3     see blue beaded necklaces.  You'll see people flashing
4     the gang sign, two fingers down, thumb out.  That's the
5     gang sign.
6          You'll also, by the way, if you look
7     closely, the person on the left in the white shirt, that
8     is Defendant William Steele.
9          You're going to hear that this photo was
10    taken at an annual gang event they have called Hood Day.
11    Hood Day is every June 10th, and there is a significance
12    to that date, which you'll hear about from the
13    cooperators.
14         Here is another picture of Defendant Steele.
15    This is from Facebook.  And you've probably already
16    heard, I think, that you're going to see numerous
17    Facebook posts, photos and messages throughout trial,
18    and that's because that is how the Defendants talk to
19    each other, over the Internet, over social media.
20         So this is a picture of Mr. Steele from
21    Facebook.  If you look closely, you'll see a blue beaded
22    necklace.  That's an indicia of the Rollin 60s Crips.
23    And below that you see a blue bandana with the Seattle
24    Mariners' logo.  Again, from Facebook.
25         That's Martel Strong flashing a gang sign.

1                   Below that you see three people.  The person

2     all the way on the right is Defendant Steele.

3                   If you look closely in that picture, you'll

4     see blue bandanas, blue beads, a blue T-shirt and a gun.

5                   Now, here's two other gang members, Jerome

6     Hamilton and Darriyon Mills.  They're not at the defense

7     table, but their names are going to come up over and

8     over again throughout trial.  And you're going to hear

9     about them because Jerome Hamilton is the originator of

10    the gang in Detroit.  Darriyon Mills is just below

11    Jerome Hamilton in the pecking order.

12                  And if you look at this picture, if you look

13    at Jerome Hamilton's neck, he's wearing a blue bandana,

14    And he's flashing the gang sign: two fingers down, thumb

15    out.

16                  Darriyon Mills, blue shirt, gang sign, blue

17    bandana.

18                  I mentioned that you're going to hear from

19    cooperators, and here they are.

20                  I'm not going to go through everything that

21    they're going to tell you, but again, if you look at

22    this picture you'll see what I've been talking about:

23    gang signs, blue shirt, blue beaded necklaces, blue

24    bandanas.  Over and over again and over again you're

25    going to see this at trial, and each one of the people

1   are going to be on the witness stand and tell you about

2   it.

3           And these cooperators are also going to

4   confirm for you that the gang existed, that these two

5   Defendants were part of the gang, and these two

6   Defendants were active members of the gang.

7           And when you hear the cooperators talk,

8   think about what they say in the totality of the

9   evidence.  Think about how what they say is corroborated

10  by everything else that you hear and see.

11          Gang members also identify themselves

12  through tattoos.  They get the Seattle Mariners logo,

13  the University of North Carolina insignia, the RSC logo,

14  Rollin 60s Crips where the "S" is the money sign, And

15  they get the words "Rich Rollin" because that's one of

16  the gang's sayings, mottos.

17          So these are from Facebook again.  There's

18  Defendant Steele on the left.

19          If you look at his right pectoral, you see a

20  Seattle Mariner's logo tattooed right on his chest.

21          Martel Strong, that's Defendant Strong's

22  arm.  "Rich Rollin."  That's the gang's motto, right

23  down his arm.

24          You're also going to learn, as I said, that

25  the gang talked in a specialized gang language.  Here's

1   some examples.  And you're going to see this at trial in

2   Facebook posts where they write this way, and you're

3   going to hear on recorded phone calls where they talk

4   this way.

5           Now, I'm not going to go through everything,

6   but I'll give you one simple example that you're going

7   to hear and see over and over again.

8           The Rollin 60s are Crips.  The Crips main

9   rivals are the Bloods.  So what the Crips do in a lot of

10  their spoken language and when they write, they remove

11  the letter "B" from words and input the letter "C."

12          So, for example, you're going to hear a

13  recorded phone call during trial with Mr. Steele on the

14  call, and he says the word "back," b-a-c-k, but he

15  doesn't say it like that.  He removes the "B" and says

16  "cack," c-a-c-k.  He says the word "about," a-b-o-u-t,

17  but he removes the "B" and says "acout."  So just be on

18  the lookout for that during trial, and you're going to

19  see it in the Facebook postings, and some of the times

20  it's going to be so hard to understand, the cooperators

21  are going to have to interpret it for you.

22          You're also going to learn the gang members

23  have nicknames and sometimes multiple nicknames.

24          In fact, it's rare the gang members even go

25  by their real names.  And sometimes some gang members

1   don't even know their fellow gang members real names.

2           What does that mean for you?  That means at

3   trial, don't be surprised when you see Facebook postings

4   and you hear the cooperators testify for them to refer

5   to each other, the Defendants and other gang members, by

6   their nicknames, not by their real names.

7           And here's an example.  This is from

8   Defendant Steele's Facebook page.

9           If you look up in the right-hand corner,

10  "Looni," that's Mr. Barber.  He's going to testify.

11          Next to him is "Thunder."  That's

12  Mr. Woodley.  He's going to testify.

13          Next to him "Fatal."  That's Darriyon Mills

14  who you've already seen in a prior slide.

15          Below that is "Cane."  That's Mr. Weaver.

16  He's going to testify.

17          "Shotti," that's Defendant Steele.

18          And you're going to hear testimony that he

19  got that nickname "Shotti" because he always carried the

20  gun.

21          "Tizzy," that's another gang member.

22          You see gang signs, and as I said, this is

23  from Mr. Steele's Facebook page.

24          Oh, and by the way, you see Seattle Mariners

25  on the left, and below, 60s, with the "S" as the money

1   symbol.

2            The gang is also organized by rankings.

3   They divide the gang into smaller subsections called

4   lines, and each line is headed by a leader known as the

5   "Big Homey."  And the "Big Homey" starts with the letter

6   "B," so they don't pronounce "Big Homey."  They call it

7   "Cig Homey," C-i-g, but it's really "Big Homey."  That's

8   the leader of these individual lines within the gang

9   itself.

10           Below the Big Homey are several lower-level

11  rankings that includes "Lil," "Baby," "Tiny," and

12  "Infant."

13           And the picture you see on the screen now,

14  this is just a representation of the gang and the lines.

15  So, for example, you see the Maniac line.  That's one of

16  the main lines in the gang that's headed by Jerome

17  Hamilton.

18           You see the "Sicco line"?  That's Charles

19  Smith's line.  He's going to be here to testify.

20           But this is just a representation again.

21  This isn't all the gang members.

22           All told at any given time, the gang has

23  between 30 and 50 members.

24           But you're also going to hear evidence of

25  how gang members increase their ranking, Increase their

1  standing within the gang, and they do so in several

2  basic ways.

3           First, the more fear that you instill in

4  others, the higher your ranking.  And second, and maybe

5  more importantly, the more criminal activity that you

6  participate in, the higher your ranking.

7           And the Rollin 60s have a very specific way

8  that they refer to criminal activity.  They call it

9  "doing work" or "going on missions."

10          And work and missions to a Rollin 60s gang

11  members means drug trafficking, murder, arson,

12  robberies.

13          You're going to see all those things during

14  trial, and you're going to hear about those crimes.

15          So that's a general background of the gang

16  memorabilia.

17          There's more to come.  You're going to learn

18  more things, more specifics about the gang.

19          Now I'm going to move on and talk about the

20  Defendants themselves.

21          Again, these are from Facebook.  Defendant

22  Steele's nickname as you know is "Shotti," but he also

23  has another nickname of "Lil Fatal," and that's because

24  he's directly below Darriyon Mills in the pecking order.

25  And Darriyon Mills' nickname is "Fatal" so he's "Lil

1    Fatal."

2              He's in a line referred to as the Maniac

3    line which you saw, and he's a drug dealer that made

4    money selling drugs under the protection of the Rollin

5    60s.

6              You're going to learn through the

7    cooperators that Defendant Steele sold cocaine,

8    prescription pills, codeine cough syrup, and marijuana.

9    In fact, he was arrested multiple times with marijuana

10   that was prepackaged for resale.  And at one of those

11   arrests, he had $1400.00 of cash on him.  And the police

12   officer who arrested him that day, he's going to be here

13   to testify.

14             But Defendant Steele is also involved in

15   violent gang crime.  You're going to hear a recorded

16   phone call from September of 2012 where Darriyon Mills,

17   "Fatal," calls Mr. Steele and requested Mr. Steele

18   murder someone for him.

19             And a few months before that, in July of

20   2012, Mr. Steele is arrested as he walked down the

21   street with this gun (indicating) and this extended

22   magazine (indicating).

23             And an extended magazine, ladies and

24   gentlemen, is just a magazine that holds more bullets

25   than normal.

1          But why was he carrying this gun and

2    extended magazine?

3          You're going to hear another recorded phone

4    call where he says why.  He says he was walking down the

5    street with these, walking behind another gang member

6    named Jermel Coleman to look out for Jermel Coleman.

7    And that's important.

8          And this is something you're going to hear

9    over and over again throughout trial.  This is what gang

10   members do.  They look out for each other, they have

11   each other's back, and that allows them to commit crimes

12   and sell drugs within their territory and make money for

13   themselves.

14         So what about Defendant Strong?  Defendant

15   Strong is a Rollin 60s gang member with the nickname of

16   "Bang-em Tel."  He has an Infant ranking.  He's in the

17   Maniac line of Jerome Hamilton, who's the originator of

18   the gang.

19         As you can see here, these three pictures

20   from Facebook, and you can see gang signs and a gun.

21         You're going to see multiple Facebook

22   postings from Defendant Strong throughout trial.  Some

23   of these posts he's going to admit that he's a Rollin

24   60s gang member.

25         Here goes the top one: "RSC for life guns,"

1    "Rollin 60s for life."

2                Below that, and you've already seen this,

3    "Gang bang with my Crips, Cheese, Fatal and Bang-em."

4                "Bang-em" is him, "Fatal" is Darriyon Mills,

5    and "Cheese" is another gang member named Tre Tigner.

6                Gang bang with Tre Tigner, Darriyon Mills,

7    and Mr. Strong.

8                But he's also a drug dealer that sold drugs

9    under the protection of the Rollin 60s.

10               One of the cooperators is going to tell you

11   that selling drugs is one of Mr. Strong's specialties.

12               In fact, you're going to see numerous

13   Facebook postings from Mr. Strong's account where he

14   offers to sell drugs, discusses selling drugs, and

15   agrees to sell drugs.

16               And you're going to see pictures from his

17   account of drugs.  One picture is a digital scale with

18   marijuana on top, and another picture is a stack of

19   money about 4 to 5 inches thick.

20               But he's also violent.  Charles Smith, one

21   of the cooperators, is going to testify.  He's going to

22   tell you that he was with Defendant Strong and Jerome

23   Hamilton on a porch one day hanging out.  A girl pulls

24   up in a car, Defendant Strong suggests that they go

25   carjack her and steal her car.

1          Mr. Smith, Charles Smith, a former gang

2    member, knew the girl and asked them not to do that.

3    And fortunately they didn't do it, but it illustrates

4    how violent this gang is.

5          So now you've heard a general overview of

6    evidence about the gang itself, you've heard a little

7    bit about the Defendants.  Now, I want to briefly

8    discuss the charges you're going to hear about.

9          Judge Hood is going to give you a number of

10   instructions throughout trial about what the crimes are

11   and what the law is.  I want to give you a little bit of

12   context about the law so as you begin to hear evidence,

13   you can orient yourself to where the evidence is

14   actually falling within the law.

15         During the preliminary instructions you

16   heard the term "RICO," and you may be wondering what

17   RICO is.

18         RICO, ladies and gentlemen, is just a law in

19   the United States.  It's the RICO Act.  It's just the

20   law.

21         And the Judge at the end of this trial is

22   going to instruct you on the specific, relevant, legal

23   definitions in that law that you have to apply.

24         Let me just offer this simple definition to

25   help orient you as you begin hearing the evidence.

1          Simply put, the RICO law applies to a group

2    of people that come together over a period of time to

3    commit crimes.  And that in essence is what the

4    Government is going to prove to you over the course of

5    this trial about the Rollin 60s.

6          And the Defendants in this case are charged

7    with being part of a RICO conspiracy.  And to prove a

8    RICO conspiracy, the Government has to meet these five

9    elements with the evidence.

10          I want to briefly discuss these five

11    elements and give you a sampling of the evidence that

12    you're going to hear that falls under each element.

13          So let's look at the first two.

14          Did an enterprise exist?  And was the

15    Defendant associated with the enterprise?

16          Ladies and gentlemen, an enterprise is just

17    a way of saying a group of people that come together

18    over a period of time for a common criminal purpose.

19    And a group of people can be a gang.  A gang can be an

20    enterprise.

21          And the common criminal purpose can be to

22    provide territory, organization, and protection of one

23    another to commit crimes, crimes like murder, arson, rug

24    dealing, and robbery.

25          And the evidence in this trial is

1   definitively going to show you that the Rollin 60s

2   existed.

3                   Special Agent Joe Nether of the Bureau of

4   Alcohol, Tobacco and Firearms is going to testify.  He

5   investigated the Rollin 60s for many years.  He's going

6   to walk you through what he did, the investigative

7   methods he used, and show you the evidence that he

8   collected.

9                   But it's more than that.  You're going to

10  hear from the former gang members that the Rollin 60s

11  street gang existed, that gang members committed crimes

12  and were rewarded for doing so.

13                  And they're going to confirm many of the

14  things I've already told you.  Like the tattoos, the

15  territory, the spray painting, the colors, the

16  specialized gang language, the rankings, the overall

17  organization, and much more.

18                  Second element.  Were the Defendants

19  associated with the enterprise?  That's relatively

20  self-explanatory, but all it means is did the Defendants

21  join the Rollin 60s Crips to further the activities of

22  the gang?

23                  And again, the former gang members are going

24  to tell you that these Defendants were in the gang.

25  They were members of the Rollin 60s.

1          In addition, you're going to see numerous

2  Facebook posts, some of which I've already shown you

3  where the Defendants admit that they're gang members.

4          The third element:  Did the Defendants

5  knowingly agree to conduct or participate in the affairs

6  of the enterprise?

7          This is just a way of saying did the

8  Defendants participate in activities associated with the

9  gang or the operation of the gang?

10          So, for example, I told you, I've been

11  alluding to the fact, that drug dealing was one way that

12  this gang made money.  These two Defendants are both

13  drug dealing members of the Rollin 60s, and you're going

14  to hear evidence of that.

15          You're also going to hear testimony that

16  robbery was another way that this gang made money.  I've

17  given you one example about the carjacking that

18  Mr. Strong suggested.  You're going to hear about an ATM

19  robbery where another guy member was shot through the

20  teeth and killed, and you're going to hear about

21  numerous other robberies also.

22          Regarding the operation of the gang.  You're

23  going to see Facebook posts and hear evidence, for

24  example, of how Defendant Strong participated in and had

25  knowledge of the initiation procedures for the gang.

1    And the gang had a very specific initiation procedure

2    called a "Put On."  And you're going to learn all about

3    that Put On and you're going to see that Defendant

4    Strong had knowledge of and participated in that.

5              Fourth element:  Did the Defendant agree

6    that he or a co-conspirator were engaged in a pattern of

7    racketeering activities?

8              Now, this element has to do with

9    racketeering acts or activities.

10             So what's a racketeering act?  Racketeering

11   acts are just crimes that are elicited in the

12   racketeering law.

13             The racketeering law just lists out a bunch

14   of crimes and says those are racketeering acts.  Some of

15   those crimes it lists are murder, arson, robbery, drug

16   dealing.  All things that are relevant to this case.

17             But what does it mean for a defendant to

18   engage in a pattern of racketeering?

19             This basically means that the Defendant or

20   another gang member commit two of those racketeering

21   acts, like murder, robbery, arson, drug dealing.

22             And this is what's important.  It doesn't

23   have to be the Defendant that commits the crime.  It can

24   be another gang member, as long as the crime is related

25   to the gang that the Defendant agreed to join.

1          So what does that mean for you?  What does

2    it mean for the type of evidence you're going to hear?

3          It basically means you're going to hear two

4    types of racketeering acts.

5          The first type are acts that these specific

6    Defendants committed.

7          So again, for example, drug dealing.  Each

8    of these Defendants was involved in selling drugs, and

9    you're going to hear evidence of that.

10         You're going to hear how each of these

11   Defendants used their gang affiliation to advertise

12   their drug dealing, network with customers, and provide

13   a protected territory to conduct their drug sales.

14         So that's the first category.  That's an

15   example: Acts that these Defendants did themselves.

16         The second category of racketeering acts are

17   acts that other gang members did on behalf of the gang.

18   So what are they?  I mentioned the ATM robbery.  I keep

19   mentioning an arson.  There's a fire bombing in this

20   case that you're going to hear about.  I keep mentioning

21   a murder.  You're going to hear about a drive-by murder,

22   I'm going to tell you it's about it now because it

23   illustrates how violent this gang truly was.

24         August 8th, 2011, it's Monday, between 5 and

25   5:30 p.m.  Four Rollin 60s gang members get into a car

1    and they drive to an area around Carlin and Belton

2    Streets in Detroit.

3             Now, at that time, it's Monday, August 8th

4    at 5 or 5:30.  And this is a picture from that day on

5    the left.  So it's not raining, it's light out, people

6    are outside.  There's literally -- and you're going to

7    see a picture of this -- there's literally a basketball

8    hoop in the street.  And that car right there is parked

9    on the side of the road and Quante Atkins is working on

10   his car.

11            Right as he's working on his car, four

12   Rollin 60s gang members drive down the street, three of

13   them begin firing wildly out of the window, one bullet

14   strikes Quante Atkins, who, by the way, is an innocent

15   bystander, has nothing to do with the gang, and Quante

16   Atkins is gunned down and murdered in the street.

17            Left behind at the scene of the crime were

18   at least 20 shell casings from two guns and a Seattle

19   Mariners baseball hat.

20            In the car, as the police would later learn,

21   were Jerome Hamilton, the leader of the gang; Jonathan

22   Barber, who's going be here to testify; Roderek Perry,

23   who's also going to sit on this witness stand and

24   testify; and Torian Brinson, who's dead.

25            All four of those people are members of the

1    Rollin 60s.

2              But why did they do this murder?  Why did

3    they do this drive-by?

4              You're going to learn from the people that

5    did the drive-by themselves, Roderek Perry and Jonathan

6    Barber, the purpose of this drive-by was to actually to

7    shoot and kill someone else, another person who had a

8    beef with the gang, who had an argument with the gang.

9    It wasn't intended for Quante Atkins.

10             And this is important again.  This is what

11   the gang does.  They have each other's back and they

12   clear out rivals.  That allows the gang members to sell

13   drugs and commit other crimes and make money for

14   themselves easier.

15             Last element:  Did the enterprise affect

16   interstate commerce?

17             This basically means did the crimes of the

18   enterprise affect commerce between multiple states?

19             So you're going to hear numerous ways that

20   happened.  Two examples are drug trafficking and use of

21   the internet to organize crimes and encourage others to

22   commit crimes.  So just keep your ear out for those

23   things.

24             Now, I'm not going to take up much more of

25   your time.  I want to discuss one other thing I've been

1    alluding to throughout, and that's how the evidence in

2    this case as a whole is going to corroborate itself.

3              So as you see and you hear the evidence,

4    which includes in part Special Agent Joe Nether's

5    testimony, testimony from the cooperating gang members,

6    testimony from other law enforcement like local police,

7    testimony from a victim of the arson who's going to be

8    here, Facebook posts of the Defendants, Facebook posts

9    of the cooperators, recorded statements of the

10   Defendants, and much, much more, keep in mind and think

11   about how the evidence all fits together like a puzzle.

12   And it fits together to show that the Rollin 60s are

13   what they claim to be, a violent gang that sells dope,

14   robs, steals, gets money and gang bangs with fellow

15   Crips.

16             At the end of this case, after all the facts

17   are in, after you hear all the evidence, after you think

18   about the totality of the evidence, after you see how

19   the evidence corroborates itself, after you weigh each

20   piece of evidence appropriately, we're going to come

21   back to you and ask you to do what the evidence in this

22   case compels.  And, frankly, what the evidence in this

23   case demands is that you find these two Defendants

24   guilty of each of the crimes they're charged with.

25   Thank you.

1              Thank you, Judge.

2              THE COURT:  Thank you.

3              Mr. Niskar, do you wish to make an opening

4    statement at this time?

5              MR. NISKAR:  Yes, Your Honor.

6              THE COURT:  Okay.

7              MR. NISKAR:  Good afternoon, ladies and

8    gentlemen.

9              As the Judge told you before we began

10   opening statements, opening statements and the

11   statements that Mr. Heesters just made are not evidence.

12   That means that you have heard no evidence yet.  The

13   presumption of innocence is still on Mr. Strong.  And

14   you can tell that he believes in his case, and he

15   believes in his case strongly.

16             But that is why I was so careful in

17   selecting you as jurors because it's important to find

18   people again that will not just jump to conclusion, that

19   will not buy a story based upon emotion.  That they will

20   hold the line.  That you will wait for the evidence to

21   start before you make up your mind about any facts in

22   this case.

23             And so, again, you have heard no evidence.

24   You have not even seen a wisp of smoke.

25             The charges in this case and the fact that

1    Mr. Strong is sitting here in this courthouse is not

2    evidence.  And again, he's presumed innocent.  He's not

3    guilty as you sit here right now.

4              Now, this case is being brought against the

5    backdrop of significant media attention in our nation

6    and our cities regarding violence in our communities.

7              And again, I believe that Mr. Heesters is

8    attempting to not prey on your emotions, but to get you

9    amped up and to -- I think you need to realize that

10   despite the news accounts and what we see and what we

11   hear on the radio, on the TV, on websites, whatever it

12   is about violence in our community, you again were

13   qualified as jurors because you agreed to decide this

14   case based upon, again, the evidence in this case only.

15   And that you won't let whatever else you have heard

16   about about gang members breaking into your home,

17   tagging your home, or tagging your community.  Whatever

18   it is that has happened outside of this courtroom is not

19   relevant to your decision in this case.

20             And again, I'm confident that you will be

21   able to set aside any sympathy that you might have based

22   upon what you hear in the news and what you hear in the

23   media about gang violence and about violence in our

24   community in general.  No one supports it.

25             But again, that's not what this case is

1    about.  This case is only about Mr. Strong and whether

2    or not the Government can prove that he engaged in this

3    racketeering.

4              Now, as you again can tell from

5    Mr. Heesters' argument, the language and the overtones

6    in this case, I believe, will be hot-blooded, they will

7    be sensitive.  And during jury selection there have been

8    some light-hearted moments, okay, and there's nothing

9    wrong with that as long as you all continue to

10   understand that this is a very serious case.

11             If something happens during this case where

12   I make a joke or something happens, don't think that I

13   don't take this case seriously, I do, and so does

14   Mr. Strong, okay.

15             If something happens that leaves a bad taste

16   in your mouth because of something that I do in

17   questioning a witness, in making an argument, again,

18   don't hold that against Mr. Strong, okay.  I'm only

19   doing what I know how to do for over 20 years, and that

20   is to zealously represent my client.  I intend to do

21   that, And if I do anything to offend you, I apologize

22   now, but I ask that you not hold that against my client.

23             Mr. Strong has pled not guilty, as the Judge

24   has told you.  He is presumed innocent.  And each of you

25   made a promise that qualified you as jurors that you

1    would continue to presume his innocence throughout this

2    trial.

3              That means that when you go home at the end

4    of the day, when you're in your car on your way home

5    commuting to and from the courthouse, Mr. Strong is not

6    guilty.  He's presumed innocent.

7              When you're sitting at the table with your

8    loved ones, your friends, you're breaking bread, during

9    that time when you're not in this courthouse, Mr. Strong

10   is not guilty.

11             Right now as you listen to the evidence,

12   despite what you may hear and how you may think about

13   things as you're hearing them from the witness stand,

14   Mr. Strong is not guilty.

15             We know and have confidence that you will

16   continue to keep your promise and afford Mr. Strong the

17   presumption of innocence throughout this entire trial.

18             Now, that presumption of innocence and that

19   verdict of not guilty that we're going to ask you for at

20   the end of this case, and that presumption of innocence

21   continues throughout the entire trial, unless the

22   prosecution can prove each element of the crime beyond a

23   reasonable doubt.

24             And Mr. Heesters and the Government put up a

25   PowerPoint with five elements of the racketeering

1    statute in this case.

2              The analogy that I like to make that I think

3    is helpful to jurors is that the elements of a crime and

4    the elements of that racketeering statute are just like

5    the ingredients in a cake mix or the mix that you get at

6    the grocery store.  You know, you go to Meijer's, you

7    pick the cake mix box off the shelf, and you look at the

8    back, what else do I need with this mix, right?  You

9    have the powder that's inside the box, but you also need

10   the egg, you need the oil, you need the water.

11             If you're missing just one of those

12   ingredients, whatever it is, the egg, the oil, the

13   water, when the buzzer goes off on the oven, it's going

14   to smell like a cake, but it's not going to be a cake.

15   It's not going to taste like a cake.  It's not going to

16   be the kind of cake that you like because you're missing

17   an element.  Each ingredient, each element has to be

18   there.

19             And in this case, I am going to agree at the

20   outset that there are some ingredients, some elements of

21   this racketeering statute that are there.  No doubt

22   about it that the Rollin 60s Crips exist.  That there is

23   such a thing, okay.  That's not what we're going to be

24   fighting about.  That's not the element or the

25   ingredient that we say is missing from this mix.

1               In this case, the main -- the focus on this

2      case is going to be that the Government will not be able

3      to prove to you beyond a reasonable doubt that

4      Mr. Strong, and again, I only represent Mr. Strong,

5      okay.  Mr. Strong, you're going to hear and you've

6      already seen stuff that relates to Mr. Steele and

7      Mr. Strong.  I am here to represent Mr. Strong, as I

8      told you during jury selection.  And each of you

9      promised that you will keep it straight and afford

10     Mr. Strong your individual assessment of the evidence

11     and your individual judgment in this case.

12               But the Government will not be able to

13     prove, going back to the missing ingredient, they will

14     not be able to prove beyond a reasonable doubt that the

15     Defendant furthered the activities of the Rollin 60s

16     Crips, okay.

17               Did he hang out with them?  Yeah.  He's

18     known some of these members, Jerome Hamilton, Tre

19     Tigner, since elementary school.  These guys were five,

20     six, seven years old running around together.

21               And you will see that over time -- and

22     Mr. Strong is one of the oldest of anyone you will see

23     come on and off that witness stand -- you will see that

24     over time this group, Rollin 60s, evolved.  And you will

25     see that, as we all do in life, we evolve as well and we

1    move on.

2              And you will see, and have already have seen

3    from the Facebook messages that are from 2008, 2009,

4    that that was a time when Mr. Strong was still living in

5    the area that's been marked and that you've seen Tracy

6    Street, Snowden Street.

7              Over time, and soon after 2010, Mr. Strong

8    moved away from that area.  He moved away.  He moved to

9    Pontiac, Hazel Park and Warren.  And in those areas, he

10   didn't associate with these other guys that are going to

11   come on and off the witness stand.  He didn't further

12   the activities of this group or agree by himself or with

13   others that they would engage in crimes or engage in a

14   pattern of racketeering.

15             The Government knows this as well.  You will

16   learn that originally -- and again, an indictment that

17   brings you and gets you arrested and brings you into

18   federal court in front of a jury, in front of a judge to

19   decide your fate, this isn't an invitation to a tea

20   party, all right.  This indictment specifically alleges

21   that Martel Strong was ordered to go out and commit a

22   robbery and that he was with other individuals and

23   agreed to go with them to commit a robbery against a

24   person named GB.  The initials of the person are GB.

25             That's what the Indictment says, okay.  That

1    Indictment that was brought against Mr. Strong in 2016

2    puts him on notice that he should be prepared to defend

3    in this case that he agreed and participated in an armed

4    robbery.

5              Three weeks ago, two and a half weeks ago,

6    Agent Nether, the special agent in charge of this case,

7    you will learn and hear as evidence in this case,

8    testified before a grand jury, and has since come off of

9    that position, and has since agreed, and will most

10   likely have to concede, that that's not as clear any

11   more.  That now, since Mr. Strong has been indicted,

12   they've done more investigation in this case, and now

13   it's not as clear that Mr. Strong was present, that

14   Mr. Strong ever agreed to do this, or participate in

15   this.

16             So rush to judgment?  I say so.  Unfair?

17   Absolutely.

18             You will not be able to find again that

19   ingredient that he agreed by himself or with others to

20   participate in the affairs of this group.

21             You may see him at a party.  You may see him

22   wearing a blue shirt.  But later, 2011, '12, '13, '14,

23   '15, '16, you will not see or hear any evidence that he

24   did anything criminal that furthered the conduct or

25   furthered this group's position or fear factor in the

1    community.

2                And unless you can make those findings

3    beyond a reasonable doubt, you will have to find

4    Mr. Strong not guilty.

5                It doesn't matter what other people did.

6    You must find, as the Government has put on the board,

7    again, the Defendant agreed to participate in the

8    affairs and agreed to a pattern of racketeering.

9                His knowledge alone about a Put On or a

10   fight between people is of no consequence.

11               The fact that he was informed through

12   Facebook messages that someone is doing something is of

13   no consequence.

14               Knowledge of something happening alone, and

15   the Judge is going to give you an instruction, that

16   isn't enough.  He has to have the intent.  He has to

17   agree.  He has to not only know that it's going to

18   happen, but agree and participate in it as well.  And in

19   this case, you will not hear any evidence of the sort.

20               Now, acquitting or finding Mr. Strong not

21   guilty, again as we discussed during jury selection,

22   should not and must not depend on you hearing him

23   testify or the defense presenting any evidence in this

24   case at all.

25               Rather, it depends on you seeing the case,

1    from start to finish, as a test of the Government's case

2    as a rush to judgment, without credible or reliable

3    proof.

4              And at the end of the case, I'm not going to

5    go through all the evidence that I think you're going to

6    hear, most of it doesn't even and won't relate to my

7    client at all, but at the end of the case, I will come

8    back before you and put the pieces of the puzzle

9    together for you and show you why I believe that the

10   evidence that is going to be introduced in this case

11   does not fit to form a picture in a puzzle of proof

12   beyond a reasonable doubt of guilt.

13             And I'm going to ask that you find my

14   client, Martel Strong, not guilty.  Thank you very much.

15             THE COURT:  Thank you.

16             Mr. Berger, do you wish to make an opening

17   at this time or reserve it until later?

18             MR. BERGER:  I want to reserve it for later,

19   Your Honor.

20             THE COURT:  Okay.  Thank you.

21             Is the Government ready to call their first

22   witness?

23             MR. CRALLE: Yes, Your Honor.

24             THE COURT:  You may.

25             MR. CRALLE:  At this time we'll call Special

1    Agent Nether.

2                    J O S E P H   N E T H E R, after being first

3    duly sworn, was examined under his oath and testified as

4    follows:

5                    THE WITNESS:  Joseph Nether, N-e-t-h-e-r.

6                    D I R E C T    E X A M I N A T I O N

7    BY MR. CRALLE:

8        Q.   Good afternoon.

9        A.   Good afternoon.

10       Q.   How are you employed?

11       A.   I'm a special agent with the Bureau of Alcohol,

12    Tobacco, Firearms and Explosives.

13       Q.   Is that commonly known as ATF?

14       A.   Yes, it is.

15       Q.   How long have you been employed by the ATF?

16       A.   Next month it will be 16 years.

17       Q.   And you're a special agent?

18       A.   Yes, that's correct.

19       Q.   What does that mean?

20       A.   It means I'm a criminal investigator, so I

21    actually investigate criminal matters related to

22    firearms, narcotics, violent acts.

23       Q.   In the course of your, I believe you said 16

24    years, what sort of investigations have you conducted?

25       A.   Throughout my career, I've investigated narcotics

1    organizations that traffic drugs, armed drug dealers,

2    people that hire people to murder individuals,

3    murder-for-hire investigations.

4         I've done approximately ten-plus armed robbery

5    crews, individuals that get together that actually are

6    going out committing armed robberies of individuals or

7    businesses.

8         I've investigated multiple street gangs, and

9    that's -- the street gangs is what my focus has been for

10   the last few years.

11   Q.  And in addition to your investigations, have you

12   ever done any other sort of work for the ATF either here

13   or elsewhere in the country in an undercover capacity?

14   A.  Yes.  I'm a member of the Enhanced Undercover

15   Program within ATF.  I'm one of approximately 30 members

16   that are members of this organization, and that causes

17   me to at times travel to different parts of the country

18   to help other agents with their undercover

19   investigations.  So I have been other places to actually

20   infiltrate robbery crews, purchase guns and narcotics in

21   these other places doing these investigations.

22   Q.  Have you ever worked on any task forces?

23   A.  Yes, I've worked on several.

24   Q.  Let's start with, what is a task force?

25   A.  A task force is where there's multiple different

1    agencies that could be local police, state police, as

2    well as federal agencies that come together and

3    investigate crimes together.

4        Q.   What task forces have you been on?

5        A.   The first task force I was involved in was called

6    the Downriver Area Narcotics Organization, which was a

7    Michigan State Police funded task force.  The base at

8    the time, it was Downriver, our office was in

9    Brownstown.  And that was a task force that was

10   comprised mostly of the local police departments in and

11   around the Downriver area as well as the Michigan State

12   Police.  And we investigated kind of low-level to

13   mid-level narcotics organizations.

14       Q.   Any others?

15       A.   I was also on a task force called TIDE, which I

16   believe is called -- stood for Tactical Intelligence

17   Driven Enforcement, which was a task force in the City

18   of Detroit, which was comprised of the state police,

19   ATF, and Detroit Police Department.

20            And at that time we were investigating a lot of

21   armed narcotics traffickers particularly in the

22   northwest area of Detroit.  My focus at the time was the

23   Joy Road area where there was a lot of armed narcotics

24   trafficking going on.

25            And then most recently I'm on a task force called

1    CVRP, which stands for Comprehensive Violence Reduction

2    Partnership, and that's a task force that is comprised

3    of the Detroit Police Department.  The Michigan

4    Department of Corrections, we have a couple parole

5    officers that are assigned with us.  The state police

6    does have a person that's assigned with us, and ATF.

7    And that's the task force I'm currently on.

8        Q.   Have you ever taught any classes or trainings

9    regarding gang investigations or undercover operations?

10       A.   Yes.  I currently teach at our ATF national

11   academy in Glenco, Georgia.  I teach gang

12   investigations, RICO enterprise organizations.  I

13   actually wrote the PowerPoint to teach the students at

14   the academy.

15            I've also taught gang investigations for the

16   DEA task force officers, and I also have taught several

17   other gang classes for different law enforcement

18   personnel.

19       Q.   In addition to those classes that you've done for

20   gang investigations, what about undercover or

21   confidential informants?

22       A.   Yes.  I have also taught at the ATF national

23   academy on confidential informants, the use of them, how

24   to use them in investigations.

25            I've also helped conduct training for our

1    advanced undercover school that's conducted typically at

2    our ATF national academy in Glenco, Georgia.

3           I've also done undercover classes for Homeland

4    Security investigations and some other local police

5    departments.

6    Q.   Now, you mentioned that you've been here in

7    Detroit since 2001?

8    A.   Yes.

9    Q.   And is it fair to say that the bulk of your work

10   has been in the Detroit area?

11   A.   Yes.

12   Q.   I believe you mentioned your current specialty or

13   your current focus is gang investigations?

14   A.   Yes, that's correct.

15   Q.   Was there a point in your tenure with the ATF

16   that you transitioned from I believe the robbery crews

17   and narcotics to more of a gang focus?

18   A.   Yes.  I would say approximately 2009 is when I

19   kind of transitioned from doing armed narcotics

20   traffickers and robbery crews to focusing more heavily

21   on gang investigations.

22   Q.   Why?

23   A.   I noticed from investigating the gangs that --

24               MR. NISKAR: Objection, Your Honor.

25   Relevance.

1               THE COURT:  How is it relevant?

2               MR. CRALLE:  Well, Your Honor, I'm going to

3    get to the background of how he came to investigate the

4    Rollin 60s --

5               THE COURT:  You can go straight there.

6               MR. CRALLE:  Okay, that's fine.

7    BY MR. CRALLE, CONTINUING:

8        Q.  In the course of your investigation or at some

9    point in your career did you begin investigating a gang

10   on the west side of Detroit known as the Bounty Hunter

11   Bloods?

12       A.  Yes, I did.

13       Q.  And when was that?

14       A.  I first learned of the Bounty Hunter Bloods back

15   in 2008, and that's when I started investigating the

16   Bounty Hunter Bloods.

17              I didn't know anything about street gangs at that

18   point, didn't really know how they operated, but that

19   was the first time I actually met a gang member that was

20   a member of the Bounty Hunter Bloods, and he sat down

21   with me and actually told me how the gang operated.

22              He told me about the membership, what areas they

23   were in.  That's when I started to learn about the other

24   different gangs that were also operating in Detroit.

25              And specifically, I was still focused in

1    Northwest Detroit, so most of the gangs I was learning

2    about were directly in that area of Detroit.

3         Q.   And was it during that period that you

4    transitioned into more of a gang investigation?

5         A.   Yes.

6         Q.   Before we start talking about the Rollin 60s, I'd

7    like to focus on some of the tools you use to

8    investigate street gangs.

9              What are some of the common ways that -- or the

10   common methods you use to investigate a street gang?

11        A.   Surveillance is one way to do the investigations.

12        Q.   And what do you mean by that?

13        A.   Basically trying to find out where these

14   individuals live.  So we'll go out in vehicles, maybe

15   just myself or other team members, go to particular

16   addresses that we believe they are living at, and we

17   will sit out there and hope to see the gang member

18   there, see if there's any type of trafficking that's

19   happening out there, the comings and goings of people.

20   So surveillance is one way that I do that.

21             Another way is, you know, if there's multiple

22   locations at the same time that we have to keep our eyes

23   on, we may use pole cameras where we will actually set

24   up fixed cameras in areas out in public streets that are

25   actually focusing on particular addresses, so we can

1   from our computer sometimes just see what is going on.

2   And that's twofold.  I mean it would be because we have

3   multiple locations to look at and sometimes the houses

4   could be on streets where everybody knows everybody and

5   you have trouble sitting and doing surveillance on that

6   location, so it's just easier to not actually be there

7   when you're doing the surveillance.

8            In the past, I've set up a store front in

9   the City of Detroit where I actually owned a business so

10  I could get gang members to come in and out of there and

11  socialize with them so they would think I'm actually a

12  member of the community.  So that was one of the ways

13  I've done that.

14           I've also done multiple search warrants on

15  social media accounts where you can actually see the

16  messaging back and forth between the gang members.  Not

17  just the messagings that are on the wall that everybody

18  that's their friend can see, but actually the messages

19  that are privately exchanged between the members.  So

20  social media search warrants would be another way to

21  investigate.

22           At times I have done undercover where I've

23  been introduced to members of the gang so I could

24  actually purchase firearms or narcotics.

25           And those are all different ways that I've

1   been able to investigate.  And obviously those different

2   methods would lead to actual search warrants at people's

3   residences.

4       Q.  Have you ever used cooperating witnesses in your

5   investigations?

6       A.  Yes.

7       Q.  What is a -- well, first, how many investigations

8   have you used a cooperating witness?

9       A.  I would say the majority of my proactive

10  investigations we would use cooperating witnesses.

11      Q.  Now, what is a cooperating witness?

12      A.  A cooperating witness is a person that typically

13  is a member of whatever criminal organization we're

14  actually investigating.  So it would be a person that

15  has intimate knowledge of the -- of what the people are

16  doing that we're trying to investigate.

17          Sometimes it would be somebody who has been

18  arrested and has a case that they -- and that's the way

19  we meet them, or other times it's somebody who just,

20  like in the Bounty Hunter gang, for instance, that

21  person who I met who was a cooperating witness that

22  ended up turning into a confidential informant, we did

23  not have a case on him, but he just wanted to get out of

24  the gang, so he agreed to be a cooperating witness with

25  us to actually help us dismantle the organization.

1      Q.   Why do you use cooperating witnesses?

2      A.   Cooperating witness, because they have intimate

3   knowledge of the gang, they can actually teach you about

4   the gang, they can actually teach you how the gang

5   operates, what crimes they're involved in, where certain

6   persons live, their territory.  They can at times make

7   introductions to actually purchase evidence to prove

8   what they're saying is actually true.

9           A Cooperating witness, the reason for using

10   them is they would be able to provide you with

11   information that typically a law enforcement officer

12   would not be able to gain.

13           Without the help of cooperating witnesses,

14   it would be very hard for us to do our job.

15      Q.   So they can get more inside an organization and

16   provide real-time intelligence?

17      A.   Absolutely.  And then if we see things, for

18   instance, on social media, they can actually verify

19   whether or not it's accurate.  If we see things on text

20   messaging or have other information, they're the ones

21   that can actually say, you know, it's not just written,

22   that's not just a text message or written down, it's

23   something that actually happened or that is something

24   that actually happened, so they can help corroborate the

25   other information we may have.

1    Q.  So they can help determine what's puffery and

2   what's not?

3    A.  Absolutely.

4    Q.  Walk us through the process of how someone

5   becomes a cooperating witness.  And as a backdrop, were

6   there cooperating witnesses used in this case?

7    A.  Yes.

8    Q.  So walk us through that process, generally

9   speaking, if a person becomes a cooperating witness.

10    A.  Well, for instance in this case, I'll use that as

11   an example, we did arrest two individuals that we found

12   in possession of firearms.  We sat down with them,

13   interviewed them under Miranda.  They gave us

14   statements.  One may have -- both of them gave us

15   statements under Miranda.  They were then charged or

16   arrested, brought before a magistrate.

17          They received -- they ended up getting

18   attorneys, and at some point we were able to sit down

19   with them and they were able to lay out the organization

20   of the gang further.  And then their attorneys and the

21   people we arrested actually agreed at that point that

22   they would help us further our investigation by

23   providing us with additional information regarding

24   members, what the gang is all about, and things of that

25   sort.

```
1                    So at that point --
2       Q.   Let me break up a second there.
3            Once a person has been arrested or once they're
4       starting to go down that road of becoming a cooperating
5       witness, are they essentially signed up or is there some
6       sort of process where they come under the fold?
7       A.   Not at the initial point, but after you can
8       verify some of the information they're giving you and
9       their attorneys agree to it, at that point -- and after
10      you verified some information, you could then start the
11      paperwork process.
12           And within ATF, we have a process of a form where
13      we actually have to make sure they understand they're
14      not going to become a law enforcement officer, they're
15      not allowed to commit crimes, they're not allowed to do
16      anything without the knowledge of ATF, particularly in
17      this case, I would be the controlling officer, the one
18      that they kept in contact with.
19           So everything that they would do at that point, I
20      would have to have firsthand knowledge of.  If they were
21      to go wear a recording device, to go meet with an
22      individual, I would be the one that would be providing
23      them with that.
24      Q.   So essentially once they've been signed up,
25      effectively, that's an agreement to let them know what
```

1   they can and cannot do?

2       A.   Correct.

3           They also are aware on this form that they're not

4   allowed to entrap individuals, They're not allowed to be

5   with individuals if they're meeting with their

6   attorneys, that they're not allowed to lie.

7           There's several different things that we have to

8   tell them and they have to sign so they understand that

9   everything has to be on the up-and-up and we have to

10  know about everything and everything that they do is

11  based on us asking them to do that.

12      Q.   Do you attempt to corroborate information that

13  cooperating witnesses provide to you?

14      A.   Yes.

15      Q.   How do you do that?

16      A.   One of the ways we did that on this case is we

17  had information about a robbery that took place, so I

18  actually provided a recording device to this cooperating

19  witness and had him go meet with the individual and

20  record a conversation where they were talking about the

21  robbery.  So that was one way I was able to corroborate

22  some of the information.

23          Other ways they told us about other

24  instances that happened.  One was a fire bombing.  Once

25  we got the address to that location, we were able to run

1    police reports and determine that this actually

2    happened.  The information they provided was kind of

3    consistent with the police report, and that's how --

4    those are the ways that we would corroborate information

5    that is given to us.

6       Q.  Is there anything that you do to try to help

7    maintain the safety of these cooperating witnesses?

8       A.  Yes.  A cooperating witness would, after we read

9    all that paperwork and they go through the process, we

10   would then assign them a number.  And that would be so

11   we could actually, when we're waiting reports, we can

12   put that number in the report instead of using their

13   actual name.  So it is a way that we can prevent

14   individuals, once discovery comes out and everybody's

15   reading the police reports, it's a way that somebody may

16   not automatically know who that person is, and it's one

17   of the major ways we protect somebody's safety.

18        I mean if it's found out that they are in

19   jeopardy, and I've had this happen several times, we

20   would do a threat assessment on the individual, and if

21   we have to move them or their family, that is something

22   we would do.

23      Q.  Are cooperating witnesses ever paid?  Do they

24   ever receive money from ATF?

25      A.  Yes.

1    Q.  For what?

2    A.  Well, in, like for instance in this case, once we

3  sign them up and get them a number, it gives us the

4  ability to actually be able to pay them.

5        One of those reasons and the major reason for me

6  actually paying cooperators in this instance would be I

7  typically work 9 to 5, so I need the cooperators to be

8  available 9 to 5 when I'm investigating.  There are

9  times where it causes late hours and weekends to work,

10  but if these cooperators go out and get normal jobs

11  working 9 to 5 where I can never get in contact with

12  them, then that's going to be a problem when I need them

13  to actually do things to help in the investigation.

14        So I try to provide them with money to help

15  sustain them so they can actually continue to live, and

16  that would be the major factor on why I would pay them.

17    Q.  How are they paid, money?

18    A.  It's just cash.  Yes, US currency.

19    Q.  But you keep track of it?

20    A.  Yes, I do.  They have to sign a receipt that said

21  they received this money.

22    Q.  And are there limitations on how the money can be

23  used?

24    A.  On how it can be used?  If we provide them with

25  subsistence, they're allowed to use that money, I guess,

1   any legal way they determine.

2       Q.   So this is fairly routine is what it sounds like?

3       A.   Yes.

4       Q.   Now, we've talked about cooperating witnesses.

5   Is there a distinction between cooperating witness and a

6   cooperating defendant?

7       A.   Yes.  A Cooperating defendant, which we have

8   several in this case, is an individual that actually is

9   arrested, is facing charges, we sat down with their

10  attorney to discuss what they know about the gang, just

11  like a cooperating witness, but there's a determination

12  made that they will not be an informant and they will

13  not go out and do purchases or things of that sort.  So

14  it's somebody who's just providing information.

15          And one of the reasons I would have a cooperating

16  defendant as opposed to a cooperating witness would be

17  if the person has already been charged and people are

18  starting to cooperate, it would be almost -- you would

19  have to assume that if I sent them out there trying to

20  make recordings or make buys when they have -- when it's

21  known to the entire gang that they have a federal

22  indictment hanging over their head, especially with a

23  charge like this, which is RICO, that it would be

24  unusual for them to go out and do those things, so I

25  believe I would be putting them in jeopardy.

1          So at that point I would just take the

2    information they're providing me, even if it's just

3    historical information, and try to track down crimes

4    that have happened based on that.

5        Q.  So it sounds like the main distinction is a

6    cooperating defendant is providing historical

7    information?

8        A.  Correct.

9        Q.  And a cooperating witness could provide

10   historical or future information?

11       A.  Correct, because cooperating witnesses in this

12   case, the two I mentioned, ended up becoming cooperating

13   or confidential informants, and they were still at a

14   point where they could go out and meet with individuals

15   and they were on bond and it was a -- they were arrested

16   for felon in possession so it wasn't as serious of a

17   case since members of the gang were getting arrested all

18   the time.

19       Q.  Now, we talked it's about in approximately 2008

20   you were investigating a group known as the Bounty

21   Hunter Bloods.

22       A.  Correct.

23       Q.  And that was a street gang of some sort?

24       A.  Yes.  It was a Bloods street gang that originated

25   from California, specifically Los Angeles.

1    Q.   But there was a set here in Detroit?

2    A.   That's correct.

3    Q.   And in the course of your investigation of the

4  Bounty Hunter Bloods, did you also become aware of

5  another group here in Detroit known as the Rollin 60s

6  Crips?

7    A.   Yes.  During that investigation, I did notice

8  that the Bounty Hunter Bloods, even though typically

9  Bloods and Crips don't get along, the Bounty Hunter

10 Bloods created an alliance with the Rollin 60s Crips to

11 where they would actually be aligned together instead of

12 having a, I guess, conflict between the two.

13   Q.   Nationally Bloods and Crips are rivals?

14   A.   Correct.

15   Q.   But you're saying here in Detroit at least this

16 group of Crips and this group of Bloods had an alliance?

17   A.   Correct.  The Bounty Hunter Bloods and the Rollin

18 60s Crips are both gangs that originate in Los Angeles,

19 California, and in California, these gangs would not be

20 in an alliance, but here in Detroit, they are actually

21 in an alliance.

22   Q.   Now, you mentioned that you became aware of this

23 through your investigation with the Bounty Hunter

24 Bloods.

25        Specifically was that through talking with

1    people, was that through social media?  How did you

2    learn of the Crips?

3        A.  There was multiple different ways.  The

4    individual that was a member of the gang that I first

5    met that was a Bounty Hunter Blood, he was somebody who

6    told me about this alliance.  So that was the first I

7    actually heard about it.

8            Once I started investigating the gang further,

9    actually -- through actual surveillance, I learned that

10   the Bounty Hunter leader, Romaia Jefferson, actually

11   lived at one point with the main leader of the Rollin

12   60s Crips, Jerome Hamilton, on a street called Lenore.

13           I also learned through social media postings

14   where they were talking back and forth with each other

15   that they definitely worked together and were in an

16   alliance.

17       Q.  Was there a name for this alliance?

18       A.  Yes, it was called the 7654.

19       Q.  Now, at some point did you shift your focus from

20   the Bounty Hunters to the Rollin 60s?

21       A.  Yes.

22       Q.  About when did you start that?

23       A.  Once I started getting towards the end of the

24   Bounty Hunter investigation, I was putting all of my

25   time into that, I started to have -- once we were

1    waiting for the time to start the indictments and

2    getting to that point, I got a little freed up to start

3    looking into other investigations so it made sense,

4    based on the contact between the Bounty Hunters and the

5    Rollin 60s and the fact that they were working together

6    that I started focusing on the Rollin 60s.  And that was

7    primarily -- that was in the beginning, maybe springtime

8    of 2013.

9        Q.  Now, in the beginning of your investigation, did

10   you speak with a confidential informant about the Rollin

11   60s?

12       A.  Yes.  I was in California and did meet with an OG

13   at the time.  The older members went by Original

14   Gangsters.

15       Q.  Let's break that down in case other people aren't

16   familiar.

17           When you say the term "OG," what does it mean?

18       A.  It means original gangster.

19       Q.  So you met with an OG in California?

20       A.  Yes, who was a verified member of the Rollin 60s

21   Crips, one of the original members.

22       Q.  Was this in a -- what sort of capacity was this

23   person providing this information to you?

24       A.  He was a confidential informant at that point.

25       Q.  So we've talked about a cooperating witness and

1    we've talked about a cooperating defendant.  We haven't

2    talked about confidential informants.

3          Briefly, what is the distinction between a CI, if

4    you will, versus those cooperators?

5    A.   Well, the confidential informant, and we touched

6    on it a little bit because the confidential witnesses

7    are turned into confidential informants.  This

8    individual it was basically the same way.  I learned

9    that he was an original member of the Rollin 60s Crips.

10   He had been caught and arrested and convicted of doing a

11   bank robbery with members of the Rollin 60s.  And after

12   he got out of prison, he then decided to work for law

13   enforcement.

14         He did provide information to law enforcement at

15   the time of his arrest to, I guess, make sure he didn't

16   go to prison as long as he would have went to prison

17   for.  So then he once he got out, he decided to work for

18   law enforcement.

19   Q.   And so as a CI, or a confidential informant, he

20   provided information but would not be called upon to

21   testify?

22   A.   He provided information and he did testify -- as

23   a confidential informant, correct.  Typically you would

24   hope that they would have to be called to testify.  In

25   his original case, it was my -- it was told to me that

1  he did testify, and at that point he was a cooperating

2  defendant.

3      Q.  But in the capacity that you spoke with him, it

4  was simply to provide background information?

5      A.  Correct.

6      Q.  Now, this confidential informant, you simply know

7  him by a number; is that right?

8      A.  Yes, he just had a number.

9      Q.  And what sort of information did that individual

10  provide to you?

11      A.  He provided me -- he provided background

12  information.

13              MR. NISKAR:  Your Honor, I'm going to

14  object.  I think it's hearsay.  It's not part of

15  801(d)(2)(e), and I'd object based upon relevance to

16  whatever this other person told him.

17              MR. CRALLE:  Your Honor, I can provide

18  additional foundation if you would like, but this

19  provides the backdrop to the next area we're going to

20  talk about as to what he knows what to look for in the

21  course of his investigation.

22              MR. NISKAR:  It's for the truth of the

23  matter asserted then and it's hearsay.

24              THE COURT:  Sounds like it, Counsel.  He can

25  tell us what he did as a result of that.

1          MR. CRALLE:  That's fine, Your Honor.

2     BY MR. CRALLE, CONTINUING:

3     Q.   Based on the information that you obtained from

4     this CI or this confidential informant in California,

5     you did come back to Detroit to look for things such as

6     gang tags and certain colors and other things of that

7     nature?

8     A.   Yes.  Based on that conversation I had with the

9     confidential informant, that was a, I guess, a former

10    member of the Rollin 60s Crips, based on that

11    information I got, I knew how the Rollin 60s operated,

12    what their colors were, what their gang initiations

13    were, how they protected their territory and knew about

14    different lines, so I knew about meetings.

15         I had learned about several different things

16    related to the Rollin 60s Crips that made me decide to

17    actually investigate the Rollin 60s here in Detroit.

18    Q.   So in your investigation of the Rollin 60s Crips

19    here back in 2013, were you able to identify a

20    discernible territory for the organization?

21    A.   Yes.

22    Q.   And how did you go about doing that?

23    A.   At that time I actually drove around looking for

24    gang graffiti, looking for also known as tags to kind of

25    figure out where the territory was.

1          I also did Facebook search warrants on
2     individuals that I had identified.  And in some of those
3     Facebook search warrants, it indicated where the
4     territory was, which also helped me figure out where to
5     drive and where to possibly find the gang graffiti.
6               MR. CRALLE:  Your Honor, may I approach?
7               THE COURT:  Yes, you may.
8     Q.  Agent Nether, you've just been handed an item
9     marked proposed Government's Exhibit 1.  Do you
10    recognize this item?
11    A.  Yes, I do.
12    Q.  What is it?
13    A.  It's a map near Seven Mile and the Lodge area,
14    Seven Mile and Tracy where their main territory for the
15    Rollin 60s would be.  So this is a map with a red line
16    basically encompassing their main territory.
17    Q.  And you recognize this as a part of Detroit and
18    you recognize this as part of the Rollin 60s' territory?
19    A.  Yes, this is on the west side of Detroit.  And I
20    do recognize this as the main hub, so to speak, for the
21    Rollin 60s Crips' territory.
22              MR. CRALLE:  Your Honor, I move to admit
23    Government's Exhibit 1.
24              MR. NISKAR:  No objection.
25              MR. BERGER:  No objection.

```
1                  THE COURT:  It's admitted as Exhibit 1.

2                  MR. CRALLE:  Your Honor, I would like to

3    publish Government's Exhibit 1, but I believe the TVs

4    might be off.

5                  THE COURT:  I'm going to let the jury step

6    down while we fix the technical difficulties.

7                  (Whereupon the Court was in recess at 2:55

8    p.m.)

9                  * * * * * * * * * * * * *

10                 (Whereupon the Court was back in session at

11   3:07 p.m.)

12                 THE COURT:  Are you satisfied the Jury is

13   present and properly seated?

14                 MR. CRALLE:  Yes, Your Honor.

15                 MR. NISKAR:  Yes, Your Honor.

16                 MR. BERGER:  Yes, Your Honor.

17                 THE COURT:  You're still under oath, sir.

18                 THE WITNESS:  Yes, Your Honor.

19   BY MR. CRALLE, CONTINUING:

20      Q.  Agent Nether, before the break, I believe we were

21   talking about Government's Exhibit 1.

22              Now that this is on the screen, can you describe

23   what this is, please?

24      A.  This is a map on the west side of Detroit showing

25   the main territory, main identified territory of the
```

1    Rollin 60s Crips.

2      Q.   And for those of us that may not be familiar with

3    the City of Detroit, can you give us a perspective as

4    far as where this is?

5      A.   The main territory happens to be just east of the

6    Lodge Freeway off of Seven Mile, and you will see where

7    it says John C. Luger Park, which they actually call it

8    Tracy Park because it's off of Tracy right off of Seven

9    Mile.

10     Q.   The boundaries here, they're marked in red; is

11   that right?

12     A.   Yes, that's correct.

13     Q.   What's the top street?

14     A.   The top street is Seven Mile.

15     Q.   That's Seven Mile.  What's the far right line?

16     A.   The far right line is Wyoming.

17     Q.   And the bottom?

18     A.   The bottom would be the Lodge Freeway -- not the

19   bottom.  That would be Six Mile or McNichols.

20     Q.   And then on the left?

21     A.   The left would be John C. Lodge Freeway.

22     Q.   Now, was this the exclusive territory of the

23   Rollin 60s, and by that I mean did they operate only in

24   this area?

25     A.   No.

1    Q.   Did they operate elsewhere within in the City?

2    A.   Yes.

3    Q.   But was this the core area?

4    A.   Yes, this was the main area.

5    Q.   Now, how did you go about identifying this area

6    depicted in the map in Exhibit 1 as the territory of the

7    Rollin 60s in Detroit?

8    A.   Per the social media search warrants that I did,

9    I was able to -- some of the members were stating where

10   the territory was, so I utilized that area to kind of

11   help me when I was driving around looking for gang

12   graffiti.  I did that without the social media search

13   warrants as well, but that did help me as well because

14   there were several different times that I actually drove

15   out looking for the gang graffiti.

16        So between just driving around and using the

17   social media to help identify the territory, that is how

18   I figured out where their main hub or main territory

19   was.

20   Q.   Now, let's focus on this area here (indicating).

21   You've alluded to this a number of times.

22        At some point did you drive around the perimeter

23   of this territory and look for any gang graffiti related

24   to the Rollin 60s?

25   A.   Yes, I did, a couple different times.

1          MR. CRALLE:  Your Honor, may I approach?

2          THE COURT:  You may.

3   BY MR. CRALLE, CONTINUING:

4     Q.  Agent Nether, I've handed you what's been marked

5   as Government's proposed Exhibit 7 through 7-F.  Please

6   flip through those and let me know when you're done.

7     A.  Yes, I recognize them.

8     Q.  And we'll talk about the specific contents of

9   each one in a moment, but what do you recognize these

10  items as?

11    A.  These are photographs of Rollin 60s gang graffiti

12  that I took photographs of.

13    Q.  These are actual pictures that you took?

14    A.  Yes.

15    Q.  And approximately when did you take them?

16    A.  I would say May, June, August, October of 2013.

17    Q.  And do those pictures fairly and accurately

18  depict the gang graffiti as you can recall from back in

19  May through October of 2013?

20    A.  Yes.

21         MR. CRALLE:  Your Honor, at this time the

22  Government would move to admit Government's Exhibit 7

23  through 7-F.

24         THE COURT:  Any objection?

25         MR. NISKAR:  No objection.

```
 1              MR. BERGER:  No objection.
 2              THE COURT:  Mine starts with B.  Is that
 3   right?
 4              MR. CRALLE:  It is not, but I will get 7 for
 5   you.
 6              THE COURT:  Maybe I have another page stuck
 7   to it.
 8              MR. NISKAR:  I have no objection to 7
 9   through 7-F.
10              THE COURT:  What about you, Mr. Berger?
11              MR. BERGER:  The same, Your Honor.
12              THE COURT:  Very well, they're admitted.
13              MR. CRALLE:  Thank you.
14   BY MR. CRALLE, CONTINUING:
15    Q.  If you can pull up Exhibit 7.
16              Agent Nether, you took this picture of
17   Exhibit 7?
18    A.  Yes, I did.
19    Q.  What is this a picture of?
20    A.  This is on Lindsey Street and Seven Mile.
21    Q.  Lindsey Street and Seven Mile, again in Detroit?
22    A.  Yes, in Detroit.
23    Q.  And you said this is graffiti related to the
24   Rollin 60s?
25    A.  Yes.
```

1    Q.  How?

2    A.  Where it says "Free Staccs," "Staccs" was the

3    leader of the Rollin 60s, Jerome Hamilton.  So based on

4    the fact that it says "Free Staccs," I believed that to

5    be Rollin 60s graffiti.  Not to mention on the

6    right-hand side it says, "RSC," which stands for Rollin

7    60s Crips.

8         So based on that, these were Rollin 60s Crips'

9    gang graffiti.

10    Q.  Based on your investigation and well as the

11    information you obtained from the confidential informant

12    in California, did you learn that RSC is a common

13    shorthand for Rollin 60s Crips?

14    A.  Yes, I did.

15    Q.  And based on your investigations in gangs over

16    your 16-year career, is it common to see "free" before

17    someone's name where someone's been incarcerated?

18    A.  It's very common.  Every time individuals in

19    gangs get locked up, I've always seen the other members

20    posting things or putting up gang graffiti or wearing

21    shirts that say free that individual.

22         So "free Staccs" would be typical of every gang

23    that I've investigated or have knowledge of.

24    Q.  Turn to Exhibit 7-A, please.

25         Agent Nether, you also took this picture of

1    Exhibit 7-A?

2        A.   Yes, I did.

3        Q.   Where did you take this picture?

4        A.   That was at Strathmore and Seven Mile in Detroit.

5        Q.   And this was in 2013?

6        A.   Yes.

7        Q.   And what led you to conclude this was related to

8    the Rollin 60s Crips?

9        A.   Based on the six-zero with the dollar sign, 60s,

10   I also learned from meeting with the confidential

11   informant in L.A., as well as some of the things I saw

12   on social media, that 60s was related to Rollin 60s

13   Crips, and not to mention the "S" is actually a dollar

14   sign which related to the Rollin 60s as well.

15        A lot of the time when they have an "S" they will

16   have it as a dollar sign because one of their slogans is

17   Rich Rollin.

18             And then I also noticed the words "B" which

19   it has an X through it, because, you know, Crips don't

20   use the word "B."  So it says "BK" and then there's an

21   "M," which I knew what "BK" and "M" stood for based on

22   social media and speaking with other individuals in the

23   gang.

24        Q.   That's affiliated with the gang as well?

25        A.   Correct.

1      Q.  Turn to Exhibit 7-B, please.

2          Agent Nether, you also took this picture?

3      A.  Yes.

4      Q.  And where did you take it?

5      A.  I took this at Stahelin and Seven Mile.

6      Q.  And what led you to conclude that this was

7   related to the Rollin 60s Crips?

8      A.  Well, in the top left corner, it has "BK" again,

9   which Crips typically put a "K" after the "B," and

10   there's also an X through the B.  So that made me

11   believed it was Crips related.

12          Then there's the "RSC" and the "S" has the dollar

13   sign through it.

14          Then there's also "Crips 60s," and as I stated,

15   the 60s would be related to Rollin 60s.

16          And then below it says "Vicious," and in spelling

17   the word "Vicious," it has six-zero utilized to spell

18   the word "Vicious," and the "S" on the far right also

19   has a dollar sign, and "Vicious" is one of the members

20   of the Rollin 60s Crips.

21      Q.  So you came to know that "Vicious" was a member

22   of the Rollin 60s here in Detroit?

23      A.  Yes.

24      Q.  Did you also learn that "BK" was a Rollin 60s

25   Crip?

1    A.   There was a Rolling 60s that went by "BK," yes.

2    Q.   Agent Nether, I notice in this picture the

3    graffiti itself is in blue.  Is that significant in any

4    way?

5    A.   Yes.  One of the colors for the Crips and Rollin

6    60s is blue.

7    Q.   But I also notice that it is effectively crossed

8    out, if you will, in red.  Is there any sort of

9    significance with that?

10   A.   Yes.  This would show that their -- red is a

11   color for the Bloods gang.  So looking at this gang

12   graffiti and showing that red is crossing out "60s" or

13   putting lines through things that are Crip related, is

14   showing that a member of the Bloods would have crossed

15   that out because there would be another gang possibly in

16   this same area.  So they're trying to have a struggle

17   for whoever is owning this territory right here.

18   Q.   Before turning to the other exhibits, you touched

19   on something here.

20        Are gang graffiti used to delimit one area of

21   territory between two organizations?

22   A.   Yes.

23   Q.   And where there is maybe not a clear demarcation

24   between those areas, between those groups, is it common

25   to see this sort of crossing out?

1    A.   Yes, because actually where this tag, this gang

2    graffiti was actually at, Seven Mile and Stahelin, is

3    actually also the main territory for a Bloods gang in

4    Detroit as well.

5         So a lot of the times I noticed when I was

6    investigating this gang as well as the other gang, the

7    Bounty Hunters, and some of the other gangs that I've

8    done, when the territories meeting up against each other

9    that's typically where you would see different gangs

10   crossing out the other gang's graffiti.

11   Q.   And, in fact, if you look at the 20s on the

12   left-hand side of the screen, was that crossed out with

13   blue?

14   A.   Yes.  If you notice all the way to the left, it

15   says "Rollin 20s" and it's both in black spray paint,

16   which would make me believe it does say "Rollin 20s"

17   together, and that's actually crossed out by the blue

18   spray paint which seems to be the same blue spray paint

19   as the Rollin 60s Crips.

20   Q.   If we can turn to Exhibit 7-C, please.

21        And again, this picture, you took this?

22   A.   Yes.

23   Q.   Where?

24   A.   I believe this building was 15011 Wyoming, and

25   this is where this tag was, this gang graffiti was.

1    Q.  Is this in the City of Detroit?

2    A.  Yes, it is.

3    Q.  On the northwest side?

4    A.  Yes.

5    Q.  And what led you to conclude that this was also

6    related to the Rollin 60s Crips?

7    A.  I noticed that a lot of the members of the Rollin

8    60s would say 20-20.  There was even a video that I saw

9    where one of the members, William Steele, actually said

10   "20-20 money gang."

11        So based on the fact that this says 20-20 and it

12   says Seven Mile, which is the territory for the Rollin

13   60s, I concluded that this was Rollin 60s related.

14   Q.  And on the right-hand side of this graffiti, are

15   there a number of six-zero, six-zero, six-zero?

16   A.  Yes.

17   Q.  Does that also go to your conclusion?

18   A.  Yes.  I mean the 60 would be related to Rollin

19   60s so it also was a possibility that that was saying,

20   like you said, six-zero, six-zero, six-zero.

21   Q.  And on the left-hand side again we see, I believe

22   it says "NFL Linwood"; is that correct?

23   A.  Correct.  I've heard of NFL.  I cannot at this

24   point remember what NFL stands for, but it is a clique,

25   not particularly an actual street gang, per se, a

1   traditional street gang that has connections out of

2   state, but NFL did belong to another crew of

3   individuals.

4       Q.   And again crossed out with the blue?

5       A.   Correct.

6       Q.   If we can turn to Exhibit 7-D, please.

7            Agent Nether, did you take this picture?

8       A.   Yes, I did.

9       Q.   Where?

10      A.   This was on Vaughn Street and Seven Mile, on the

11  south side of the -- south side of Seven Mile.

12      Q.   And what led you to conclude that this was

13  related to the Rollin 60s Crips?

14      A.   Based on at the top it says "60s," which I said

15  is related to the Rollin 60s, and then there is a "Rich

16  Rollin" directly underneath it, which is one of the

17  slogans of the Rollin 60s.

18           And to the left, it says in black ink, it says --

19  you'll notice that it says "Rocket" and it's actually

20  crossed out in blue, and then "Rocket" is in black, but

21  underneath it it says "Tre Killers."

22      Q.   When you say "Tre killers," you're talking about

23  the "TR 33" on the left?

24      A.   Yes.  The 33 is related to the 33rd Playboy

25  Gangster Crips and "Rocket" is a member of the Playboy

1    Gangster Crips.

2         So the Playboy Gangster Crips in California, all

3    gangster Crips are enemies of neighborhood Crips, and

4    Rollin 60s are neighborhood Crips.

5    Q.  Let me break that down a second.

6         So it's not that a Crip is a Crip is a Crip?

7    A.  Correct.

8    Q.  So it's not so easy as Bloods don't like Crips?

9    A.  Correct.

10   Q.  It's also that Bloods don't like Crips and some

11   Crips don't like other Crips?

12   A.  Correct.

13   Q.  So in this context, the Playboy Gangster Crips

14   are rivals with the Rollin 60s Crips; is that correct?

15   A.  Correct.  They are rivals in California, and

16   based on the rivalry in California, the fact that

17   they're enemies in California, that rivalry pays itself

18   out here in Detroit as well.

19   Q.  Because they're rivals in California, they have

20   to be rivals here?

21   A.  Correct.

22   Q.  I'm sorry, you were explaining the TR 33 and what

23   that means.

24   A.  So because it says "Tre killers," Playboy

25   Gangster Crips are also unknown as Tres, and that's

1    because the 33 stands for 33rd, which is associated with

2    a street in California where the Playboy Gangster Crips

3    are from.

4         So that is why the blue spray paint would say Tre

5    Killers as in they would kill the Playboy Gangster

6    Crips.

7              Underneath that it says "N-hood," which is

8    just short for neighborhood, and you would notice that

9    instead of the two "0s" they have six-zero to spell out

10   hood so that would be neighborhood.

11             And you'll also notice that there is a "K"

12   after the "H" and a "K" after the "D," and that would be

13   because those can be related to other gangs.

14   Q.   And then beginning on the right, is that the word

15   "Vicious"?

16   A.   Right.  On the right again I see the word

17   "Vicious" spelled the same way it was on the other gang

18   graffiti with a six-zero helping to spell out the word

19   "Vicious" with the "S" having a dollar sign.

20             And then above that, I actually see tears,

21   "T," "III" backwards, "VBZ," which actually spells

22   "tears," which is also a member of the Rollin 60s Crips,

23   that's an incarcerated member.

24             And then to the left of that, you'll see

25   that there's something else that says "33rd" or "33."

1   The stuff in black ink is related to the Playboy

2   Gangster Crips, and that says "33" again which would be

3   related to the Playboy Gangster Crips.

4       Q.   Let's turn to Exhibit 7-E.

5            Agent Nether, did you take this picture as well?

6       A.   Yes, I did.

7       Q.   Where did you take this picture?

8       A.   I'm having trouble remembering exactly where I

9   took this picture.

10           Do you mind if I refer to my report?

11      Q.   Not at all.

12           And just to provide some context, Agent Nether,

13  when you would take these pictures when you were out

14  surveilling and looking at the graffiti, would you write

15  reports afterwards?

16      A.   Yes, I would, which would have the location

17  because I took probably a hundred photos so it would be

18  hard to remember where the photo was taken.

19      Q.   Just generally speaking, what's the purpose of

20  writing a report like that?

21      A.   To refresh my memory down the line so I could

22  remember where I took the photograph.

23               MR. CRALLE:  Your Honor, may I approach?

24               THE COURT:  You may.

25  BY MR. CRALLE, CONTINUING:

1    Q.   Without reading from the report, does that report

2    refresh your memory?

3    A.   Yes, it does.

4    Q.   Where did you take this picture?

5    A.   At Margarita and Schaefer in the City of Detroit.

6    Q.   And for those of us not familiar with the City of

7    Detroit, where would that be?

8    A.   Still on the west side of Detroit.  It would

9    still be close to the territory of the Rollin 60s Crips.

10   Q.   And what led you to conclude that this graffiti

11   was related to the Rollin 60s Crips?

12   A.   Based on the fact that it says "RSC," the "S"

13   seems to be in a dollar sign even though it only has one

14   line through it, and then it says "60s," that would tend

15   to make me believe this was Rollin 60s related Crips.

16   Q.   In this picture it looks like the blue "RSC 60s"

17   has been crossed out by a lot of red writing.

18   A.   Correct.

19   Q.   And again, is that an indicator of the two rival

20   groups?

21   A.   Yes.  I mean the red ink would be more Blood

22   related and, you know, Schaefer would be towards the end

23   of territory for Rollin 60s Crips.  So it wouldn't be

24   unusual that this would be the area, just like I said,

25   Seven Mile and Stahelin, that there would be an issue

1    and possibly other gangs trying to cross out the Rollin

2    60s territory, or Rollin 60s' gang graffiti is what I

3    should have said.

4        Q.  Can we have 7-F, please.

5            Agent Nether, did you take this picture as

6    well?

7        A.  Yes.

8        Q.  And what led you to conclude this was Rollin 60s

9    Crips related?

10       A.  Based on the fact that it says "Rollin 60s Crips"

11   and the fact that "C Nice," it says "RIP C Nice," was a

12   deceased member in the gang, and the fact that it's in

13   blue and the way it's written all made me believe it was

14   Rollin 60s Crips gang graffiti.

15       Q.  In other words, this was a memorial, if you will,

16   to a deceased Rollin 60s named "C Nice"?

17       A.  Correct.

18       Q.  Agent Nether, and I believe you alluded to this

19   earlier, were these all the pictures that you took?

20       A.  No, I took a lot more.

21       Q.  So this is just a representative sample?

22       A.  Yes.

23       Q.  And did you see graffiti only in the City of

24   Detroit or did you see it outside of Detroit as well?

25       A.  I saw it outside of the city.  I saw it -- I know

1    I saw gang graffiti that said "60s" in Ecorse.  So there

2    were Rollin 60s that lived outside of the main

3    territory, and I did identify some Rollin 60s that lived

4    even outside of the City of Detroit as well.

5        Q.  In other words, you don't have to be in Detroit;

6    that is not the only base of operations, if you will?

7        A.  No.  It is the main territory where the gang was

8    believed to have started, but several of the members to

9    include Jerome Hamilton, which was the main leader of

10   the Rollin 60s, lived in Atlanta, and would just come

11   into town, you know, frequently enough for just

12   sometimes.

13       Q.  Now, we talked about the gang territory on the

14   west side of Detroit.  And again, for those of us that

15   may not be familiar with Detroit, you keep saying the

16   phrase "west side," and there's also an east side, if

17   you will.

18       A.  Correct.

19       Q.  Where is the dividing line there?  What is west

20   side versus east side in Detroit mean?

21       A.  It's just a side of the city.  I mean there's an

22   east side of the city and west side of the city, there's

23   a southwest area of the city.

24           So even though the main hub of the Rollin 60s was

25   on the west side, they would still have members that

1   they would make part of the gang that lived on the east

2   side of the city as well.

3                Most of the members would be on the west

4   side, but they were always adding new members.

5                So the east side, even though it was

6   smaller, I did find some gang graffiti I believe near

7   like Connor and the Ryan area on the east side of

8   Detroit.

9       Q.   And, in fact, during the course of your

10   investigation, did you also learn that there were Rollin

11   60s members in Canada as well?

12       A.   Yes.   I did find one member that lived in Canada.

13       Q.   Now, you've alluded to or you've referenced a

14   number of rivals.   Did the Rollin 60s here in Detroit

15   have rivalry with other gangs?

16       A.   Yes.

17       Q.   What are some examples?   What were the primary

18   rivals?

19       A.   The primary rival is what I mentioned earlier,

20   which was the Playboy Gangster Crips, known as PBGC.

21   That was one of the main rivals because they are

22   gangster Crips which is totally different than

23   neighborhood Crips.   They actually even have a different

24   ranking system.

25                They were also rivals of Hoover Crips, and

1    that's why after the letter "H" they would put a "K"

2    after it, because the "K" means killer in Crips'

3    language, so the Hoover Crips are also gangster Crips

4    which would be Hoover Gangster Crips or HGC.

5              They were even rivals with Skyline Pirus

6    which is a Bloods set.

7    Q.   And let's make that easy for the court reporter.

8    How do you spell Piru?

9    A.   P-i-r-u.

10   Q.   You said that's a Bloods set?

11   A.   Yes.  Pirus are the original Bloods set.  The

12   original Bloods set was called a Piru.  The name changed

13   once they started having subsets to just Bloods after

14   that, but the Pirus continued to keep the Piru in their

15   name.

16   Q.   In addition to other rival gangs, if you will, I

17   believe you mentioned that they also had rivalries with

18   cliques?

19   A.   Yes.  They would have -- there was a rivalry that

20   they had with Band Crew, and Band Crew is another, I

21   would call it a clique, or it is a gang but it's not a

22   traditional street gang in the sense of its having

23   origin out of state, so it didn't have origins from

24   California.

25             Band Crew is just something that was more of a,

1    I guess, a neighborhood type thing where they might not

2    have had bandanas and beads and things of that sort, and

3    the ranking systems would be different as well.

4        Q.   In the course of your investigation, were you

5    able to identify a discernible structure that the gang

6    used within its -- to organize its membership, if you

7    will?

8        A.   Yes.

9        Q.   And how was that done?

10       A.   The first way I was able to determine the ranking

11   system was through social media.  The members would

12   actually put what their rank was in the gang, and that

13   is how I learned about that.

14            That is also how I learned how it was different

15   than the different types of Crips sets, like the

16   Gangster Crips have a different type of ranking system.

17   Social media was the initial way that I learned about

18   it.

19            And then after arresting -- when I said I

20   arrested two cooperating defendants, that would have

21   been Carlos Woodley and Anthony Weaver, and those

22   individuals were also able to tell me about the ranking

23   system, so they were able to verify the information I

24   had.

25       Q.   Now, when you say "ranking system," do you mean

1    like a traditional hierarchical organization?

2        A.   Yes.

3        Q.   So there's someone in charge of someone else?

4        A.   Yes.

5        Q.   And effectively just goes down a hierarchical

6    line?

7        A.   Correct.

8        Q.   In fact, did the Rollin 60s organize itself by

9    lines?

10       A.   Yes, they did.

11       Q.   And did you learn that that is a common

12   organization method not only here in Detroit but

13   nationwide?

14       A.   Yes, absolutely, even with different gangs.

15       Q.   So what is a line?

16       A.   A line is a group of gang members that might be

17   in a particular area that has their -- they have the

18   ranking system within that particular line.  So there

19   would be somebody in charge of the line that would be

20   the highest ranking person all the way down to the

21   lowest ranking person of that line, and basically that

22   would be a lot of the times for a certain area.

23            So like in this case, you would have lines on the

24   west side of Detroit, you may have a line on the

25   eastside of Detroit.

1     Q.   And in a company, you may have a marketing line

2     or a finance line, if you will.  How were lines tracked

3     or how were they characterized within the Rollin 60s?

4     A.   They were characterized by a particular name.  So

5     each line had its own name.  So you could tell based on

6     the name who the controlling person was in that line,

7     and you would also be able to tell based on individual

8     names which line they belonged to.

9     Q.   And in the course of your investigation, were you

10    able to identify members of the Rollin 60s here in

11    Detroit?

12    A.   Yes.

13    Q.   How?

14    A.   I was able to identify them through social media,

15    through police reports, through IP addresses that I was

16    able to gain through the social media, through

17    cooperating or confidential informants that were the

18    cooperating Defendants, Anthony Weaver and Carlos

19    Woodley.  That is how I was able to identify the members

20    of the gang.

21    Q.   Now, we haven't talked about police reports yet.

22    In the course of your investigation, did you go out and

23    essentially pull police reports of people that you felt

24    might be involved with Rollin 60s?

25    A.   Yes.  Once I identified a member of the gang, I

1   would then run their criminal history to try to find out

2   every time they've been arrested.

3       Once I would find the dates where they -- when

4   they've been arrested and I found the police department

5   that arrested them, I would then attempt to locate those

6   police reports.

7   Q.  What is the purpose of this?

8   A.  The purpose would be to find out what crime they

9   committed so I could get a sense of what type of crimes

10  the Rollin 60s were committing.  So that would be one of

11  the things.

12      I would also look at the police reports to see if

13  there was any evidence confiscated, like whether or not

14  they were arrested with a gun or drugs that may have

15  been packaged for sale.

16      I would also see if maybe they were arrested with

17  a cellphone, because if there were those things I may go

18  to that police department and try to take it in custody

19  if they no longer needed it.  One of the other reasons

20  to pull the police reports were it could help identify

21  additional members.

22      So typically I would notice that when a member

23  would get arrested, you know, sometimes or more often

24  than not they would be with another gang member, so then

25  I could, you know, see that other name and then look

1    into that person's history to get a photograph of them

2    and possibly match that photograph to some social media

3    pictures to see if I could identify this other person as

4    a member of the gang.

5           And then if I am able to identify that person as

6    a member of the gang, the process would start all over

7    where I would run their criminal history and obtain all

8    their police reports.

9    Q.  And in the course of doing that effectively,

10   you're able to take a big picture view of everything

11   that's being done by a people?

12   A.  Correct.  I wanted to see, based on the

13   identified members, which -- what crimes that these

14   members were committing so I could find out what their

15   main crime was, what possibly their source of income

16   was.  It was a way to figure out the totality of what

17   has been going on with this gang.  And actually, I would

18   go back several years so I could figure out how often

19   this gang has been involved in these different

20   activities for how many years.

21              MR. CRALLE:  Your Honor, may I approach?

22              THE COURT:  You may.

23   BY MR. CRALLE, CONTINUING:

24   Q.  Agent Nether, I just handed you what's marked as

25   Government's Exhibit 2 through 2-E.  Do you recognize

1    these items?

2        A.   Yes, I do.

3        Q.   2-E is the last one, right?

4        A.   Yes, 2-E is the last one.

5        Q.   What are these items?

6        A.   These are photographs of members of the Rollin

7    60s Crips, identified members.

8        Q.   And are you familiar with each of the individuals

9    in these separate exhibits?

10       A.   Yes, I am.

11       Q.   And have you met many of the people there such

12   that you could identify them?

13       A.   Yes.  I've probably sat in front of most of these

14   individuals, yes.

15            MR. CRALLE:  Your Honor, at this time the

16   Government would move to admit Government's Exhibit 2

17   through 2-E.

18            THE COURT:  Any objection?

19            MR. NISKAR:  No objection.

20            THE COURT:  Mr. Berger?

21            MR. BERGER:  No.

22            THE COURT:  Very well, Exhibits 2 through

23   2-E are admitted.

24   BY MR. CRALLE, CONTINUING:

25       Q.   Thank you.

1          If we could start with Exhibit 2, please.  Agent

2     Nether, who is -- first of all, what is Exhibit 2?

3          A.   This is a -- these are driver's licenses or IDs

4     of Martel Strong on the left and William Steele on the

5     right.

6          Q.   Exhibit 2-A, what's the difference between this

7     exhibit and Exhibit 2?

8          A.   Just the fact that it appears to have the names

9     below the photographs.

10         Q.   So that's Mr. Strong on the left?

11         A.   Correct.

12         Q.   And in the course of your investigation, did you

13    learn that he also went by the nickname "Bang-em"?

14         A.   "Bang-em" or "Bang-em Tel."  I've also heard him

15    just called "Tel."

16         Q.   "Tel" being short for Martel?

17         A.   Yes.

18         Q.   And on the right, is that a picture of William

19    Steele?

20         A.   Yes, that's correct?

21         Q.   And in the course of your investigation, did you

22    learn that he also went by the name "Shotti"?

23         A.   Yes.

24         Q.   As well as "Little Fatal"?

25         A.   Yes.

1    Q.  If we can move to Exhibit 2-B, please.

2        Have you met all of the individuals depicted in

3    this photo?

4    A.  Yes, I have.

5    Q.  And if we can move to Exhibit 2-C, the difference

6    here being that each of those pictures is identified

7    with the name; is that right?

8    A.  That is correct.

9    Q.  Let's start with the upper left-hand corner.  Who

10   is this?

11   A.  That is Jonathan Barber, known as "Looni," also

12   "Big Bonehead."

13   Q.  He went by the name "Big Bonehead"?

14   A.  Most of the time he went by "Looni," but he was

15   in charge of the Bonehead line, so he was also known as

16   "Bonehead," "Big Bonehead."

17   Q.  And to the right of Jonathan Barber, who is this?

18   A.  That is Sadeisha Johns.  She was also known as

19   "Lady Mayhem" or "Dee Dee."

20   Q.  And she was a member of the Rollin 60s?

21   A.  Yes.  She was a leader of the female line of the

22   Rollin 60s.

23   Q.  So the Rollin 60s were not limited to only male

24   members?

25   A.  Correct, they had female members as well.

1    Q.   To the right of Ms. Johns, who is that?

2    A.   That is Deaires Foster who is also a member of

3    the Rollin 60s who went by "Little Bluebone," also

4    "Trigger," but the name he went by mostly was "Trigger,"

5    but "Little Bluebone" relates him to the line of Rollin

6    60s he was on and his rank in that line.

7    Q.   And to the right of Mr. Foster, who is this?

8    A.   That is Roderek Perry, a/k/a "Hoodlum."

9    Q.   And on the lower left-hand corner, who is this?

10   A.   That is Carlos Woodley.  He is known as "Thunder"

11   or "Thunderhead" and also "Little Max 60."

12   Q.   And to the right of Mr. Woodley?

13   A.   That is Anthony Weaver.  He's also known as

14   "Cane" or "Little TK."

15   Q.   And to the right of Mr. Weaver?

16   A.   That is Charles Smith.  He is known as "Chucc" or

17   "Siccowe," and he's also known as "Baby Sayso."

18   Q.   And to the right of Mr. Smith, who is this?

19   A.   This is Jermel Coleman.  He is known as "Ninja."

20   He's also know as "Mel."

21   Q.   "Mel" being short for Jermel?

22   A.   Yes.

23   Q.   Now, Agent Nether, in the course of your

24   investigation, did you learn that most of the people

25   depicted in this photograph, specifically Mr. Barber,

1    Woodley, Weaver, Smith, Ms. Johns, were all the heads of

2    various lines of the Rollin 60s?

3        A.   Yes, I did learn that.

4        Q.   And they all had people that reported to them?

5        A.   That is correct.

6        Q.   So this is just a subset, if you will, of the

7    members of the Rollin 60s here in Detroit?

8        A.   Correct.  They're still Rollin 60s, but they

9    controlled lines underneath the overall Rollin 60s Crips

10   set.

11       Q.   If we could move to Exhibit 2-D, please.  And do

12   you recognize the people depicted in this exhibit?

13       A.   Yes, I do.

14       Q.   If we can move to Exhibit 2-E.  Starting again in

15   the upper left-hand corner, who is this?

16       A.   This is Jerome Hamilton, the person that I said

17   was the main leader of the Rollin 60s.  He mainly went

18   by the name "Staccz," but he also went by "Maniac," and

19   he was in charge of the Maniac line, which was the main

20   line for the Rollin 60s.  That was the -- since he was

21   considered the main leader, that was the main line of

22   the Rollin 60s were the Maniacs.

23       Q.   And to the right of Mr. Hamilton?

24       A.   That is Darriyon Mills.  He went by "Fatal," and

25   he was also "Little Maniac."  And "Little Maniac" is

1   based on being directly under the leadership of Jerome

2   Hamilton.

3      Q.  So that's an example of the ranking system that

4   you referred to earlier?

5      A.  Correct.

6      Q.  So a person directly underneath the head of the

7   line would be known as "Little"?

8      A.  Correct.  If you belonged underneath that line,

9   you had to take some form of that person's name that

10  you're underneath.

11      So because Jerome Hamilton also went by "Maniac"

12  and had a Maniac line, if you were underneath the Maniac

13  line, you would have to have some form of that name, so

14  one of his names was also "Little Maniac," and that

15  would be how you could tell who he was directly under or

16  who he was affiliated with.

17      Q.  Who is depicted to the right of Mr. Mills?

18      A.  That is Tre Tigner.

19      Q.  And did he have a name he also went by?

20      A.  He went by "Cheese."

21      I was just going to say he was also a member of

22  the Maniac line.

23      Q.  Thank you.  Sorry to interrupt.

24      To the lower left, who is this?

25      A.  That is Terrell Lewis, also known as "Vicious,"

1  and that is the name of the person that we saw in a

2  couple of the gang graffiti pictures earlier.

3      Q.  To the right of Mr. Lewis, Mr. Terrell Lewis, who

4  is this?

5      A.  That is Gerrod Lewis, also known as "C Nice."

6  That is the deceased member of the Rollin 60s where we

7  saw the photograph on Patton and Grand River where it

8  said "RIP C Nice."

9      Q.  Rest in peace?

10     A.  Rest in peace, yes.

11     Q.  To the right of Mr. Gerrod Lewis, who is this?

12     A.  That is Torian Brinson, also known as "T Murda."

13  He's also a deceased member of the Rollin 60s.

14     Q.  Is it fair to say that most of the people

15  depicted in this photograph we're going to be referring

16  to in the course of your testimony?

17     A.  Yes.

18     Q.  Now, Agent Nether, in the course of your

19  investigation, as well as your conversations with the

20  members of the Rollin 60s, did you learn how people gain

21  membership or became members of the Rollin 60s Crips?

22     A.  Yes, I did.

23     Q.  What is that process?

24     A.  Based on speaking with the original OG from

25  California, as well as speaking to the cooperators on

1  this investigation, I learned that the way you get into

2  the gang is either by putting in some form of work or

3  conducting a mission, which is some type of criminal

4  activity, or the main way to get in was a process called

5  a Put On which is also referred to as a C-down or a

6  loc-in.

7      Q.  Let's break that down a little bit.

8          So it sounds like there are two ways you can

9  become a Rollin 60s, two primary ways?

10     A.  Correct.

11     Q.  You can either put in work or do a mission?

12     A.  Correct.

13     Q.  Or you can go through this Put On or C-down

14  process?

15     A.  Correct.

16     Q.  And for purposes of the court reporter, when

17  we're saying C down, is that literally the letter "C"?

18     A.  Yes.

19     Q.  And then the word "down"?

20     A.  Correct.

21     Q.  Work for a mission, is that just another way of

22  saying do some sort of criminal activity?

23     A.  Yes.

24     Q.  And would that be any criminal activity you

25  wanted or would it have to be something you were told to

1  do?

2     A.  Well, if you were getting into the gang based on

3  putting in work, that would be something that you were

4  told to do.

5        The loc-in was also something that you are told

6  to do.

7                   THE COURT:  The what?

8                   THE WITNESS:  A loc-in or C down.

9                   MR. CRALLE:  Spell that for the court

10  reporter as well, please.

11                  THE WITNESS:  Loc-in would be l-o-c, dash,

12  i-n, like loc-in.

13  BY MR. CRALLE, CONTINUING:

14     Q.  Okay.  Let's again break that down a little bit.

15        When you loc, l-o-c, is that a common phrase used

16  within the Crips?

17     A.  Yes.

18     Q.  Is that essentially a synonym for the word

19  "Crips."  In other words, if I were to say, hello, Loc,

20  is that the same essentially calling you a Crip?

21     A.  Yes, yes.  All the Crips would refer to each

22  other as Locs.

23     Q.  So when we're talking about that Put On or C-down

24  or loc-in, those are all different ways of effectively

25  saying the same thing?

1      A.   Correct.

2      Q.   Now that we know what it's called, what is it?

3      A.   It is a process of -- it's actually a voluntary

4    process of having to fight other members of the gang to

5    show the other members of the gang basically how tough

6    you are, so you have to fight them for a certain amount

7    of time.

8           It could be one-on-one where we've seen that or

9    it could be multiple members fighting that recruit at

10   one time.

11     Q.   So essentially you're going to fight members of

12   the Rollin 60s, and if you make it through, you're in?

13   And when I say "make it in" or "make it through," to

14   clarify, this is just a fight?  This isn't anything more

15   than that, is it?

16     A.   Correct, it's a fight.

17     Q.   It's a fist fight?

18     A.   Correct.

19     Q.   So effectively it's a measurement of how tough

20   you are?

21     A.   Correct.

22     Q.   So if you fight to their satisfaction, you're a

23   member?

24     A.   If it's to their satisfaction, yes, you would be

25   a member at that point.

1     Q.  But if you don't go through one of those two

2   processes, you're not officially a member?

3     A.  Correct, you would not officially be a member.

4          MR. CRALLE:  Your Honor, that is the end of

5   that topic.  I believe we had talked about ending at

6   four.  I'm happy to proceed if you'd like.

7          THE COURT:  No.  Well, I'll let my jurors go

8   home today and then we'll bring them back on Monday.  If

9   you think this is good place to stop.

10          MR. CRALLE:  It is a good break point.

11          Remember that you're not permitted to talk

12   about the case among yourselves or with anyone else.

13   And not to use any social media of any kind or any other

14   kind of research to find out anything about the case or

15   anybody involved in the case, including the people at

16   counsel table.

17          I would also ask that if any news reports

18   appear, that we do not expect, but if they do, you

19   shouldn't pay attention to any of the news reports or

20   anything on any kind of media that might come out about

21   the case.

22          Some of you have some notebooks, and so

23   Ms. Owens is back in the back again, and Ms. Silber up

24   here will let you know where we're going to put your

25   notebooks and collect them from you and make sure that

1   you get them back first thing on Monday morning.

2                All of you have a copy of the schedule,

3   right?  And so it says that on Monday we're going to --

4   well, it says on Friday there is no trial on mine, but

5   in any event, on Monday we're going to start at 9 and go

6   to 12:30 and then from 2 to 5.  I'm not going to promise

7   those exact lunchtimes moments, okay.  When it gets to a

8   good place to stop, that's when we'll stop so you'll

9   have time to get lunch.

10               So everyone come at least in time to go up

11  to the fifth floor first and then to come down here, all

12  right, so maybe like 8:45 at least.

13               Do you have any other matters for the jurors

14  today?

15               MR. CRALLE:  No, Your Honor.

16               MR. NISKAR: No, Your Honor.

17               MR. BERGER:  No, Your Honor.

18               (Whereupon the Jury was excused at 3:57

19  p.m.)

20               THE COURT:  Are there any other witnesses

21  you expect to call on Monday?

22               MR. CRALLE:  I think it's possible we'll

23  call Charles Smith, but I doubt it.  He's more likely

24  Tuesday.

25               THE COURT:  But your next witness will be

```
 1   Charles Smith?

 2             MR. CRALLE:  That's correct.

 3             THE COURT:  And on Monday you should be

 4   prepared to go until five, okay?

 5             MR. CRALLE:  Yes, Your Honor.

 6             THE COURT:  But I will adjust the lunch

 7   period based on any number of factors, okay.

 8             MR. CRALLE:  Yes, Your Honor.

 9             THE COURT:  Anything else today?

10             Mr. Niskar, do you want to leave your box?

11             MR. NISKAR:  I'm going to leave one, if I

12   could, in chambers and take one with me.

13             THE COURT:  Okay, that's fine.  They gave

14   you a place to store it?

15             MR. NISKAR:  Jim, hasn't told me yet, but --

16             THE COURT:  But he will.

17             Anything else, Mr. Berger?  Do you have

18   anything you want to leave?  You don't have anything you

19   need to leave?

20             MR. BERGER:  Yes, one briefcase.

21             THE COURT:  Okay, that's fine.  You can put

22   it in the same place.

23             Mr. Cralle, you need to gather up the

24   documents.

25             MR. CRALLE:  I will.
```

1             THE COURT:  And also, when you have a

2    witness on the stand, even if you're taking something up

3    to them, don't talk to them, okay?

4             MR. CRALLE:  Yes, Your Honor.

5             THE COURT:  Very good.  I'll see you all on

6    Monday.

7             Court is in recess.

8             (Proceedings concluded at 4:00 p.m.)

9             * * * * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T I O N

2                   I, CHERYL E. DANIEL, Official Federal Court

3     Reporter, after being first duly sworn, say that I

4     stenographically reported the foregoing proceedings held

5     on the day, date, time and place indicated.  That I

6     caused those stenotype notes to be translated through

7     Computer Assisted Transcription and that these pages

8     constitute a true, full and complete transcription of

9     those stenotype notes to the best of my knowledge and

10    belief.

11                  I further certify that I am not of counsel

12    nor have any interest in the foregoing proceedings.

13

14                  /S/ CHERYL E. DANIEL,

15

16                  CHERYL E. DANIEL,

17                  FEDERAL OFFICIAL COURT REPORTER

18

19    DATED:  July 17, 2017

20

21

22

23

24

25