1                   UNITED STATES OF AMERICA

2                 EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4    UNITED STATES OF AMERICA

5         V                        Case No.  16-20062

6    WILLIAM SHAWN STEELE - D - 12

7              Defendant.

8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

9                      JURY TRIAL

10        BEFORE CHIEF JUDGE DENISE PAGE HOOD

11               U.S. DISTRICT COURT

12       231 W. LAFAYETTE STREET, COURTROOM 730

13                 DETROIT, MICHIGAN

14              WEDNESDAY, JULY 19, 2017

15   APPEARANCES:

16   FOR THE GOVERNMENT:         SHANE CRALLE,

17                               MICHAEL HEESTERS,

18                               U.S. ATTORNEY'S OFFICE

19                               211 W. FORT, STE. 2001

20   FOR THE DEFENDANT:          SEYMOUR BERGER,

21                               24901 NORTHWESTERN HWY.

22                                 STE. 411

23                               SOUTHFIELD, MI 48075

24

25

1                    I N D E X                        PAGE

2   GOVERNMENT'S CASE IN CHIEF   (CONTINUED)

3       JONATHAN BARBER

4       DIRECT EXAMINATION BY MR. CRALLE                6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     E X H I B I T S              PAGE

 2    GOVERNMENT'S

 3    14 - BARBER      FACEBOOK 1                    12

 4                     FACEBOOK 8                    14

 5                     FACEBOOK 2                    16

 6                     FACEBOOK 3                    19

 7                     FACEBOOK 6                    21

 8                     FACEBOOK 12, 12.2             27

 9                     FACEBOOK 13                   33

10                     FACEBOOK 14                   35

11                     FACEBOOK 15, 15.2, 15.3       36

12                     FACEBOOK 9                    60

13    71               MAP                           63

14                     FACEBOOK 10                   65

15                     FACEBOOK 11                   66

16                     FACEBOOK 20                   94

17                     FACEBOOK 21, 21.2            101

18                     FACEBOOK 27                  104

19                     FACEBOOK 28                  105

20                     FACEBOOK 29                  106

21                     FACEBOOK 30                  108

22                     FACEBOOK 26                  109

23                     FACEBOOK 32                  116

24                     FACEBOOK 33                  119

25                     FACEBOOK 34                  121
```

```
 1                    I N D E X (CONTINUED)              PAGE

 2     GOVERNMENT'S

 3     33-A, B         PHOTOS                            130

 4     BARBER 14       FACEBOOK 36                       143

 5                     FACEBOOK 37                       151

 6                     FACEBOOK 39, 39.2                 153

 7                     FACEBOOK 40                       154

 8                     FACEBOOK 41, 412                  157

 9                     FACEBOOK 43                       160

10                     FACEBOOK 44, 44.2                 164

11                     FACEBOOK 16                       170

12                     FACEBOOK 17, 17.2                 171

13                     FACEBOOK 35, 35.2                 176

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    Wednesday, July 19, 2017

3                    Detroit, Michigan.

4                    At approximately 9:10 a.m.

5                    THE CLERK:  The Court calls case 16-20062,

6    United States of America versus William Shawn Steele.

7    Will Counsel identify yourselves for the record.

8                    MR. CRALLE:  Good morning, Your Honor.

9    Shane Cralle for the United States.

10                   MR. HEESTERS:  Good morning, Your Honor.

11   Michael Heesters for the Government.

12                   MR. CRALLE:  Your Honor, we have Sharita

13   Gentry with us as well, our paralegal, and special agent

14   Nether standing in the hall with our witness.

15                   THE COURT:  Good morning.

16                   MR. BERGER:  Yes, Your Honor.  Seymour

17   Berger appearing for Mr. Steele, who is standing next to

18   me.

19                   THE COURT:  Good morning to you, too.

20                   The jurors are here, so why don't we have

21   your agent come in and be seated with your witness and

22   then we'll call the jurors in.

23                   (Whereupon the jurors were brought in at

24   9:14 a.m.)

25                   THE COURT:  Are you satisfied the Jury is

```
 1   present and properly seated?
 2              MR. CRALLE:  Yes, Your Honor.
 3              MR. BERGER:  Yes, Your Honor.
 4              THE COURT:  And is your next witness Mr.
 5   Barber?
 6              MR. CRALLE:  Yes, it is.
 7              THE COURT:  And is his attorney with him?
 8              MR. CRALLE:  No.
 9       The Government calls Jonathan Barber.
10              THE COURT:  You may step forward and be
11   sworn.
12              J O N A T H A N   B A R B E R, after being
13   first duly sworn, was examined under his oath and
14   testified as follows:
15              THE WITNESS:  My name is Jonathan Barber; B
16   A R B E R.
17              THE COURT:  You may proceed.
18              D I R E C T   E X A M I N A T I O N
19   BY MR. CRALLE:
20       Q.  Good morning.
21       A.  Good morning.
22       Q.  There is some water there in front of you and if
23   you can make sure that you can speak loudly enough so
24   everyone can hear you including the Court Reporter,
25   please.
```

1          Can you introduce yourself again.

2     A.   Jonathan Barber.

3     Q.   How old are you?

4     A.   Twenty-six.

5     Q.   And are you from Detroit?

6     A.   Yes.

7     Q.   Where did you grow up?

8     A.   At what part of my life?

9     Q.   Let's start with are you from Detroit?

10    A.   Yes.

11    Q.   And at some point did you live in the area of

12   Seven Mile and Tracey?

13    A.   Yes.

14    Q.   When was that?

15    A.   This was when I was 14.

16    Q.   That's when you moved to that area?

17    A.   Yes.

18    Q.   And how long did you live over there?

19    A.   For seven years.

20    Q.   So from 14 to 21?

21    A.   Yes.

22    Q.   And what years were those?

23    A.   Not '14, it was 2007.  So 2007 to 2012 when I

24   lived in that area.  So it would be five years.

25    Q.   So 2007 to 2012?

1     A.   Yes, sir.

2     Q.   Where did you move after that?

3     A.   I moved to Six Mile and Southfield.

4     Q.   And for those of us that may not be familiar with

5     the layout of Detroit, where is that?

6     A.   That would be North Rosedale Park or south of

7     Seven Mile.

8     Q.   Is that still what you would consider the west

9     side or east side of Detroit?

10    A.   It's the west side.

11    Q.   So still on the west side.

12         And how long did you live there?

13    A.   About a year.

14    Q.   And where did you move after that?

15    A.   Moved to Plymouth Road and Evergreen.

16    Q.   And how long did you live there?

17    A.   About three years.

18    Q.   Were you at any point a member of the Rollin 60s

19    Crips?

20    A.   Yes.

21    Q.   For how long?

22    A.   From 2009 'til about 2012.

23    Q.   Until at least 2012?

24    A.   Yes.

25    Q.   And did you go by a particular name within the

1    Rollin 60s Crips?

2        A.   Yes.

3        Q.   What was that name?

4        A.   "Looni".

5        Q.   Did you go by any other names?

6        A.   Yes.

7        Q.   What were those names?

8        A.   "Big Bonehead".

9        Q.   "Big Bonehead"?

10       A.   Yes.  "Baby Blu Stain".

11       Q.   Anything else?

12       A.   "Big Blu Bones".

13       Q.   Anything else?

14       A.   "Big Bad Mood".

15       Q.   I'm sorry, can you say that last one again?

16       A.   "Big Bad Mood".

17       Q.   Now, did each of those names have some sort of

18   significance?

19       A.   Yes.

20       Q.   Let's start with "Looni", what was the

21   significance of the name "Looni"?

22       A.   It was the name that I was originally given to

23   identify myself as an individual in the gang.

24       Q.   And "Big Bonehead", what was the significance of

25   that name?

1    A.   It showed my leadership and rank at the time as

2    well as acquiring recruits.

3    Q.   "Baby Blu Stain", what was the significance of

4    that name?

5    A.   It was a California member's name, so basically

6    it was to show that I had connections to California.

7    Q.   To show that you were under --

8    A.   An OG in California.

9    Q.   That he was your?

10   A.   Big homey.

11   Q.   That he was the big homey of your line?

12   A.   Yes.

13   Q.   And you said the last one was "Big Blu Bones"?

14   A.   "Big Blu Bones", yes.

15   Q.   And what was the significance of that name?

16   A.   That was to show the amount of recruits that I

17   had acquired.

18   Q.   And approximately how many recruits did you bring

19   into the Rollin 60s Crips?

20   A.   Fifteen.

21   Q.   And those were all here in Detroit?

22   A.   Yes.

23           MR. CRALLE:  Your Honor, may I approach the

24   witness?

25           THE COURT:  You may.

1  BY MR. CRALLE, CONTINUING:

2    Q.  Mr. Barber, in front of you is a packet of

3  information.  Each one of those should be marked in some

4  way.  This is all part of Government's Exhibit 14.

5    Do you recognize the top page?  This is marked

6  Barber Facebook 1.

7    A.  Yes, I do.

8    Q.  And what is this document?

9    A.  It is showing the names that I used on Facebook.

10   Q.  So this is your Facebook account information?

11       THE COURT:  What exhibit number is it?

12       MR. CRALLE:  This is Government's Exhibit

13  14, Barber Facebook 1.

14       Your Honor, we move to admit this exhibit at

15  this time.

16       THE COURT:  Any objection.

17       MR. BERGER:  No foundation.

18       THE COURT:  Lay a better foundation.

19  BY MR. CRALLE, CONTINUING:

20   Q.  Mr. Barber, did you ever use Facebook?

21   A.  Yes.

22   Q.  And the document in front of you, does that

23  contain some of the names you used on Facebook?

24   A.  Yes.

25   Q.  And is that a record of your Facebook account?

1    The top page only.

2        A.   Yes.

3             MR. CRALLE:   Your Honor, we seek to admit

4    Barber Facebook 1 at this time.

5             THE COURT:   Do you have some specific

6    objection to the foundation he has laid?

7             MR. BERGER:   Not to the foundation but now

8    relevancy.

9             THE COURT:   How is it relevant?

10            MR. CRALLE:   Your Honor, Facebook is one of

11   the many ways that Mr. Barber communicated with other

12   members of the Rollin 60s and this document will confirm

13   the account information that he used during that time.

14            THE COURT:   Your objection is noted and

15   preserved and overruled.   And this document is admitted.

16   BY MR. CRALLE, CONTINUING:

17       Q.   Mr. Barber, if we can look, and there is a sheet

18   in front of you or you can feel free to look at the

19   screen if that is easier.

20            Did you have a primary name that you went by

21   on Facebook?

22       A.   Yes.

23       Q.   What was that name?

24       A.   "Sevenmile Looni".

25       Q.   Is that the name at the very top there?

```
 1      A.   Yes, it is.
 2      Q.   And did you use Facebook to communicate with
 3  other members of the Rollin 60s Crips?
 4      A.   Yes, I did.
 5      Q.   Here in Detroit?
 6      A.   Yes.
 7      Q.   Did you use these to communicate with members in
 8  other states such as California?
 9      A.   Yes.
10      Q.   Did you use it to communicate with prospective
11  members of the Rollin 60s Crips?
12      A.   Yes.
13      Q.   Did you use it essentially to recruit members?
14      A.   Yes.
15      Q.   Did you use it to communicate with rival gangs?
16      A.   Yes.
17      Q.   Is it fair to say that Facebook was an
18  instrumental way or key way that you carried on the
19  affairs of the Rollin 60s Crips?
20      A.   Yes.
21      Q.   Next in the packet in front of you if you can
22  turn to the next page, Barber Facebook 8, do you
23  recognize this page?
24      A.   Yes.
25      Q.   What is this document?
```

1    A.   Me stating my name to -- this is a status update

2    and reply to my status.

3    Q.   Status update from your Facebook?

4    A.   Yes.

5    Q.   And this is a status update that you made?

6    A.   Yes.

7              MR. CRALLE:  Your Honor, the Government

8    would seek to admit Government's Exhibit 14, Facebook 8.

9              MR. BERGER:  Object as to relevancy.

10             MR. CRALLE:  Your Honor, it is relevant

11   because it is a contemporaneous document that goes to

12   the name or at least one of the names that Mr. Barber

13   used during the period in which he was part of the gang.

14             THE COURT:  Well, he can tell us his name.

15   How is it relevant to have the Facebook page on?

16             MR. CRALLE:  Because it's a contemporaneous

17   document, so that goes to the Jury's ability to assess

18   his credibility to his testimony today.

19             THE COURT:  Very well, I'm going to allow

20   it.  Your objection is noted and preserved for the

21   record and it is admitted as 14, page 8.

22   BY MR. CRALLE, CONTINUING:

23   Q.   If we can zoom in on the status update.

24        Mr. Barber, what are you saying here?

25   A.   "The Names Big Bonehead Looni Don't Forget It."

1      Q.   When did you post this status update?

2      A.   January 18th, 2013.

3      Q.   So this is one of the names that you used at this

4    time?

5      A.   Yes.

6      Q.   Mr. Barber, did you ever use Facebook to indicate

7    your membership in the Rollin 60s Crips?

8      A.   Yes.

9      Q.   What were some of the ways that you did that?

10     A.   Status updates, pictures, quotes, maybe rap

11   lyrics.

12              THE COURT:  Maybe what?

13              THE WITNESS:  Rap lyrics.  Lyrics from rap

14   songs.

15   BY MR. CRALLE, CONTINUING:

16     Q.   Was this a common way that members would claim

17   their affiliation with the Rollin 60s Crips?

18     A.   Yes, it was.

19     Q.   In front of you on the next page is a document

20   marked Barber Facebook 2.  Do you recognize this

21   document?

22     A.   Yes, I do.

23     Q.   What is it?

24     A.   It is a picture of me and gang stuff on it.

25     Q.   Gang stuff, when you say gang stuff, what do you

1    mean specifically?

2        A.  As far as the number "60" and the writing.

3        Q.  And the writing?

4        A.  Yes.

5        Q.  So this document indicates your membership in the

6    gang?

7        A.  Yes.

8            MR. CRALLE:  Your Honor, the Government

9    seeks to admit Exhibit 14, Barber Facebook 2.

10           THE COURT:  Any objection?

11           MR. BERGER:  Relevancy, Your Honor.

12           THE COURT:  How is it relevant, Counsel?

13           MR. CRALLE:  It is relevant because it's

14   going to --  it's a contemporaneous document that would

15   be used for the Jury to assess whether or not he is

16   credible as to his testimony today.

17           THE COURT:  It is admitted.  Your objection

18   is overruled and it may be relevant.

19           You may proceed.

20   BY MR. CRALLE, CONTINUING:

21       Q.  Mr. Barber, could you decode the writing on the

22   screen for the Jury?

23       A.  "Rollin get rolled on Looni in the worst way".

24           I can't read the --

25       Q.  Read the portions that you can.

1    A.   "Like a blunt."  Something.  "Like a blunt quick"

2    --  oh, "I'll smoke your ass like a blunt quick".

3         I didn't make this, make the picture, but.

4         The bottom says, "I'm Looni bitch Crip rule

5    corrip".

6    Q.   So this was indicating that you were in fact a

7    member of the Rollin 60s Crips?

8    A.   Yes.

9    Q.   And if we could scroll down, please, and look at

10   the date of this post.

11        When was this uploaded?

12   A.   November 14th, 2009.

13   Q.   If we can turn to the next page, please.

14        This would be Barber Facebook 3.  Do you

15   recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   A picture of me posing with a gun and shirt and

19   beads.

20   Q.   And what is the significance of this photograph?

21   A.   The beads represent my affiliation as well as the

22   shirt and the hat.

23        I guess the gun was just to say I have guns.

24        MR. CRALLE:  Your Honor, the Government

25   seeks to admit Government's Exhibit 14, Barber Facebook

1   3.

2                    THE COURT:  Any objection?

3                    MR. BERGER:  Objection as to relevancy, Your

4   Honor.

5                    THE COURT:  How is it relevant, Mr. Cralle?

6                    MR. CRALLE:  Your Honor, it's relevant

7   because it goes to whether or not Mr. Barber was in fact

8   a member of the gang.  And also he is going to discuss

9   his use of firearms.

10                   THE COURT:  The objection is overruled and

11  it's admitted.

12  BY MR. CRALLE, CONTINUING:

13      Q.  Mr. Barber, if you could, you were discussing the

14  beads a moment ago.  What is the significance of those

15  beads?

16      A.  The beads are another way that we show our

17  affiliation.  That we showed our affiliation.

18      Q.  The color?

19      A.  The color as well as the pattern.

20      Q.  The color and the pattern?

21      A.  Yes.

22      Q.  And the shirt, is there a significance to the

23  writing on your T-shirt?

24      A.  Yes.  The writing on my T-shirt is to show

25  allegiance to the Rollin 60s gang.

1   Q.   And you mentioned also the firearm.  That's a

2   handgun that's in your right hand; is that right?

3   A.   Yes, it is.

4   Q.   And what was the significance of that?

5   A.   To show that I possessed weapons.

6   Q.   Was that a common thing for members of the Rollin

7   60s Crips to possess firearms?

8   A.   Yes.

9   Q.   And why is that?

10   A.   For protection and intimidation.

11   Q.   Protection from whom?

12   A.   Rivals.

13   Q.   And intimidation of who?

14   A.   People we wanted to extort or maybe commit

15   robberies as well as maybe it would make someone think

16   twice before disrespecting a member.

17   Q.   Let's skip ahead in the packet in front of you to

18   what has been marked as Barber Facebook 6.  This would

19   be three pages forward.

20        Do you see that document?

21   A.   Yes.

22   Q.   Do you recognize this document?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   Throwing up a gang sign as well as wearing a blue

1    bandana.

2        Q.   And were gang signs another way that you

3    indicated your membership within the Rollin 60s Crips?

4        A.   Yes.

5                Mr. Cralle:   Your Honor, the Government

6    moves to admit Government's Exhibit 14, Barber Facebook

7    6 to go to whether or not he was a gang member.

8                THE COURT:   Mr. Berger, do you have any

9    objection?

10               MR. BERGER:   As to relevancy and cumulative.

11               MR. CRALLE:   This is the last one, Your

12   Honor, and this is not cumulative because it is

13   distinctive from the prior two as far as the way it

14   indicates his membership.   And then we will be moving

15   on.

16               THE COURT:   Prior two exhibits here?

17               MR. CRALLE:   That is correct, Your Honor.

18               THE COURT:   I don't think that is his

19   objection relative to cumulativeness, but I do think

20   that you were permitted to have this because the Court

21   finds it relevant.

22               I think Mr. Berger's cumulativeness

23   objection goes to the number of things that we have seen

24   so far in this case.

25               At this time, I'm not prepared to not allow

1    you to have it admitted at this time.

2              It's admitted as 14, Facebook 6.

3    BY MR. CRALLE, CONTINUING:

4    Q.   If we can zoom in on the photo, please.

5         You mentioned that there were certain things in

6    this photograph that indicated your membership within

7    the gang?

8    A.   Yes.

9    Q.   And what are those?

10   A.   The bandana as well as the sign I'm making with

11   my hands.

12   Q.   Now, the sign, you're making a sign with both

13   hands; is that right?

14   A.   Yes.

15   Q.   And the one in your right hand, which would be on

16   the left side of the picture, what was the significance

17   of that?

18   A.   Neighborhood Crip.

19   Q.   Neighborhood Crip?

20   A.   Yes.

21   Q.   Is there a common phrase or common description

22   for that particular gang sign?

23   A.   Neighbors don't need any favors.

24   Q.   Neighbors don't need any favors.

25            Are you familiar with the phrase, two fingers and

1   a thumb?

2       A.   Two fingers and a thumb til your body's numb.

3               THE COURT:   Til what?

4               THE WITNESS:   The phrase was "Two fingers

5   and a thumb til your body's numb".

6   BY MR. CRALLE, CONTINUING:

7       Q.   And what does that been?

8       A.   Basically membership until death.

9       Q.   And the sign in your left hand, what does that

10  mean?

11      A.   It is making an "N" with the right hand.

12      Q.   These were some of the ways that you indicated

13  membership within the gang?

14      A.   Yes.

15      Q.   Moving on, what was your particular rank within

16  the gang?

17      A.   A big homey.

18      Q.   Describe what a big homey is, please.

19      A.   Big homey calls meetings, forms missions as well

20  as provides leadership to younger members or

21  lower-ranking members.  Collects dues, provides

22  firearms, provides knowledge as well as helps to develop

23  the younger members.

24      Q.   Are there multiple big homey's within a gang?

25      A.   There are.

1    Q.   Explain how that works, please.

2    A.   There is a power structure, and at the top of the

3    power structure is the big homies.  Under those big

4    homies are lil homies.  Those lil homies have -- they

5    work like managers in a store.  Under those managers

6    will be the workers who would be the foot soldiers, also

7    known as the babies, the tinys, and the infants will be

8    the ones that would actually go and do physical work.

9    Those would be the ones that would be taking orders and

10   we collect dues from.

11   Q.   And you said there are multiple big homies?

12   A.   Yes.

13   Q.   Is there a big homey over the big homies if you

14   will?

15   A.   Yes.

16   Q.   And then did big homies have leaders not only

17   here in Detroit but also out of state?

18   A.   Yes.

19   Q.   What's the purpose of that?

20   A.   Well, the purpose of that is to be able to --

21   it's sort of like a pipeline from one state to another.

22   Pipeline of information, supplies, connections, maybe

23   new prices for weapons or drugs.

24        It's many possible possibilities with that

25   pipeline established.

1    Q.   You mentioned that you had a big homey in

2  California?

3    A.   Yes.

4    Q.   What is the significance of having a connection

5  to California?

6    A.   I would be able to go out there and have a place

7  to stay, have no issues whatsoever with disrespect or

8  maybe a rival coming in and attack.

9        I would be protected basically.  I wouldn't be

10  left to hang out to dry, you know, and I would be able

11  to share that with other members of my gang in my city.

12    Q.   And does having a connection to California make a

13  particular set of the gang, in this case the Rollin 60s

14  Crips, more legitimate?

15    A.   Yes.

16    Q.   Please explain what that means.

17    A.   Well, pretty much nowadays there's gangs popping

18  up everywhere and a lot of them don't have credible

19  sources.  The ones who do have credible sources are

20  taken seriously and have better opportunities in order

21  to make money, recruit more members, as well as if they

22  were to have legal troubles, they would be able to leave

23  town pretty easily and have a place to stay.

24    Q.   So by having that connection to California that

25  made the Detroit Rollin 60s Crips a full-fledged

1    legitimate set?

2       A.   Yes.

3       Q.   Who were the big homies in the Rollin 60s during

4    your time in the gang?

5       A.   The Detroit Rollin 60s?

6       Q.   Yes, I'm sorry, the Detroit Rollin 60s Crips?

7       A.   It was me, "Looni"; "Chucc", who is "Sicco";

8    Jerome, who is "Staccs"; Daryion, who is "Fatal";

9    "Kane", whose real name is Anthony Weaver.

10          And I didn't consider her a big homey, but "Lady

11   Mayhem".

12              THE COURT:  I'm sorry?

13              THE WITNESS:  I didn't consider "Lady

14   Mayhem" to be a big homey, but others respected her

15   position.  So she qualified to have that rank.

16   BY MR. CRALLE, CONTINUING:

17      Q.   Flip to the next page in your packet.  This is

18   marked as Barber Facebook 12 and also Barber Facebook

19   12.2 as part of Government's Exhibit 14.

20          Do you recognize this document?

21      A.   Yes.

22      Q.   What is it?

23      A.   A picture of the big homies.

24      Q.   Picture of the big homies?

25      A.   Yes, it is.

1    Q.   And these were the big homies that you were just

2  referencing?

3    A.   Yes.

4            MR. CRALLE:   Your Honor, the Government

5  seeks to admit Barber Facebook 12 and 12.2 from

6  Government's Exhibit 14.

7            MR. BERGER:   Yes, relevancy and cumulative.

8            THE COURT:   It is overruled as to relevancy,

9  and since we don't have anything like this in evidence

10  yet, it is admitted as Exhibit 14, Facebook page 12.

11            MR. CRALLE:   And 12.2, Your Honor?

12            THE COURT:   And 12.2.

13            MR. CRALLE:   I seek to admit both 12 and

14  12.2.

15            THE COURT:   All right, they're admitted.

16  BY MR. CRALLE, CONTINUING:

17    Q.   Mr. Barber, the picture on the screen, is that

18  what you were just describing?

19    A.   Yes.

20    Q.   So these were the Rollin 60s Crips big homies

21  here in Detroit?

22    A.   Yes.

23    Q.   And that is you in the upper right-hand corner?

24    A.   Yes.

25    Q.   Who is that to the left of you?

1      A.   Daryion, "Fatal".

2      Q.   Who is that to the left of "Fatal"?

3      A.   "Kane".

4      Q.   And below "Kane" in the lower left-hand corner,

5   who is that?

6      A.   "Staccs".

7      Q.   Is his real name Jerome Hamilton?

8      A.   Yes.

9      Q.   And to the right of Jerome Hamilton, who is that?

10      A.   "Lady Mayhem".

11      Q.   And the right of "Lady Mayhem", who is that in

12   the lower right-hand corner?

13      A.   "Chucc".

14           THE COURT:  Is who?  I didn't hear that.

15           THE WITNESS: "Chucc".

16   BY MR. CRALLE, CONTINUING:

17      Q.   There is writing on the screen.  Can you decode

18   that for the Jury?

19      A.   "Big homies".

20      Q.   And there is a person to the left of that word

21   spelled "CIGK", who is that person?

22      A.   "Thunderhead".

23      Q.   If we can scroll down, please.  What is the title

24   of this post?

25      A.   "Detroit headline neighborhood Rollin 60s Crips

1   big homies neighborhood."  Or "hash tag neighbohood".

2       Q.   You said hashtag what?

3       A.   Neighborhood.

4       Q.   Is there a significance to the word "headline"

5   that's in that title?

6       A.   Yes.

7       Q.   What is that significance?

8       A.   The particular big homies that we were affiliated

9   with that we were recruited by in California.

10      Q.   So everyone in this picture was under a big homey

11  in California?

12      A.   Yes.

13      Q.   And what was his name?

14      A.   "Lil n head".

15      Q.   And so did everyone take -- in this group, did

16  everyone take in some way the name "head" as part of

17  their gang name?

18      A.   Yes.

19      Q.   Was that how you got the name Bonehead?

20      A.   Yes.

21      Q.   And what is another example of these individuals

22  how they took the name "head"?

23      A.   "Thunderhead".

24      Q.   And if you could look on the bottom below the

25  title, are there a number of people tagged to this

1   photo?

2      A.   Yes.

3      Q.   For example, the person at the very top there,

4   who is that?

5      A.   That's me.

6      Q.   That's you.  And underneath your account that's

7   tagged here, who is that?  Alamin Woodley?

8      A.   Alamin Woodley.

9      Q.   Who is that?

10     A.   Who is Alamin Woodley?

11     Q.   Yes.

12     A.   "Thunderhead".

13     Q.   And below "Thunderhead", who was tagged to this

14  photo?

15     A.   "FlyCrippin Big Homey Cane".

16     Q.   Was that Anthony Weaver?

17     A.   Yes.

18     Q.   And on the second page, please.  Who were the

19  individuals tagged here?

20     A.   "Mane" Davis.

21     Q.   Is that Jerome Hamilton?

22     A.   Yes.

23     Q.   And underneath that, "Lady amped up head"; is

24  that right?

25     A.   Yes.

1     Q.   Who was that individual?

2     A.   "Lady Mayhem".

3     Q.   And below that?

4     A.   Curt Cobain.

5     Q.   Who is Curt Cobain?

6     A.   "Chucc".

7     Q.   Mr. Barber, was it common for posts like this for

8   people to tag other members of the Rollin 60s?

9     A.   Yes.

10    Q.   Why would people tag other members?

11    A.   To show them the picture or to start a

12   conversation maybe online.

13         I really didn't get involved in, you know,

14   tagging people on pictures.  That was "Mayhem's" thing.

15    Q.   But people certainly tagged you?

16    A.   Yes.

17    Q.   Was that to make sure you were aware of the post?

18    A.   Yes.

19    Q.   Keep everyone connected?

20    A.   Yes.

21    Q.   And if for some reason you were tagged

22   incorrectly, you could remove yourself, correct?

23    A.   Yes.

24    Q.   Now, you mentioned that you were the big homey of

25   a particular line.  What was the name of your line?

1   A.   The boneheads.

2   Q.   So everyone in your line was known as a bonehead

3   of some sort?

4   A.   Yes.

5   Q.   How many members did you have under your line?

6   A.   On the bonehead line?

7   Q.   Yes.

8   A.   There where four.

9   Q.   And they all reported to you?

10   A.   Yes.

11   Q.   And as big homey of that line, could you order

12   the members of your line to do missions?

13   A.   Yes.

14   Q.   In the packet in front of you is what has been

15   marked as a Government's exhibit.  This is Barber

16   Facebook 13, the next page.  Do you see that?

17   A.   Yes, I do.

18   Q.   What is this item?

19   A.   These are --  this is a picture of the bonehead

20   recruits.

21   Q.   So these are people in your line?

22   A.   Yes.

23   Q.   And is this from your Facebook page?

24   A.   Yes, it is.

25                MR. CRALLE:  Your Honor, the Government

1    seeks to admit Exhibit 14, Barber Facebook 13.

2                    THE COURT:  Any objection?

3                    MR. BERGER:  Yes, relevancy.  My client is

4    not involved in this.

5                    THE COURT:  Mr. Cralle.

6                    MR. CRALLE:  Your Honor, this goes to Mr.

7    Barber's status within the gang showing his leadership

8    within it and he is going to describe things that he

9    directed people within this gang to do which would all

10   be racketeering acts.

11                   THE COURT:  Your objection is noted and

12   preserved for the record and is overruled and it is

13   admitted.

14   BY MR. CRALLE, CONTINUING:

15     Q.  Mr. Barber, you were describing the people

16   depicted in the photograph.  Who are they?

17     A.  It is "Hoodsta Ice" to the left.

18     Q.  You said "hoodsta ice"?

19     A.  Yes.

20     Q.  Who is next to him?

21     A.  That's "Hoodlum".

22     Q.  And beside him?

23     A.  That's "T Murda".

24     Q.  "T Murda"?

25     A.  Yes.

1     Q.   And to the right of "T Murda"?

2     A.   "2 Hood".

3     Q.   And these were all people below you in the

4  bonehead line?

5     A.   Yes.

6     Q.   Now, you said as big homey you could order these

7  members of your line to do missions?

8     A.   Yes.

9     Q.   What is a mission?

10    A.   A mission is anything that involves progress

11  within the gang.

12    Q.   What do you mean by progress within the gang?

13    A.   You could -- maybe someone is ordered to find a

14  mission which would have been maybe to seek out or

15  basically -- what do they call it when like burglars sit

16  outside of a house?  Casing?  Like you're casing a

17  robbery opportunity or opportunity to strike your

18  rivals.

19         A mission could be a murder or a robbery.  It

20  could be a shooting.  It could be a tagging mission

21  which would mean spray painting.

22         A mission could be maybe robbing a drug dealer or

23  finding a new connection, a new plug with a better

24  source of weapons or drugs.

25         That's pretty much what missions were assigned.

1          Or assaults, too.

2     Q.  Assaults, too?

3     A.  Yes.

4     Q.  So a mission is essentially a generic word for

5  some sort of criminal activity?

6     A.  Yes.

7     Q.  For the gang to make money?

8     A.  Yes.

9     Q.  And were missions assigned by you?

10    A.  Yes.

11    Q.  And did other big homies assign missions?

12    A.  Yes.

13    Q.  Were those missions assigned in person?

14    A.  Yes.

15    Q.  Were they also assigned over Facebook?

16    A.  Yes.

17    Q.  In the packet in front of you is what has been

18  marked as Barber Facebook 14.  This is part of

19  Government's Exhibit 14.

20         Do you recognize this document?

21    A.  Yes, I do.

22    Q.  What is this document?

23    A.  I'm telling a member to find a mission with other

24  recruits.

25    Q.  So this is a conversation between you and another

1  Rollin 60s?

2     A.  Yeah.

3     Q.  While you were over those members?

4     A.  Yes.

5          MR. CRALLE:  Your Honor, the Government

6  seeks to admit Exhibit 14, Barber Facebook 14.

7          THE COURT:  Any objection?

8          MR. BERGER:  Relevancy, Your Honor.

9          THE COURT:  How is it relevant?

10         MR. CRALLE:  Mr. Barber is discussing

11  criminal activity, racketeering acts, within the gang.

12         THE COURT:  I will admit it and your

13  objection is overruled.

14  BY MR. CRALLE, CONTINUING:

15    Q.  Mr. Barber, starting at the top there, first of

16  all, who are those two Facebook account names relate to?

17    A.  Mine and a member named "O dog".

18    Q.  So that's a conversation between you and a person

19  named "O dog"?

20    A.  Yes.

21         THE COURT:  This is on 14?

22         MR. CRALLE:  That is correct, Your Honor.

23  BY MR. CRALLE, CONTINUING:

24    Q.  And when was this message sent?

25    A.  July 21st, 2011.

1    Q.   And the first message is from you?

2    A.   Yes.

3    Q.   Can you please read that?

4    A.   "You hoodsta gooch n ceaz need to make dat

5    mission cracc.  If u don't kno cout it asc hkhoodlum."

6    Q.   And did "O dog" respond?

7    A.   Yes.

8    Q.   What did he say?

9    A.   "HK".

10   Q.   What does "HK" mean?

11   A.   All right.  It's agreement.

12   Q.   It means okay?

13   A.   Yes.

14   Q.   But was it forbidden to use the letters "O" and

15   "K"?

16   A.   Yes.

17   Q.   Why?

18   A.   It stood for "O killer".

19   Q.   And what does "O killer" mean?

20   A.   "O killer" is a derogatory term that our rivals

21   used to disrespect our gang as well as other Rollin O

22   gangs.

23   Q.   So as a Rollin 60s, generically you were known as

24   "Os"?

25   A.   Yes.

1     Q.   So if someone said the letters "O" "K", that

2    would be derogatorily saying killing Rollin 60s?

3     A.   Yes.

4     Q.   And did "H-K" have a meaning?

5     A.   Yes.

6     Q.   What did it mean?

7     A.   "Hoover killer."

8     Q.   "Hoover killer"?

9     A.   Yes.

10     Q.   Is that a rival gang?

11     A.   Yes.

12     Q.   The people that are referenced in this message,

13    you said "O dog", you mentioned "hoodsta", "gooch" and

14    "ceaz" and then "hoodlum", those are all members of the

15    Rollin 60s?

16     A.   Yes.

17     Q.   And you direct them to make that mission "cracc"?

18     A.   Yes.

19     Q.   Do you recall the nature of this particular

20    mission?

21     A.   At that particular time I was asking them to find

22    a drug dealer or someone to rob in order to get them

23    some kind of drugs to sell.

24     Q.   Thank you.

25          Did you ever order anyone to shoot someone?

1     A.   Yes.

2     Q.   What is an example?

3     A.   "Hoodlum" was being harassed by a rival gang

4  member.  I believe he was a Skyline Piru and he called

5  and said he didn't know what to do.  And I said if he

6  comes to your house, shoot him.

7     Q.   Did you ever send --  did you know a gang member

8  by the name of DeAngelo Green?

9     A.   Yes.

10    Q.   What was his gang name?

11    A.   "Loco".

12    Q.   Did you ever order him on a mission to shoot

13 someone?

14    A.   Well, I didn't tell him.  He got out when I got

15 out.  I didn't order him to do anything though.

16         You want me to talk about that particular

17 occasion?

18    Q.   Please.

19    A.   Well, on that particular occasion, I went -- I

20 was on my way to the gas station to get a cigarillo to

21 smoke.  At that time I noticed a rival tag in the

22 neighborhood over a tag that I had just made earlier.

23 So I knew that it had to have been that day when the

24 rival gang was in the area.

25         The next day, they came back, the gang was the

1    Black Peastones, they came back and wanted to fight, but

2    they, instead of finding us, they found someone that we

3    knew and they called us over there.

4         Q.  Let me interrupt you there if I could.  Let's

5    break that down a little bit.

6              What time period are we talking about?

7         A.  This is 2010.

8         Q.  So in 2010, you mentioned that you had spray

9    painted some graffiti?

10        A.  Yes.

11        Q.  Where did you do this?

12        A.  On the gas station.

13        Q.  And where was this gas station located?

14        A.  On Schaefer and the Lodge Freeway.

15        Q.  So you spray painted some graffiti on a gas

16   station at Schaefer and the Lodge.  Was it just a

17   generic writing, what was the type of graffiti?

18        A.  It was something I was working on for a while.

19   So it was more of something that you would see downtown

20   or like on the side of a train than just like regular

21   writing on the wall.

22        Q.  So it was fairly elaborate is what you're saying?

23        A.  Yes.

24        Q.  It had taken you some time to do it?

25        A.  Yes.

1     Q.   So you had spent some time doing this graffiti

2   and then at some point I think you mentioned that you

3   went out to get a cigarillo?

4     A.   Yes.

5     Q.   Now, where were you prior to leaving to go get

6   that cigarillo?

7     A.   At "Shotti's" house.

8     Q.   And by "Shotti", who do you mean?

9     A.   Shawn.

10    Q.   Shawn?

11    A.   William Shawn Steele.

12    Q.   And do you see Mr. Steele in the courtroom today?

13    A.   Yes.

14    Q.   Can you describe an article of clothing he is

15   wearing?

16    A.   A black shirt.

17          MR. CRALLE:   Your Honor, may the record

18   reflect that the witness has identified the Defendant.

19          THE COURT:   So noted for the record.

20   BY MR. CRALLE, CONTINUING:

21    Q.   So at this point in 2010 you leave Mr. Steele's

22   house to go to -- did you say to the liquor store?

23    A.   Gas station.

24    Q.   And about what time of day is this?

25    A.   This is past midnight.  It's past midnight and I

1    don't know specifically what time of day it was.

2        Q.  It was late at night?

3        A.  It was late at night.

4        Q.  When you go to the gas station, what happens?

5        A.  I notice the graffiti on the wall over what I had

6    made earlier.  It was a derogatory term to our set so I

7    knew that it was an enemy that did it.  So the next

8    day --

9        Q.  Let me interrupt, I'm sorry.

10           So you go to the gas station and you see that

11   someone has crossed out or painted over the tag that you

12   had spent so much time doing?

13       A.  Yes.

14       Q.  Were you upset by this?

15       A.  Yes.

16       Q.  Why?

17       A.  It took a long time for me to do the tag.  I put

18   a lot of work into it.  And then on top of that for it

19   to have happened right after I did it was a little

20   frustrating.

21       Q.  So you headed back to where after this?

22       A.  Back to "Shotti's" house.

23       Q.  And do you discuss it?

24       A.  Yes.

25       Q.  You were upset?

1     A.   Yes.

2     Q.   And how did he react when he learned that your

3  tag had been crossed out?

4     A.   He was upset, too, but it wasn't -- he wasn't

5  that upset though.

6     Q.   He wasn't as upset as you?

7     A.   Yes.

8     Q.   And you mentioned the next day there were --

9  there was a group of people in the area?

10    A.   Yes.

11    Q.   Who were these people?

12    A.   The Black Peastones.

13    Q.   The Black Peastones is a rival gang?

14    A.   Yes.

15    Q.   And what were the Black Peastones doing?

16    A.   Looking for a fight.

17    Q.   How did you learn they were in the area?

18    A.   I was contacted by some people that lived in the

19  neighborhood that knew us.  They weren't gang members

20  but they knew us.

21    Q.   So someone alerted you that a rival gang was in

22  the area?

23    A.   Yes.

24    Q.   And what happened after that?

25    A.   We were told to go and see what they wanted to

1   do.  See if they wanted to fight or shoot.  Just to see

2   what the commotion was about.

3       Q.  Who directed you to go confront this gang?

4       A.  "Fatal".  Daryion.

5       Q.  Daryion Mills?

6       A.  Yes.

7       Q.  And who did he instruct to do this?

8       A.  He instructed me to go over there, but I rode

9   with "Shotti" and "Loco".

10      Q.  So you, Steele and "Loco", DeAngelo Green, go out

11  to find this rival gang?

12      A.  Yes.

13      Q.  How did you get there?

14      A.  He drove.

15      Q.  When you say "he", who do you mean?

16      A.  "Shotti".

17      Q.  So Mr. Steele drives and the two of you are in

18  the car?

19      A.  Yes.

20      Q.  Where were you sitting in the car?

21      A.  In the back passenger seat.

22      Q.  And where was "Loco" sitting?

23      A.  Back passenger seat.

24      Q.  Was there anyone in the front with Mr. Steele?

25      A.  Yes.

1      Q.   Who?

2      A.   His girlfriend at the time.

3      Q.   His girlfriend at the time?

4      A.   Yes.

5      Q.   What kind of car was he driving?

6      A.   Gold G-6.

7      Q.   Is that a model of Pontiac?

8      A.   Yes.

9      Q.   Did you find the rival gang?

10     A.   Yes.

11     Q.   Where did you find them?

12     A.   On Snowden and Pickford.

13     Q.   What happened when you saw them?

14     A.   When we saw them, we got out the car, and they

15  were still in the truck, and they approached us in the

16  truck at a speed and then started rolling the windows

17  down.

18     Q.   As they're approaching you at that speed with the

19  windows rolling down, what did you think was going to

20  happen?

21     A.   They were going to start shooting.

22     Q.   And so what did you do in response?

23     A.   I shot first.

24     Q.   And did you tell anyone else to shoot?

25     A.   Yes.

1     Q.   Who?

2     A.   "Loco" -- well, I didn't tell him to shoot, but

3  he shot because I was trying to shoot -- because I was

4  shooting.

5     Q.   So the two of you were shooting at this rival

6  gang and --

7               THE COURT:  Who is this other person?

8               THE WITNESS:  DeAngelo Green.

9  BY MR. CRALLE, CONTINUING:

10    Q.   How many times did you shoot at this rival gang?

11    A.   Six.

12    Q.   What kind of gun were you using?

13    A.   A .38 caliber.  A .38 special revolver.

14    Q.   Mr. Green, do you know what kind of gun he had?

15    A.   A .22 caliber Baretta.

16    Q.   Do you know how many times he shot?

17    A.   Once.

18    Q.   So you guys, the two of you fired seven times at

19  this rival gang?

20    A.   Yes.

21    Q.   And before I move on, Mr. Barber, you have some

22  familiarity with firearms?

23    A.   Yes.

24    Q.   You know the difference between a revolver and a

25  semi-automatic?

```
 1      A.   Yes.

 2      Q.   You know the difference between makes and models?

 3      A.   Yes.

 4      Q.   So after the two of you fired seven times at the

 5  Black Peastones, what happened?

 6      A.   We got -- "Loco" got in the car and they pulled

 7  off.  I ran down Snowden towards the freeway, towards

 8  the Lodge freeway.  I crossed over the freeway, stashed

 9  the gun and went back to "Shotti's" house.

10      Q.   And what happened when you got back to

11  Mr. Steele's house?

12      A.   We got in the car, drove up to Eight Mile, and I

13  dumped the shells in the sewer.

14      Q.   When you say we got in the car, who got in the

15  car?

16      A.   "Shotti" and I and Daryion.

17      Q.   So you and Mr. Steele and Mr. Barber get in the

18  car and drive to where?

19      A.   Mr. Mills.  I'm Mr. Barber.

20      Q.   I'm sorry, I misspoke.

21           You, Mr. Mills and Mr. Steele get in the car?

22      A.   Yes.

23      Q.   And then where do you go?

24      A.   To Eight Mile and Hubbell.

25      Q.   For what purpose?
```

 1     A.   To -- I think he was something -- we were doing

 2     something else, but at that time I thought it would be a

 3     good time to get rid of the shells.

 4     Q.   Get rid of the shell casings?

 5     A.   Yes.

 6     Q.   So you're getting rid of the evidence of that

 7     gang shooting?

 8     A.   Yes.

 9     Q.   And was that so that it couldn't be linked back

10     to you?

11     A.   Yes.

12     Q.   Now returning to talking about your membership or

13     your leadership as a big homey, did people on your line

14     have to pay dues to you?

15     A.   Yes.

16     Q.   If we can turn the next page in the document in

17     front of you, Barber Facebook 15, 15.2 and 15.3.   Could

18     you please read through that and let me know if you

19     recognize them.

20     A.   Yes.

21     Q.   What are these pages?

22     A.   This is me asking a member why he doesn't pay

23     dues, and -- well, it took a while to get to that point,

24     but at the end of the conversation is where I -- the

25     point of the conversation was for me to ask why he

 1  wasn't paying dues.

 2     Q.  So this is a conversation between you and a gang

 3  member?

 4     A.  Yes.

 5     Q.  While you were both members of the gang?

 6     A.  Yes.

 7          MR. CRALLE:  Your Honor, the Government

 8  seeks to admit Government's 14, Barber Facebook 15, 15.2

 9  and 15.3.

10          THE COURT:  Any objection?

11          MR. BERGER:  Objection as to relevancy with

12  regard to Mr. Steele.

13          THE COURT:  How is it relevant, Counsel?

14          MR. CRALLE:  Your Honor, it goes to Mr.

15  Barber's leadership.  It goes to the topic of dues.

16  These all go to whether or not an enterprise existed,

17  the organization of the enterprise and the association

18  of members.

19          THE COURT:  Very well, the objection is

20  overruled because it may be relevant and it's admitted.

21  BY MR. CRALLE, CONTINUING:

22     Q.  If we can start at the very top, please.

23          Mr. Barber, you mentioned that this is a

24  conversation between you and another gang member?

25     A.  Yes.

1      Q.   Who is that gang member?

2      A.   That is "Baby Blu Bones".

3      Q.   Is that the screen name Rondale Perry?

4      A.   I'm sorry, I think it's "Infant Blu Bones".   I'm

5    sorry, not "Baby Blu Bones".

6      Q.   And by infant, that means he is even lower in the

7    hierarchy?

8      A.   Yes.

9      Q.   But this is Rondale Perry?

10     A.   Yes.

11     Q.   And is he related to another member of your line?

12     A.   Yes.

13     Q.   Who?

14     A.   "Hoodlum" who is Roderek Perry.

15     Q.   So they're basically both members of your line?

16     A.   Yes.

17     Q.   And starting at the top, who is the first person

18   that initiates this message string?

19     A.   Me.

20     Q.   What do you say?

21     A.   I said, "NNicca u out?"

22     Q.   What do you mean by "you out"?

23     A.   I believe at that point in time he was

24   incarcerated for something.

25     Q.   And how does he respond?

```
 1    A.   "Snoo u".

 2    Q.   What does "snoo" mean?

 3    A.   It means who.

 4    Q.   Why don't you say they word "who"?

 5    A.   Because it sounds too close to Hoover, the rival

 6  gang.

 7    Q.   Scrolling down to the next one, how does he

 8  respond -- or he says "snoo u" and how do you respond?

 9    A.   I said, "snoo me!!??nicca u aint hoodlum quit

10  fakin cuzz."

11    Q.   And what do you mean when you said you ain't

12  Hoodlum?

13    A.   It means that he didn't have as much leeway with

14  me as "Hoodlum" did so I don't appreciate, you know,

15  playing with me and wasting my name, you know, when I'm

16  trying to be serious with you.

17    Q.   Basically could you interpret that as disrespect?

18    A.   Yes.

19    Q.   And how did he respond?

20    A.   "Naw this is his brother".

21    Q.   But he doesn't say brother, does he?

22    A.   He says, "crother".

23    Q.   Why does he say "crother"?

24    A.   To replace the "B".

25    Q.   How do you respond to that message?
```

```
 1     A.   "So how yu don't know Snoo I am."

 2     Q.   How does he respond?

 3     A.   "O dam".

 4     Q.   And then?

 5     A.   He says, "wats gud".

 6     Q.   And then you responded?

 7     A.   "West hood".

 8     Q.   So at that point he realized who you were?

 9     A.   Yes.

10     Q.   Can we turn to 15.2, please, starting at the top.

11          Is that you sending a message to him?

12     A.   Yes.

13     Q.   What are you saying?

14     A.   "Snoo is u".

15     Q.   And what does he say?

16     A.   "Hoodlum cro".

17     Q.   So he is identifying himself as Roderek Perry's

18  brother?

19     A.   Yes.

20     Q.   So just for clarification, is that his younger

21  brother or older brother?

22     A.   Younger brother.

23     Q.   And then what do you ask him?

24     A.   "West yo name".

25     Q.   How does he respond?
```

1      A.   "Blue bone".

2      Q.   And how did you respond to that?

3      A.   I said, "man how da fucc u dont kno yo name.nigga

4  im big blu bones".

5      Q.   What do you mean by that?

6      A.   I mean that he is supposed to identify himself as

7  infant blu bones not just blu bones.  If anything, blu

8  bones would mean me.

9      Q.   So again, this was a sign of him disrespecting

10  you?

11      A.   Yes.

12      Q.   I take it by this point you're getting kind of

13  frustrated with him?

14      A.   Yes.

15      Q.   How did he respond?

16      A.   "I mean infant blue bones".

17      Q.   And you responded?

18      A.   "Smh".

19      Q.   And then does he respond again?

20      A.   He said, "yeah big homey gave me that name".

21      Q.   And when he said "big homey", who is he referring

22  to?

23      A.   Me.

24      Q.   And how did you respond?

25      A.   "Man u gotta be dumb or some shit.  Nigga snoo I

1   am".

2       Q.   Because he is saying that big homey gave you the

3   name?

4       A.   Yes.

5       Q.   So he doesn't realize that's you?

6       A.   Yes.

7       Q.   If we can turn to 15.3.  How does he respond?

8       A.   "O".

9       Q.   And then finally, what is the next message in

10  this string?

11      A.   Me asking him -- I ask him, I say, "so west da

12  deal nigga?u don't put n no worc dont pay no dues what's

13  yo purpose of gettin down den nicca".

14      Q.   What do you mean by that last message when you

15  say you don't put in no work?

16      A.   He wasn't active.  He didn't commit any crimes or

17  anything. He didn't represent the set in any kind of

18  way.

19      Q.   He wasn't pulling his weight?

20      A.   Yes.

21      Q.   What do you mean when you say don't pay no dues?

22      A.   Don't pay dues as far as he didn't pay his

23  membership dues.

24      Q.   And then what did you mean by what's your purpose

25  of getting down?

1    A.   I asked him why -- well, I was asking him what

2  was he around for if he didn't participate in anything.

3    Q.   Basically why are you a gang member if you're not

4  going to do anything?

5    A.   Yes.

6    Q.   Over the time that you were a Rollin 60s Crip,

7  did people come and go?

8    A.   Yes.

9    Q.   People joined the gang, left the gang, things

10 like that?

11   A.   Yes.

12   Q.   Was there an expectation that they would commit

13 gang activity while they're a member though?

14   A.   Yes.

15   Q.   And if they didn't, were there repercussions?

16   A.   Yes.

17   Q.   What?

18   A.   Violations, possibly losing their life.

19   Q.   Possibly losing their life?

20   A.   Yes.

21   Q.   And just to be clear, while you were a member,

22 was Mr. Steele also a member of the Rollin 60s Crips?

23   A.   Yes.

24   Q.   And did he carry out gang activity?

25   A.   Yes.

1    Q.   Is there any question in your mind whether or not

2    he is a Rollin 60s Crip?

3    A.   No.

4    Q.   Now, you have referenced or you have mentioned

5    the term "dues" a number of times.  What were dues?

6    What was the purpose?

7    A.   The purpose of dues was to collect a certain

8    amount of money every month from members, and as that

9    number accumulates, we were able to purchase guns and

10   drugs for them to be able to make money and to be able

11   to expand or as well as if a member was to become

12   incarcerated, they'd have money on their books, their

13   commissary, and --

14   Q.   Let's break that down.

15        So first, if a person was arrested, you would put

16   money on their books?

17   A.   Yes.

18   Q.   What does that mean exactly?

19   A.   We would put money in their commissary account so

20   they could buy things at the store or talk to their

21   family.

22   Q.   And you said you would also pool money together

23   to buy guns?

24   A.   Yes.

25   Q.   To buy drugs?

1    A.   Yes.

2    Q.   We'll break down the economics of the drug side

3    in a minute, but is that so you could buy a bigger

4    quantity of drugs at a particular time?

5    A.   Yes.

6    Q.   And were there advantages of buying a larger

7    quantity for the gang?

8    A.   Yes.

9    Q.   During the period that you were a member, what

10   were the typical dues like?  What was the amount of the

11   typical dues?

12   A.   Like $10.00 a month per person.

13   Q.   And how were these dues collected?

14   A.   At meetings or lil homies would collect them in

15   person before the meetings.

16   Q.   And then would the dues all be given to a central

17   person?

18   A.   Yes.

19   Q.   Who?

20   A.   The big homey.

21   Q.   Which one?

22   A.   At the time it would be given to --  it depends

23   on what time point because there was a power struggle at

24   one point and then everybody collected their own dues.

25   But before that power struggle, Daryion collected all

1  the dues.

2      Q.  And did all members pay dues?

3      A.  Yes.

4      Q.  Did William Steele pay dues?

5      A.  Yes.

6      Q.  Who did he pay dues to?

7      A.  Daryion.

8      Q.  To Daryion Mills?

9      A.  Yes.

10     Q.  "Fatal"?

11     A.  Yes.

12     Q.  Now, we haven't talked about this, but which line

13  has William Steele in?

14     A.  Daryion's.  The Fatal line.

15     Q.  He was in the Fatal line.  And what was his rank

16  in that line?

17     A.  Lil homey.

18     Q.  He was a lil homey?

19     A.  Yes.

20     Q.  And his big homey was who?

21     A.  Daryion.

22     Q.  So William Steele reported directly to Daryion

23  Mills?

24     A.  Yes.

25     Q.  And I believe earlier you said the lil homey is

1   like a manager?

2       A.   Yes.

3       Q.   What was the main territory of the Rollin 60s

4   Crips?

5       A.   Seven Mile and Schaefer.

6       Q.   Were there any other territories?

7       A.   Yes.

8       Q.   What?

9       A.   Van Dyke and Mack.

10      Q.   In the packet in front of you is an item marked

11  Barber Facebook 9.  This is part of Government's Exhibit

12  14.

13           Do you recognize this?

14      A.   I don't have 9.

15      Q.   You don't have Barber Facebook 9?

16      A.   No.

17               MR. CRALLE:  Your Honor, may I approach the

18  witness?

19               THE COURT:  You may.

20               THE WITNESS:  Oh, it is behind 15.  Sorry.

21  BY MR. CRALLE, CONTINUING:

22      Q.   If you could review that, please.

23           Do you recognize this?

24      A.   Yes.

25      Q.   What is this document?

1     A.   Having a discussion with a Rollin 100 member.

2     Q.   This is a discussion between with you and another

3  gang member?

4     A.   Yes.

5     Q.   And what are you discussing?

6     A.   The turfs that we -- he wants to know the

7  boundary lines of the turfs so he doesn't cross over

8  them.

9     Q.   So this is a discussion between you and another

10 gang member, a rival gang discussing the territory of

11 the Rollin 60s Crips?

12    A.   Yes.

13              MR. CRALLE:  Your Honor, we would seek to

14 admit Government's Exhibit 14, Barber Facebook 9.

15              THE COURT:  Any objection?

16              MR. BERGER:  Same objection, relevancy.

17              THE COURT:  Mr. Cralle.

18              MR. CRALLE:  This is relevant because it

19 shows the territory controlled by the organization, the

20 enterprise.

21              THE COURT:  Very well, the Court admits it

22 and notes your objection for the record, Mr. Berger, and

23 it is admitted as Exhibit 14, Facebook 9.

24 BY MR. CRALLE, CONTINUING:

25    Q.   If we could start at the top, Mr. Barber.   Who

1   starts this message string?

2       A.  I do.

3       Q.  And you're reaching out you said to a rival gang?

4       A.  Yes.

5       Q.  And what do you say?

6       A.  "West upk".

7       Q.  And what does he respond?

8       A.  "Whats all the turf yall got under yall control

9   cause 100s finna expand the turf cause we finna to get

10  into some heavy shit".

11          I guess the last part is just a signature tag.

12      Q.  So the rival gang, what was it called?

13      A.  The rollin -- well they weren't rivals, they were

14  just a different gang.

15      Q.  I'm sorry, this is a separate gang but they're

16  not rivals?

17      A.  Yeah.

18              THE COURT:  What are they called?

19              THE WITNESS: The Rollin 100s.

20  BY MR. CRALLE, CONTINUING:

21      Q.  So a separate gang known as the Rollin 100s asked

22  you what your turf is?

23      A.  Yes.

24      Q.  Because they don't want to have a confrontation

25  with you?

1     A.   Yes.

2     Q.   As they expand their territory?

3     A.   Yes.

4     Q.   How do you respond?

5     A.   I tell him -- I map out the area for him on the

6   west side.

7     Q.   So you lay out the area on the west side?

8     A.   And the east side.

9     Q.   And what were those areas?

10     A.   Seven Mile -- well, the Seven Mile area on the

11   west side, east and west, the boundaries would have been

12   Wyoming and the Lodge freeway.  North to south the

13   boundaries are Pembroke and Curtis.

14     Q.   If we could pull up Government's Exhibit 1 that

15   was previously admitted.

16         Is this the area you were just describing

17   (indicating)?

18     A.   Yes.

19     Q.   That is the west side?

20     A.   Yes.

21             MR. CRALLE:  Your Honor, may I approach the

22   witness?

23             THE COURT:  Yes, you may.

24   BY MR. CRALLE, CONTINUING:

25     Q.   Mr. Barber, I have just handed you what has been

 1   marked as Government's Exhibit 71.

 2          Do you recognize that item?

 3   A.   Yes.

 4             THE COURT:  Exhibit 71?

 5             MR. CRALLE:  Yes, Your Honor.

 6             THE COURT:  Okay.

 7   BY MR. CRALLE, CONTINUING:

 8   Q.   Do you recognize that item?

 9   A.   Yes.

10   Q.   And what is that item?

11   A.   A map of the east side territory.

12   Q.   Map of the east side territory controlled by the

13   Rollin 60s?

14   A.   Yes.

15             MR. CRALLE:  Your Honor, the Government

16   seeks to admit Exhibit 71, please.

17             THE COURT:  Any objection?

18             MR. BERGER:  Objection as to relevancy.

19             THE COURT:  How is it relevant, Counsel?

20             MR. CRALLE:  Your Honor, it's relevant

21   because it goes to another area under the control of the

22   enterprise.

23             THE COURT:  Your objection is noted and

24   preserved for the record and overruled and admitted as

25   71.

```
 1  BY MR. CRALLE, CONTINUING:
 2     Q.  Mr. Barber, the boundaries of this area, what
 3  were they?
 4     A.  North to south is Warren to Mack.  East to west
 5  is Van Dyke to Cadieux.
 6     Q.  Now, how did the Rollin 60s acquire this
 7  territory on the east side?
 8     A.  I had many members on the east side.  Most of my
 9  members were actually resided on the east side within
10  the same area.  So it was pretty easy for them to take
11  over.
12     Q.  So this was all territory under your control?
13     A.  Yes.
14     Q.  And approximately how many members did you have
15  in this area on the east side of Detroit?
16     A.  About 10.
17             THE COURT:  How many?
18             THE WITNESS:  About 10.
19  BY MR. CRALLE, CONTINUING:
20     Q.  Now Mr. Barber, how would you delineate the
21  boundaries of your territory so that other people would
22  know that it was, in fact, Rollin 60s' territory?
23     A.  Graffiti or throwing blue shoes up on the power
24  lines.
25     Q.  So those would be ways someone would know these
```

1    are Rollin 60s' territory?

2        A.   Yes.

3        Q.   In the packet in front of you is what's been

4    marked as Barber Facebook 10 as part of Government's

5    Exhibit 14.

6             Do you recognize this item?

7        A.   Yes.

8        Q.   What is this?

9        A.   It's a graffiti from the Rollin 60s.

10            THE COURT:   What page are you on again?

11            MR. CRALLE:   Barber Facebook 10.   Should be

12   the next page in your packet.

13            Your Honor, the Government seeks to admit

14   Barber Facebook 10 out of Government's Exhibit 14.

15            THE COURT:   Any objection?

16            MR. BERGER:   Relevancy, Your Honor.

17            THE COURT:   How is it relevant?

18            MR. CRALLE:   It's relevant because it goes

19   to show how the enterprise would inform others of its

20   existence and its territories.

21            THE COURT:   Your objection is noted and

22   preserved for the record and overruled.   And this item

23   is admitted.

24   BY MR. CRALLE, CONTINUING:

25       Q.   Let's zoom in on the picture.

1        Mr. Barber, can you decode for the Jury this

2   graffiti, please.

3        A.   Slauson to Seven Mile.

4        Q.   Let's start with the first word there, Slauson.

5   What's the significance of that word?

6        A.   That is the street where the Rollin 60s

7   originated in California.

8        Q.   And what is the significance of Seven Mile?

9        A.   The territory where we originated in Detroit.

10       Q.   So this was showing your connection to

11   California?

12       A.   Yes.

13       Q.   And if we can scroll down, please, to the date.

14   What is the time period that this was uploaded at least

15   to your Facebook account?

16       A.   May 27th, 2010.

17       Q.   So this was during the period in which you were a

18   member?

19       A.   Yes.

20       Q.   Next in your packet you will see what is marked

21   as Barber Facebook 11.  Do you recognize this item?

22       A.   Yes.

23       Q.   What is it?

24       A.   Two members on the east side posing in front of a

25   territory.  I mean, tagged on the east side.

1    Q.   These are people tagging on the east side?

2    A.   Yes.

3    Q.   And do you know those members?

4    A.   Yes.

5         MR. CRALLE:  Your Honor, the Government

6    seeks to admit Barber Facebook 11 out of Government's

7    Exhibit 14.

8         THE COURT:  This is not already in evidence?

9         MR. CRALLE:  No, it is not, Your Honor.

10   This is specific to Mr. Barber.

11        THE COURT:  Any objection?

12        MR. BERGER:  Relevancy, Your Honor.

13        THE COURT:  How is it relevant, Counsel?

14        MR. CRALLE:  It is relevant because it goes

15   to how the enterprise informed others of its existence.

16        THE COURT:  Your objection is noted and

17   preserved for the record and overruled and this item is

18   admitted as Exhibit 14, 11.

19   BY MR. CRALLE, CONTINUING:

20   Q.   Mr. Barber, you were mentioning that you knew

21   about these people?

22   A.   Yes.

23   Q.   Who are they?

24   A.   This is "Hoodsta gooch" and "2 hood".

25   Q.   Let's break that down.  You said "hoodsta gooch"?

1      A.   Yes.

2      Q.   And "2 hood"?

3      A.   Yes.

4      Q.   And were they people under your line?

5      A.   Yes.

6      Q.   Was this a way that they were informing people of

7   their membership and the territory?

8      A.   Yes.

9      Q.   Was it part of a mission?

10      A.   No.

11      Q.   They just did it on their own?

12      A.   Yes.

13      Q.   And where was this graffiti spray painted?

14      A.   On Mack Avenue.

15      Q.   This was on Mack Avenue?

16      A.   Yes.

17      Q.   So this is the east side?

18      A.   Yes.

19      Q.   And the phrase on the left says "Crips"; is that

20   right?

21      A.   Yes.

22      Q.   And that is painted in blue?

23      A.   Yes.

24      Q.   And on the right, what does it say?

25      A.   Rollin 60s.

1    Q.   Now, let's talk about when you first joined the

2    gang, please.

3         Do you remember the year in which you joined the

4    gang?

5    A.   2009.

6    Q.   Do you remember the month?

7    A.   July.

8    Q.   Now, prior to joining the Rollin 60s, were you a

9    member of a different gang?

10   A.   Yes.

11   Q.   What was the name of that gang?

12   A.   Bounty Hunter.

13   Q.   So you were a Bounty Hunter Blood before you

14   became a Rollin 60?

15   A.   Yes.

16   Q.   And when you were a member of the Bounty Hunter

17   Bloods did you meet members of the Rollin 60s Crips?

18   A.   Yes.

19   Q.   How did that come about?

20   A.   There is an affiliation which calls for a cease

21   fire between the two gangs called 7654.

22   Q.   7654, what did that mean?

23   A.   Family loyalty will honor a life.

24   Q.   Was that essentially an alliance between these

25   two gangs?

1     A.   Yes.

2     Q.   Between the Bounty Hunter Bloods and the Rollin

3  60s Crips?

4     A.   Yes.

5     Q.   Were there any other groups connected to the 7654

6  alliance?

7     A.   Yes.

8     Q.   Who?

9     A.   What's left of BMF.

10     Q.   What does BMF stand for?

11     A.   Black Mafia Family.

12              THE COURT:   I'm sorry, I didn't hear

13  that.

14              THE WITNESS:   The Black Mafia Family,

15  Your Honor.

16  BY MR. CRALLE, CONTINUING:

17     Q.   So you met members of the Rollin 60s at that time

18  through the 7654 alliance?

19     A.   Yes.

20     Q.   Anyone in particular?

21     A.   Jerome Hamilton.

22     Q.   And during this period while you were a Bounty

23  Hunter Bloods, where did you live?

24     A.   I lived on --  well, I lived on the east side,

25  and then moved to Oak Park for a little while.  Then I

1    moved to the neighborhood off of Seven Mile and

2    Schaefer.

3       Q.  So while you were a Bounty Hunter Bloods, you

4    moved into Rollin 60s territory?

5       A.  Yes.  This was before they were Rollin 60s

6    though.

7       Q.  This was as the gang is sort of forming?

8       A.  Yes.

9            THE COURT:  You know that there is some

10   drilling outside but I don't have any control over it.

11            Can you all hear all right, though?

12            Yes?  So you all need to speak a little tiny

13   bit louder, but don't get any closer to the mike because

14   it distorts.  Just use your voice louder.

15            THE WITNESS:  Okay.

16            MR. CRALLE:  Thank you, Your Honor.

17            THE COURT:  You, too, Mr. Cralle.

18   BY MR. CRALLE, CONTINUING:

19      Q.  Now, Mr. Barber, you were mentioning that when

20   you moved over to the Rollin 60s' territory, you met

21   other individuals there?

22      A.  Yes.

23      Q.  Who specifically?

24      A.  I don't understand the question.

25      Q.  Let me rephrase.

1         When you first moved over to the Rollin 60s'
2    territory as a member of the Bounty Hunter Bloods, who
3    did you meet?
4         A.   Daryion.
5         Q.   And Daryion is Daryion Mills who we have been
6    talking about?
7         A.   Yes.
8         Q.   Did he go by a different name?
9         A.   Yes.
10        Q.   What was that?
11        A.   "Fatal".
12        Q.   And did you have conversations with "Fatal"
13   initially about becoming a member of his gang while you
14   were a Bounty Hunter Bloods?
15        A.   No.
16        Q.   So it wasn't at that point?
17        A.   No.
18        Q.   Was there some sort of event that led you to
19   switch from the Bounty Hunter Bloods to the Rollin 60s?
20        A.   Well, I didn't switch, I just stopped.  I stopped
21   gang-banging for a while.
22             But do you want me to speak about the incident in
23   particular?
24        Q.   Sure.  Was there an incident while you were a
25   Bounty Hunter Bloods that kind of soured you on it?

1     A.   Yes.

2     Q.   What was that?

3     A.   An attempted robbery on myself.

4     Q.   Let's put that in context.  So while you were a

5  Bounty Hunter Bloods, there was some sort of attempted

6  robbery of you?

7     A.   Yes.

8     Q.   Approximately when did this happen?  Year would

9  be fine.

10    A.   2008.

11    Q.   So in 2008 someone tried to rob you?

12    A.   Yes.

13    Q.   Where did this happen?

14    A.   On my street, Littlefield and Seven Mile.

15    Q.   And when they tried to rob you, what did you do?

16    A.   I acted like I was going to fight and then I ran.

17    Q.   And ran to where?

18    A.   To a neighbor's house.

19    Q.   And what did you do?

20    A.   Ran up to the neighbor's house, and after they

21  left, I called the Bounty Hunter member that was in my

22  area that was supposed to be in control of the members

23  in the area and he wouldn't respond.

24         Well, he talked to me, we talked, but he wouldn't

25  do anything, so.

1     Q.   So let me break that down.

2          So someone tried to rob you?

3     A.   Yes.

4     Q.   Because you're a Bounty Hunter, you reached out

5     to your fellow Bounty Hunter Bloods for help?

6     A.   Yes.

7     Q.   And someone talked to you but basically didn't do

8     anything?

9     A.   Yes.

10    Q.   What was your reaction to that?

11    A.   I was upset.

12    Q.   Why?

13    A.   Because it was my understanding that that was his

14    responsibility was to react to any situation involving a

15    member in his control as well as that's one of the first

16    rules to being a part of a gang that you react to a

17    situation.

18    Q.   So basically the gang let you down?

19    A.   Yes.

20    Q.   Did anyone else help you out?

21    A.   Yes.

22    Q.   Who?

23    A.   Daryion and a couple guys from the neighborhood.

24    Q.   How did Daryion Mills help you?

25    A.   We went looking for the guys.

1      Q.   So you and Mr. Mills go around the area looking

2   for the people that tried to rob you?

3      A.   Yes.

4      Q.   Did you find them?

5      A.   No.

6      Q.   But this soured you on the Bounty Hunter Bloods?

7      A.   Yes.

8      Q.   And so what happened after that?

9      A.   After that, I dropped my membership of the gang.

10     Q.   So you stopped being a Bounty Hunter Blood after

11  that, after they didn't come to your aid?

12     A.   Yes.

13     Q.   And at some point did you begin to associate with

14  the Rollin 60s before you became a full-fledged member?

15     A.   Yes.

16     Q.   Please describe that.

17     A.   Basically I just would hang out, smoking,

18  drinking, went to school together.  Just hanging out a

19  lot really.  And then sometimes we get into fights, you

20  know, with other people, but it didn't blow up until

21  being a gang until later on.

22     Q.   So basically during this lull between the Bounty

23  Hunter Bloods and becoming a Rollin 60s, you associated

24  with people there but you weren't a full-fledged member?

25     A.   Yes.

1    Q.   Was it primarily Daryion Mills?

2    A.   Yes.

3    Q.   Anyone else?

4    A.   Jerome was going through a trial at the time, so

5  he wasn't around in the area.

6        There was a member named "T Loc" but he really

7  didn't -- he wasn't around much either.

8        At the time I pretty much just hung out with

9  Daryion.  And like "Shotti" was there, but he left for a

10 while and I don't know what where he went, but.

11            THE COURT:  I'm sorry, I didn't hear what

12 you said.

13            THE WITNESS:  I didn't know where "Shotti"

14 went for a while.  Like, before the whole gang -- got

15 involved in the gang, you know, we used to hang out as

16 kids, teenagers, just hanging out.  And that was mostly

17 with Daryion and Cheese and "Shotti".  We was just, you

18 know, we were just being kids, teenagers being kids, you

19 know.

20            "Shotti" went out of town for a while . I

21 don't recall exactly where he went, but he was gone for

22 about a year.

23    Q.   And at some point in 2009 was there an incident

24 that led you to become a Rollin 60s?

25    A.   Yes.

1    Q.  At some point in 2009 was there an incident that

2    led you to become a Rollin 60s Crips?

3    A.  Yes.

4    Q.  What was that incident?

5    A.  There was a fight that we had with a rival gang.

6    Q.  Let's start with what rival gang?

7    A.  Eight Mile Sconis.

8    Q.  How do you spell Sconis?

9    A.  S C O N I S.

10   Q.  So there was an incident with the Eight Mile

11   Sconi's.  How did that incident start?

12   A.  One of the members tagged in the area and I saw

13   the tag and I call Daryion at the time -- I called

14   Daryion, and he sent "Shotti" to go look for the guy and

15   they had a fight.

16       "Shotti" wouldn't fight.  They had a one-on-one

17   fight and "Shotti" wouldn't fight, and they wanted a

18   rematch.  So everybody decided to meet up at the Citgo

19   on Seven Mile and Littlefield.  And they started a fight

20   and one of the guys got into it with Daryion and he told

21   me to punch him, so I did.

22       So when I punched him, somebody threw a bottle

23   and then everybody started fighting.  And they called

24   like 30 more people coming down Outer Drive.  And at

25   that time, like -- well, we could see police coming from

1  Seven Mile from the gas station, but they saw the 30

2  guys coming down Outer Drive before they saw us.  So

3  that gave us the opportunity to get away.

4      Q.  So if I can make sure I understand.  A rival gang

5  came in the area and started tagging?

6      A.  Yes.

7      Q.  Daryion Mills sent William Steele to go confront

8  them?

9      A.  Yes.

10     Q.  William Steele gets into a fight with this rival

11  gang?

12     A.  With one of the members.

13     Q.  With one of the members?

14     A.  Yes.

15     Q.  And wins?

16     A.  Yes.

17     Q.  And the rival gang wanted a rematch with the

18  Rollin 60s as a result?

19     A.  No, they wanted another one-on-one fight.

20     Q.  They wanted another one-on-one with Mr. Steele?

21     A.  Yes.

22     Q.  So everyone meets at the Citgo?

23     A.  Yes.

24     Q.  So this is the Rollin 60s at this point and the

25  Sconis?

1     A.  Yes.

2     Q.  And at this point you're associated but you're

3  not a full-fledged member?

4     A.  Yes.

5     Q.  But Daryion Mills is a member?

6     A.  Yes.

7     Q.  And William Steele is a member?

8     A.  Well, I didn't see him get jumped in or he didn't

9  wear a flag or anything, but like he was a member before

10  I was.  And I got down right after that happened, so.

11    Q.  Is it fair to say that you understood him to be a

12  Rollin 60s member at that time?

13    A.  Yes.

14    Q.  So when he is out fighting the Eight Mile Sconis,

15  he was a Rollin 60s?

16    A.  Yes.

17    Q.  Do you remember the person he fought?

18    A.  Dave.  That's the only name I know him by.

19    Q.  So the Eight Mile Sconis, they wanted a rematch

20  one-on-one with Mr. Steele?

21            THE COURT:  Are you going to go through his

22  whole testimony again?

23            MR. CRALLE:  No, Your Honor.  I just didn't

24  understand it all, but I'll move on.

25            THE COURT:  Rather than repeating the whole

1   testimony, okay.

2                 MR. CRALLE:  Yes, Your Honor.  Thank you.

3   BY MR. CRALLE, CONTINUING:

4       Q.  And you said there was a fight that broke out

5   between everyone?

6       A.  Yes.

7       Q.  And how did that lead you to become a Rollin 60s

8   member?

9       A.  At that point in time -- after that, I was pretty

10  much marked, you know.  I would be forever associated

11  with the gang since I fought beside them with the rival

12  gang.

13              And I have had actually had a couple run-ins with

14  the same guy and we fought every time we saw each other

15  and it's because he figured I was a member of the gang.

16              So I decided, you know, I was damn if I do, damn

17  if I don't.  So I just joined the gang.

18      Q.  Based on that incident, you asked to become a

19  member?

20      A.  I didn't ask to become a member, they already

21  wanted me to become a member.

22              Then I had to get the approval from Jerome once I

23  agreed with them.

24      Q.  And did you receive that approval?

25      A.  Yes.

1    Q.  And I believe you mentioned that you became a

2  full-fledged member in July, 2009?

3    A.  Yes.

4    Q.  Describe that process to become a member of the

5  Rollin 60s.

6    A.  I wasn't the only person getting jumped in at the

7  time, so we all fought each other.  It was a

8  one-on-one-on-one fight.  So it was three people

9  fighting each other.

10   Q.  Where did this take place?

11   A.  At the park on Tracey.

12   Q.  Do you know the other two people you fought?

13   A.  Yes.

14   Q.  Who was that?

15   A.  "Cheese" and "Kane".

16   Q.  So you fought "Cheese", is that Tre Tigner?

17   A.  Yes.

18   Q.  And "Kane", is that Anthony Weaver?

19   A.  Yes.

20   Q.  Were there any witnesses that day?

21   A.  Yes.

22   Q.  Who?

23   A.  I know Daryion was there for sure.  I'm not sure

24  who else was there at the time.  It was some other

25  members, too, drinking and smoking and stuff.

1     Q.   But other people were present?

2     A.   There were other people present though.

3     Q.   Now, you've called that process a couple of

4  things.   You mentioned being jumped in; is that right?

5     A.   Yes.

6     Q.   Is it known by any other terms?

7     A.   Put-on or getting rolled in.

8     Q.   Rolled in?

9     A.   Yes.

10    Q.   And generally speaking, that means that you have

11  to fight another member or members?

12    A.   Yes.

13    Q.   What is the --  well, first, how long does the

14  fight last?

15    A.   It's not timed.  It is usually until somebody

16  can't take it any more or until the person with the

17  highest rank around says that's enough.

18    Q.   What is the purpose of the fight?

19    A.   The purpose was to fight to see if you would

20  fight back even though you knew you would lose or if you

21  would be able to take orders even though you don't see

22  the benefit of it.   If you will follow orders

23  unquestionably.  And pretty much just see how much heart

24  you have.  If you really had what it took to be a

25  member.

1    Q.  Did everyone have to go through this roll-in or

2  put-on process?

3    A.  Not everyone.  Some people had different

4  situations.

5    Q.  What do you mean by that?

6    A.  Like for instance, "Chucc" didn't get put on

7  because he came from another set and he brought those

8  members with him.  So his rank was established based off

9  that precedence.  Based off him having leadership in the

10  gang that became part of our gang.  So by him bringing

11  those members over, it established his leadership in our

12  gang.  So we didn't feel like he needed to get a put-on.

13    Q.  What was that other gang that he was a member of?

14    A.  The Neighborhood Cobra Crips.

15    Q.  So his gang essentially merged with your gang?

16    A.  Yes.

17    Q.  And that's why he didn't have to go through the

18  put-on process?

19    A.  Yes.

20    Q.  Did anyone else not have to go through that

21  put-on process?

22    A.  It was never said that they didn't have to go on,

23  still go through it, but I didn't see quite a few people

24  that I haven't seen get jumped in or put-on.

25    Q.  Is it fair to say that you saw a number of people

1   though go through that process?

2       A.  Yes.

3       Q.  Did you see Sadeisha Johns or "Lady Mayhem" go

4   through it?

5       A.  No.

6       Q.  And in fact, did -- first, were there women

7   members that were part of the Rollin 60s?

8       A.  Yes.

9       Q.  Did they go through the put-on process?

10      A.  Yes.

11      Q.  Did they at one point go through a different

12  process?

13      A.  Yes.

14      Q.  What was that?

15      A.  They be sexed in.

16      Q.  You said sexed in?

17      A.  Yes.

18      Q.  What does that mean?

19      A.  The big homey or whoever was around with the

20  highest rank would tell her to go have sex with a member

21  that he choose. It wouldn't be like multiple people or

22  anything like that.

23      Q.  But that's what a woman had to do in order to

24  join the gang?

25      A.  At that time, yes.

1    Q.   Who's idea was that?

2    A.   That was Daryion's and "D Loc's" idea.

3    Q.   Why were there female members of the Rollin 60s?

4    A.   They're less likely to be, like, pulled over or

5    harassed by police.  Less likely to get jumped, you

6    know, get robbed.

7         Like, if they're carrying drugs or if we were to

8    get stopped, they're less likely to get searched because

9    most of the gang units, the cops were men, so they

10   really weren't allowed to touch them.

11   Q.   What do you mean by that?

12   A.   Like, you know, they have to wait for a female

13   officer to come and pat them down.  They have to detain

14   them and wait for a female officer to come pad them

15   down.

16        So once we noticed that process, we pretty much

17   took that to our advantage.

18   Q.   How so?

19   A.   By recruiting more female members and using them

20   to carry money and drugs.

21   Q.   In addition to having female members carrying

22   drugs and guns, was there any other benefit?

23   A.   Yes.

24   Q.   What?

25   A.   Well, sometimes they wanted partnerships or just

1   pretty much like having females around.

2      Q.   Were females ever used with disputes with rival

3   members?

4      A.   Yeah.

5      Q.   What does that mean?

6      A.   Well, if a rival saw one of us, they would be

7   suspicious, but if they saw a female that they didn't

8   know was involved and that female, you know, somehow got

9   close to them, it would make it easier for us to take

10  advantage of them or rob them or get the jump on them.

11     Q.   Did the Rollin 60s ever use females to try to

12  seduce rivals?

13     A.   Yes.

14     Q.   Could you give an example of that.

15     A.   I don't remember exactly which one it was but we

16  sent someone to seduce "Toon", who was the known leader

17  of the Playboys at the time.  I don't remember which

18  female recruit it was, but that didn't really work.

19     Q.   What would have happened, what was the plan if it

20  had succeeded?

21     A.   We were going to kill him.

22          THE COURT:  Well, that's speculation.  Go to

23  a new question.

24          MR. CRALLE:  Your Honor, I was asking about

25  the plan, not about whether it succeeded.

1           THE COURT:  They didn't have to do it, but

2    if you want to ask him if there was one, I suppose you

3    can ask that.

4           It sounded like you were asking what would

5    have happened if it had succeeded.

6    BY MR. CRALLE, CONTINUING:

7      Q.  Mr. Barber, what was the plan in using this

8    female with respect to "Toon"?

9      A.  Pretty much to take out their head in command.

10   The highest member that they had.

11          There wasn't like any specific thing we would do,

12   but more than likely he probably would have got killed.

13          THE COURT:  That sounds like speculation to

14   me.  Go to your next question.

15   BY MR. CRALLE, CONTINUING:

16     Q.  Mr. Barber, who were the members of the Rollin

17   60s at the time that you joined?

18     A.  All of them or?

19     Q.  As many -- if you could just name a few.

20     A.  Daryion, Jerome, "Shotti", "Spike", "Tree", "BK",

21   "Lu Loc", "Crissy Loc", "K Swiss", "Nightmare".  That's

22   pretty much everyone I remember.

23     Q.  Ultimately how many members or how large did the

24   organization grow?

25     A.  It was more than a hundred.

```
 1      Q.   More than a hundred members?

 2      A.   (Nods head yes).

 3      Q.   I'm sorry, did you answer that?

 4      A.   Yes.  Sorry. I meant to answer verbally.

 5      Q.   Thank you.

 6           And after you became a member, did you

 7 participate in many of the put-ons?

 8      A.   Yes.

 9      Q.   Why did you participate in them?

10      A.   I was expected to.  I was -- I mean --

11           THE COURT:  You were what?

12           THE WITNESS: I was expected to because I was

13 a primary member as well as I got size on my side pretty

14 much.  Pretty much just to have the upper hand.

15 BY MR. CRALLE, CONTINUING:

16      Q.   Now, what were some of the reasons that you

17 joined the gang or that a person joins the gang?  What

18 is the benefit?

19      A.   I think the main benefit would be -- well, the

20 main benefit for me was power.  Was to be able to go

21 somewhere and not be disrespected.

22      Q.   What do you mean by not be disrespected?

23      A.   You know, you might not expect -- you might be

24 having a good day and you're standing in line with your

25 girlfriend or something and some guys come up and starts
```

1   harassing her, or, you know, that pretty much, you know,

2   will mess up your day.  But when I had that power, that

3   didn't happen, you know.

4        Like things, like, well, I always, when I was

5   younger, I was always getting harassed and bullied and

6   stuff, and so always when I looked at other gangs, I

7   always wondered what they had, you know, they didn't get

8   disrespected or harassed or bullied.

9        So when I got older, you know, I wanted to do

10   that in order to not be disrespected again.

11   Q.   And is that based on some sort of indicator that

12   people knew you were in a gang and that's why they

13   wouldn't disrespect you?

14   A.   Yes.

15   Q.   What was that?

16   A.   Well, just word of mouth or things that you have

17   done, your reputation.  Mostly just word of mouth.

18   Q.   Did membership in the Rollin 60s also provide

19   protection?

20   A.   Yes.

21   Q.   How so?

22   A.   It makes it harder for -- it makes it harder for,

23   like, other rivals to come into the area, and, say you

24   sell drugs and you want to be the only -- you don't want

25   any competition, you want to be the only one who has it.

1   So if you're a member of that gang in that area, it is

2   less likely that someone would come from out of that

3   area and come in and take away your clientele and slow

4   down your money.

5          I mean, that would be the economic standpoint of

6   it.

7          As far as, like, if I have a house or something

8   in the area, maybe it works to your advantage, like if

9   you're selling drugs, and you know, maybe police are

10  looking for you, you've got people that will call you

11  and let you know ahead of time, you know, so you can

12  make the proper adjustments.

13  Q.   Did it provide people that you call on if you

14  were in trouble?

15  A.   Yes.

16  Q.   If you were a member of the gang, if you're doing

17  something illegal, can you call the police for

18  assistance?

19  A.   No.

20  Q.   But you can call other gang members?

21  A.   Yes.

22  Q.   Now, were there responsibilities or obligations

23  that a member had to fulfill when they were a member of

24  the gang?  Are there certain things you had to do

25  basically?

1    A.   You had to participate.  It wasn't -- you know,

2  you had to bring something to the gang.  You know, maybe

3  you weren't good at selling drugs but you're good at

4  robberies or something, that's what you would do.  Or

5  maybe you're good at stealing cars, that's what they

6  would do.

7        Whatever it was that you did best is what your

8  role was.

9    Q.   What types of activities did the Rollin 60s do

10  and what sort of crimes did they commit?

11    A.   Break-ins, stole cars, armed robberies,

12  shootings, tag-ins.  You go into a store and like steal

13  everything.  You know, like a snatch and grab stuff.

14        Just sometimes we take, like, it wouldn't be --

15  technically it wouldn't be a hit, but like, you know,

16  say somebody's having or some of their kids having

17  trouble at high school or school, somebody pay them some

18  money to go beat them up or something like that.  And

19  things like that.

20    Q.   Now, you mentioned that you could call on other

21  60s for assistance.  Were there consequences if you did

22  not come to the aid of a fellow member?

23    A.   Yes.

24    Q.   What were the consequences?

25    A.   It was a violation.

1    Q.  And you mentioned that term a few times, what

2  does a violation mean?

3    A.  Usually it's a beating, but it can be anything

4  from embarrassment to being humiliated in front of other

5  members.  Or possibly, like, you know, being, like, a

6  slave for a week or something like that.  You know,

7  cleaning up somebody's house.  Clean out their cars,

8  stuff like that.  Just humiliation.

9       That is like the easy way.

10    Q.  Were there worse things that could happen?

11    A.  Yes.

12    Q.  Like what?

13    A.  You can get -- they had different violations

14  which were physical, but no one ever got killed, whether

15  it was, like, it was assumed that if you did something

16  that merited that, that it would happen.

17    Q.  Now, you mentioned that one of the major ways

18  there could be a violation was a beating.  Was there a

19  phrase that was used for that?

20    A.  It's more than -- it's different ones.

21       They had the 60 penny drop.  They got Phd, pump

22  head done.

23    Q.  Are you familiar with the term "fade"?

24    A.  Well, the fade really wasn't a violation, it was

25  more of a like a personal issue.  We're going to fight

1    and we're going to get it over with and that is going to

2    be it.

3                THE COURT:  I'm sorry, say that again.

4                THE WITNESS:  A fade was not -- it wasn't

5    really a violation, it was more of I have a personal

6    issue with you but I don't want it to go past this point

7    and so we're going to fight and after this fight, it's

8    going to be over with.  That's said and done.  You know,

9    nobody wants to hear anything about it.

10   BY MR. CRALLE, CONTINUING:

11       Q.  Sounds like two people within a gang can work out

12   an issue between them?

13       A.  Yes.

14       Q.  Now, you've mentioned that the gang held meetings

15   from time to time.  If you could, how were meetings --

16   how were members informed of meetings?

17       A.  Through Facebook or calls over the phone.

18   Sometimes we ran into a member face-to-face and he'd

19   tell other members.

20           It got around pretty easily though.

21       Q.  In the packet in front of you is what is marked

22   as Barber Facebook 20.  This is part of Government's

23   Exhibit 14.  Do you recognize that item?

24       A.  Yes.

25       Q.  What is this item?

1      A.   This is a status saying that we planned on

2    meeting at Northland for a fight tomorrow or day after.

3    The posting.

4      Q.   This was a call out to all Rollin 60s?

5      A.   Yes.

6              MR. CRALLE:   Your Honor, at this time we

7    move to admit Government's Exhibit 14, Barber Facebook

8    20.

9              THE COURT:   And it consists of what, three

10   lines?

11             MR. CRALLE:   Yes, Your Honor, it is one line

12   at the very bottom.

13             THE COURT:   Any objection?

14             MR. BERGER:   Relevancy, Your Honor.

15             THE COURT:   How is it relevant?

16             MR. CRALLE:   Your Honor, it goes to the

17   existence of the enterprise, the association of members.

18   And it goes to racketeering acts which we'll hear about

19   in a moment.

20             THE COURT:   All right, your objection is

21   noted and preserved for the record and overruled, and it

22   is admitted.

23   BY MR. CRALLE, CONTINUING:

24     Q.   Mr. Barber, you said this was a status update?

25     A.   Yes.

1      Q.   Did you do the status update?

2      A.   Yes.

3      Q.   What is the date of this update?

4      A.   January 6th, 2010.

5      Q.   January 6th, 2010?

6      A.   Yes.

7      Q.   Can you decode this status update for everyone?

8      A.   It is saying all 60s we banging on fo life

9   tomorrow at Northland C 15.

10      Q.   So all 60s.  So this was going out to every 60?

11      A.   Yes.

12      Q.   We banging on fo life, what is fo life?

13      A.   Fo life is a rival gang.

14      Q.   And what does tomorrow at Northland mean?

15      A.   The date and that tomorrow would be the day and

16   Northland was the location.  Northland Mall.

17      Q.   And what does C 15 mean at the very end?

18      A.   That was a code that we don't use any more.  I

19   really don't remember what it means.

20      Q.   But it was a code of some sort?

21      A.   Yes.

22      Q.   And what was going to happen with fo life at

23   Northland Mall.  Like, what is the -- can you explain

24   what was going on at this time?

25      A.   It was a dispute because some members tagging in

1    that area and they wanted to settle it.  So we said we

2    would meet them up there at Northland when it was open

3    at the time and handle it there.  If they wanted to

4    fight or if they wanted to talk, whatever it happened to

5    be.

6        Q.  So this was a request for 60s to show up, and was

7    there -- did people go the next day to Northland Mall?

8        A.  Yes.

9        Q.  Approximately how many people?

10       A.  Somewhere -- it was about 50.

11       Q.  About 50?

12       A.  Yeah, it was about 50 of us.

13       Q.  Went to the mall?

14       A.  Yeah.

15       Q.  To confront the rival gang?

16       A.  Yes.

17       Q.  Did the rival gang show?

18       A.  No.

19       Q.  So what happened?

20       A.  We got kicked out before they showed because it

21    was too many of us and we were all in one group.

22       Q.  And what did you do after you got kicked out of

23    the mall?

24       A.  Went back to Seven Mile and Schaefer and had a

25    meeting and did a put-on.

1      Q.   And this was winter?

2      A.   Yes.

3      Q.   In January?

4      A.   Yes.

5      Q.   You went back to Seven Mile and Schaefer?

6      A.   Yes.

7      Q.   Do you know where specifically?

8      A.   Tracey Park.

9      Q.   If we can pull up what has been previously

10   admitted as Strong Facebook 36.  And if we can zoom in

11   on the picture.

12          Do you recognize this photograph?

13     A.   Yes.

14     Q.   What is this photograph.

15     A.   When we went -- after we left the mall, some of

16   us that were -- that is just one of the groups of people

17   that went to the mall and came back to Tracey.

18     Q.   So this was after you guys had been kicked out of

19   the mall?

20     A.   Yes.

21     Q.   And you went back to Tracey and these are just

22   some of the 50 people you were describing?

23     A.   Yes.

24     Q.   Are you part of this photograph?

25     A.   Yes.

1    Q.   Is Mr. Steele part of this photograph?

2    A.   Yes.

3    Q.   And this was in the park near Tracey?

4    A.   No, this is behind Daryion's house in the alley.

5    Q.   Where were meetings typically held?

6    A.   At the park or member's house.

7            THE COURT:  At the park or where?

8            THE WITNESS:  A member's house.

9  BY MR. CRALLE, CONTINUING:

10   Q.   Did you ever initiate a meeting with other gang

11  members?

12   A.   Yes.

13   Q.   Approximately how many?

14   A.   I can't say for certain but it's around 10.

15   Q.   Were there meetings with just the big homies of

16  the gang?

17   A.   Yes.

18   Q.   Did you ever participate in those?

19   A.   Yes.

20   Q.   What were discussed generally at meetings, and

21  I'm talking about the larger meetings, not the big homey

22  meetings?

23   A.   The larger meetings were to collect dues and to

24  discuss things that people have done throughout before

25  the last time we met or since the last time we met as

1    far as rival gangs or completing missions, if there were

2    new connections on drugs and weapons.  If there were any

3    new members that they wanted to join or if there were

4    any kind of like burglaries or something we could rob to

5    get money.  Or you know, anything that would make

6    progress within the gang.

7        Q.  So you mentioned -- did you discuss the sale of

8    drugs?

9        A.  Yes.

10       Q.  Any drugs in particular?

11       A.  Weed for the most part.  That's pretty much what

12   everybody sold.

13       Q.  That wasn't all everyone sold, was it?

14       A.  No.

15       Q.  What other types of drugs did members of the

16   Rollin 60s sell?

17       A.  Ecstasy, crack.

18       Q.  So during these meetings, they were essentially

19   updates on what happened since the last meeting?

20       A.  Yes.

21       Q.  Were people given assignments or missions to

22   complete during the meetings?

23       A.  Yes.

24       Q.  Did you ever see William Steele attend meetings

25   other than the one we just saw on the screen?

1      A.   Yes.

2      Q.   Now, you mentioned you would also discuss rival

3    gangs.  Did you also discuss retaliation or things to do

4    against rival gangs?

5      A.   Yes.

6      Q.   What were some of the rival gangs that the Rollin

7    60s had during this time?

8      A.   The Playboy Gangster Crips, Black Peastones, Fo

9    Life.

10          There was a branch of us that had a dispute with

11    some Vice Lords but a lot wasn't really a part of that.

12    That was pretty much that area where they operated they

13    had that dispute.  It wasn't a -- we all weren't a part

14    of that.  It wasn't a gang beef.

15          Sconis, Eight Mile Sconis.  Then there was the

16    Skyline Pirus.  And that is the main enemies.  Main

17    rivals.

18      Q.   If we can turn in front of you to what has been

19    marked as Barber Facebook 21 that is part of

20    Government's Exhibit 14.

21          Do you recognize this item?

22      A.   21 point what?

23      Q.   This is 21 and 21.2.  There are two pages to it.

24      A.   Okay.  Yes.

25      Q.   What is this?

1    A.  This is me talking to a member asking if he's

2   ready for a put-on.

3    Q.  So this is you trying to coordinate someone

4   joining the gang?

5    A.  Yes.

6            MR. CRALLE:  Your Honor, we move to admit

7   Government's Exhibit 14, Barber Facebook 21 and 21.2.

8            THE COURT:  Any objection?

9            MR. BERGER:  Relevancy and leading.

10           THE COURT:  Well, you have been leading the

11  witness generally, but your objection to this is

12  relevancy, Mr. Berger?  Is that your objection?

13           MR. BERGER:  Relevancy, yes, and leading.

14           THE COURT:  Do you want to respond, Mr.

15  Cralle?

16           MR. CRALLE:  Yes, Your Honor.  This would go

17  to how the organization recruited members to prove the

18  existence of the enterprise.

19           THE COURT:  And what now?

20           MR. CRALLE:  To prove the existence of the

21  enterprise.

22           THE COURT:  Very well, your objection is

23  noted and preserved for the record and overruled and

24  it's admitted.

25  BY MR. CRALLE, CONTINUING:

 1     Q.   Mr. Barber, at the bottom of the screen, this is

 2   a -- who are the two people on this Facebook message?

 3     A.   Me and "Tiny Blu Bones"

 4     Q.   Who is "Tiny Blu Bones"?

 5     A.   "Dee SoSouthwest".

 6     Q.   And when was this message?  When was this string?

 7     A.   September 20th, 2011.

 8     Q.   And what are you two discussing at this point?

 9     A.   I asked if he was ready to get his put-on on

10   Friday.

11     Q.   If we can turn to page 21.2. How does he respond

12   to your question?

13     A.   He say, yes.

14     Q.   In fact, what else does he say?

15     A.   "Hell yea hood, tiny blu bones" which is the name

16   that he would be receiving.

17     Q.   How do you respond to him?

18     A.   "HK well linc up wit me on Friday round 2".

19     Q.   So you were saying that this would happen Friday

20   at 2?

21     A.   Yes.

22     Q.   How did he respond?

23     A.   "HK".

24     Q.   Next in the packet in front of you is what has

25   been marked as Government's Exhibit 23 and 23.2 as part

1   of Government's Exhibit 14.

2          Do you recognize this item?

3   A.   Yes.

4   Q.   What is it?

5   A.   This is me asking a member who he is and his

6   affiliations.  Well, he is not a member of our gang but

7   it was someone who was representing something close to

8   or similar to our gang.  So I just wanted to make sure

9   and check out who he was.

10   Q.   So this is a discussion between you and some

11   other type of gang member?

12   A.   Yes.

13          MR. CRALLE:  The Government seeks to admit

14   Government's 14, Facebook 23 and 23.2.

15          THE COURT:  Do you have any objection?

16          MR. BERGER:  Objection as to relevancy, Your

17   Honor.

18          THE COURT:  How is this relevant?

19          MR. CRALLE:  Your Honor, this is relevant

20   because it shows him discussing the existence of the

21   enterprise and also the existence of other enterprises

22   and the relationships between them.

23          THE COURT:  I don't think it is relevant.

24   Go to your next question.   Sustained.

25   BY MR. CRALLE, CONTINUING:

1    Q.   Mr. Barber, do you know William Steele?

2    A.   Yes.

3    Q.   And how do you know him?

4    A.   We were friends for a long time.

5    Q.   In front you is what has been marked as

6  Government's Exhibit 14, Facebook 27.  Do you recognize

7  this?

8    A.   Yes.

9    Q.   What is it?

10    A.   Picture of me and him.

11         MR. CRALLE:  Your Honor, the Government

12  seeks to admit Government 14, Barber Facebook 27.

13         THE COURT:  Any objection?

14         MR. BERGER:  Relevancy, Your Honor.

15         THE COURT:  How is it relevant?

16         MR. CRALLE:  It goes to show that Mr. Barber

17  knows Mr. Steele.

18         THE COURT:  I'm going to allow this.  I find

19  that it is relevant and your objection is overruled and

20  preserved for the record.  And this is admitted.

21  BY MR. CRALLE, CONTINUING:

22    Q.   What is depicted in this picture?

23    A.   We're sitting on the hood of a car.

24    Q.   And who is in the picture?

25    A.   "Shotti" and I.

1    Q.   That's the two of you?

2    A.   Yes.

3    Q.   That's you on the left?

4    A.   Yes.

5    Q.   And him on the right?

6    A.   Yes.

7    Q.   If we can scroll down.  When was this photograph

8  uploaded to Facebook?

9    A.   October 5th, 2011.

10    Q.   And who is tagged to this photo?

11    A.   "Shotti" and me.  "Shotti" and I.

12    Q.   So both of you were tagged in the photo?

13    A.   Yes.

14    Q.   And the next picture in front of you or the next

15  item in front of you rather is what is marked as Barber

16  Facebook 28.   Do you recognize that item?

17    A.   Yes.

18    Q.   What is this item?

19    A.   Picture of "Shotti" throwing up signs.

20    Q.   Is this from the very same day?

21    A.   Yes.

22         MR. CRALLE:  Your Honor, the Government

23  seeks to admit Government's Exhibit 14, Barber 28.

24         THE COURT: Any objection?

25         MR. BERGER:  Relevancy, Your Honor.

1          THE COURT:  It's overruled as to relevancy

2   since this is a photo of your client, and it is

3   admitted.

4   BY MR. CRALLE, CONTINUING:

5       Q.  Mr. Barber, who is depicted in the screen on this

6   picture?

7       A.  "Shotti".

8       Q.  And what is he doing?

9       A.  Throwing up west side.

10      Q.  And is there a significance to that sign?

11      A.  I'm not sure if he means west side Detroit or

12  West Side Crip.  I can't be for certain.

13      Q.  But is that a common sign though as well?

14      A.  Yes.

15      Q.  Was it used by members of the Rollin 60s Crips?

16      A.  Yes.

17      Q.  Was this from the same day that we were just

18  looking at?

19      A.  Yes.

20      Q.  In front of you is what has been marked as Barber

21  Facebook 29.  Do you recognize that?

22      A.  Yes.

23      Q.  What is this item?

24      A.  Us sitting inside the car.

25      Q.  When you say "us", who do you mean?

1      A.   "Shotti" and I.   William and I.

2              MR. CRALLE:  The Government seeks to admit

3      Barber Facebook 29 from Government's Exhibit 14.

4              THE COURT:   Any objection?

5              MR. BERGER:  Relevancy, Your Honor.

6              THE COURT:  How is it relevant, Mr. Cralle?

7              MR. CRALLE:  Your Honor, this goes to show

8      the relationship between the two as well as the signs

9      thrown up by Mr. Barber are particularly relevant.

10              THE COURT:  The Court admits it.  Your

11      objection is noted and preserved for the record.

12      BY MR. CRALLE, CONTINUING:

13      Q.   Mr. Barber, who is depicted in this photograph?

14      A.   William and I.

15      Q.   And that is you on the left?

16      A.   Closest to the camera, yes.

17      Q.   Is there anything significant that you are doing

18      with your hands?

19      A.   It's a Neighborhood Crips sign.

20      Q.   And that's Mr. Steele beside you?

21      A.   Yes.

22      Q.   And finally, if you can turn to what has been

23      marked as Government's Exhibit 14, Barber Facebook 28 --

24      I'm sorry, Facebook 30 rather.  Do you recognize that

25      item?

1    A.  Yes.

2    Q.  And what is this?

3    A.  A status.

4    Q.  Status update on what?

5    A.  Saying --

6    Q.  Without reading it first, is this is your

7  Facebook account?

8    A.  Yes.

9            MR. CRALLE:  Your Honor, the Government

10  seeks to admit Barber Facebook 30 as part of

11  Government's Exhibit 14.

12            THE COURT:  Any objection?

13            MR. BERGER:  Relevancy, Your Honor.

14            THE COURT:  How is it relevant?

15            MR. CRALLE:  It is relevant because it

16  discusses his client.

17            THE COURT:  It discusses what?

18            MR. CRALLE:  Mr. Steele.  The third and

19  fourth words in the status post.

20            THE COURT:  All right, the Court finds it's

21  relevant and your objection is overruled and it is

22  admitted.

23  BY MR. CRALLE, CONTINUING:

24    Q.  Mr. Barber, when was this posted?

25    A.  July 31st, 2012.

1     Q.   And this was on your Facebook account?

2     A.   Yes.

3     Q.   And what did you post?

4     A.   "Damn cuzz...Free Shoti Free Fatal Free Tears

5     rich rollin rich peace, Ace Blue S.i.p. C Nice".

6     Q.   Mr. Barber, was it common when members of the

7     gang were arrested for people to pay their respect to

8     them so to speak?

9     A.   Yes.

10    Q.   And how was that typically done?

11    A.   Shirts or on Facebook.

12    Q.   Was there a phrase that would be commonly said?

13    A.   Yes.

14    Q.   What was that?

15    A.   Free that person.

16    Q.   And so here where it says free Shotti, free

17    fatal, free tears, was that significant in some way?

18    A.   Yes.

19    Q.   And how so?

20    A.   They were all incarcerated at the time.

21    Q.   But this is significant because they were also

22    your fellow gang members?

23    A.   Yes.

24    Q.   And then at the end there is a reference to RRIP

25    Ace Blue you said?

1     A.   Yes.

2     Q.   And S.i.p. C Nice?

3     A.   Yes.

4     Q.   What does that mean?

5     A.   Two members who died.

6     Q.   Finally if we can turn to what has been marked as

7   Barber Facebook 26.  Do you recognize this item?

8     A.   Yes.

9     Q.   What is it?

10    A.   A picture of members on hood day.

11    Q.   Members of what?

12    A.   The Rollin 60s.

13         MR. CRALLE:  Your Honor, the Government

14   seeks to admit Government's Exhibit 14, Barber Facebook

15   26.

16         THE COURT:  Any objection?

17         MR. BERGER:  No, Your Honor.

18         THE COURT:  Very well, it's admitted.

19   BY MR. CRALLE, CONTINUING:

20    Q.   First, if we can zoom in on the picture.

21         Mr. Barber, who is in this photograph?

22    A.   Members of the Rollin 60s.

23    Q.   And are you in this photograph?

24    A.   Yes.

25    Q.   Which one?

1      A.   Far left, second from the left.

2               THE COURT:   I'm sorry, far left what?

3               THE WITNESS: Second from the left.

4    BY MR. CRALLE, CONTINUING:

5      Q.   Can you identify some item of clothing you're

6    wearing at that time?

7      A.   Blue shirt and a blue hat.

8      Q.   And who else is in this photograph?

9      A.   William is in the photograph.

10     Q.   Where is he?

11     A.   He is underneath me in the white shirt.

12     Q.   And what is he doing with his hands?

13     A.   Looking at a tattoo on his arm.  With the middle

14   finger up.

15     Q.   Is there a significance to that tattoo?

16     A.   Yes.

17     Q.   Do you know what tattoo he is pointing to?

18     A.   Being reproductive.

19     Q.   And the members of the Rollin 60s that are there,

20   what are they doing with their hands?

21     A.   Making signs; gang signs.

22     Q.   Are all those signs to indicate affiliation or

23   membership?

24     A.   Yes.

25     Q.   Mr. Barber, are there any people depicted in this

1   photograph that are not members of the Rollin 60s?

2       A.   No.

3       Q.   If we could scroll down, please.

4            What is the title of this photograph?

5       A.   "We Out Here Tryna Function!!!6 times 10 Day

6   neighborhood in peace.  Ace Blue S.i.p in peace C Nice

7   rollin".

8       Q.   Six times 10 day, what is that a reference to?

9       A.   Reference to the date.

10      Q.   Is there a date of significance there?

11      A.   Yes.

12      Q.   What?

13      A.   June 10th.

14      Q.   And is that known by any other name?

15      A.   Hood Day.

16      Q.   And looking at the upload, what is the date of

17  that?   When was this uploaded to Facebook?

18      A.   July 29th, 2012.

19      Q.   What year did this Hood Day function take place?

20      A.   2012.

21      Q.   So based on this photograph, was William Steele a

22  member of the Rollin 60s in 2012?

23      A.   Yes.

24           MR. CRALLE:   Your Honor, I'm going to turn

25  to another topic now.

```
 1                THE COURT:  You may.

 2   BY MR. CRALLE, CONTINUING:

 3      Q.  Mr. Barber, do you know someone by the name of

 4   Thunder or Thunderhead?

 5      A.  Yes.

 6      Q.  When did you first meet him?

 7      A.  In 2011.  I believe it was March 2011.

 8      Q.  Did anything significant happen that first day

 9   when you met him?

10      A.  I wanted to see if he was official, so we took

11   him to do a mission.

12      Q.  You wanted to see if he was official, what do you

13   mean by that?

14      A.  If he was just somebody being nosey or if he was

15   actually trying to be a functional member.  An active

16   member.

17      Q.  What do you mean being noisy?

18      A.  If he was an informant or maybe a spy or

19   something maybe from a rival gang and he was just acting

20   like one of us.

21      Q.  Was this person new to the area?

22      A.  Yes.

23      Q.  And you said you were concerned he was a spy or

24   informant?

25      A.  Yes.
```

1    Q.  Is that part of the reason why you were concerned

2  about that?

3    A.  Yes.

4    Q.  What did you do?

5    A.  We took him on a mission.

6    Q.  Describe that mission.

7    A.  It was a firebombing.

8        THE COURT:  I didn't hear what you said.

9        THE WITNESS:  It was a firebombing in

10  retaliation of a rival -- of a gang member.

11  BY MR. CRALLE, CONTINUING:

12    Q.  So take us through that.  There was an issue with

13  a rival gang?

14    A.  Yes.

15    Q.  What was that issue?

16    A.  One of the members on the east side was walking

17  his grandmother from church and a rival gang member

18  pulled a gun on him and he wanted retribution for that.

19    Q.  And when he wanted that retribution, what did he

20  do?

21    A.  He told us about it later on that night and we

22  all got in the car and drove over there and firebombed

23  the house.

24    Q.  Was this person part of your line?

25    A.  The person who it happened to, yes.

1    Q.   What was his name?

2    A.   "O Dog".

3    Q.   So there was an issue with "O Dog" and who did he

4    reach out to within the Rollin 60s?

5    A.   He reached out to me, "T Murda", which his is

6    cousin.

7    Q.   Why did he reach out to you?

8    A.   Because I was his big homey.

9    Q.   So if someone in your line had an issue, they

10   called you?

11   A.   Yes.

12   Q.   And where were you at the time?

13   A.   On the west side.

14   Q.   And where was he?

15   A.   On the east side.

16   Q.   And when you learned about this incident, what

17   did you do?

18   A.   I met up --  well, I was already with

19   "Thunderhead", so we went to the east side and did the

20   firebombing.

21   Q.   And who was with you at the time?

22   A.   It was me, "Thunderhead", "Kane", "Vicious", "O

23   Dog" and "T Murda".

24   Q.   Now, before you went to do the firebombing, did

25   you meet with "O Dog"?

1      A.   I met with them at the house, yes.

2      Q.   And after you met with him, what did you do?

3      A.   We went to the house.

4      Q.   First did you have to get supplies?

5      A.   Yes.

6      Q.   And to do a firebombing, what sort of supplies do

7  you need?

8      A.   Glass bottle and something flammable.

9      Q.   And specifically this time, what flammable items

10  did you get?

11      A.   Gas and a rag.

12      Q.   And then where did you go after you got the gas,

13  the rag, the bottle and so on?

14      A.   To the house where it happened.

15      Q.   So the house of a suspected rival gang member?

16      A.   Yes.

17      Q.   And what did you do then?

18      A.   We firebombed the house.

19      Q.   What does that mean to firebomb a house?

20      A.   Threw the bottle.  Lit the bottle on fire and

21  flew it at the house.

22      Q.   On who lit that bottle on fire?

23      A.   "Vicious"  -- I mean, not "Vicious", "Murda".

24  "Vicious" broke the windows open.

25      Q.   So "Vicious" broke the windows of the house open?

1    A.   Yes.

2    Q.   And who lit them on fire?

3    A.   "T Murda".

4    Q.   And did someone throw them?

5    A.   Yes.

6    Q.   Who?

7    A.   "T Murda".

8    Q.   To try to set the house on fire?

9    A.   Yes.

10    Q.   This was all in retaliation for another gang?

11    A.   Yes.

12    Q.   Was this -- now, you mentioned that you were

13   concerned that "Thunder" was an informant or spy?

14    A.   Yes.

15    Q.   Did he participate in this?

16    A.   He didn't take action as far as getting out of

17   the car.  He was the driver as well as he supplied the

18   rag.

19    Q.   And is that how he got brought into the gang so

20   to speak?

21    A.   Yes.

22    Q.   In front of you is what has been marked as Barber

23   Facebook 32.  Do you recognize that item?

24    A.   Yes.

25             THE COURT:  I'm sorry, what number again?

1               MR. CRALLE:  Barber Facebook 32.

2   BY MR.  CRALLE, CONTINUING

3     Q.   What is this item?

4     A.   I'm speaking to an out-of-town member of the

5   Rollin 60s.

6     Q.   And what are you discussing generally, without

7   getting into the substance?

8     A.   We're discussing "Thunderhead" who was the member

9   that took on the mission that day when I first met him.

10              MR. CRALLE:  Your Honor, the  Government

11   seeks to admit Barber Facebook 32 as part of

12   Government's Exhibit 14.

13              THE COURT:  Any objection?

14              MR. BERGER:  Relevancy.

15              THE COURT:   How is it relevant?

16              MR. CRALLE:  It is a contemporaneous

17   document in which he discusses the incident that he just

18   described.

19              THE COURT:  Your objection is noted and

20   preserved and the document is admitted.

21   BY MR. CRALLE, CONTINUING:

22     Q.   Staring at the top, who is -- who are the

23   recipients on this message string?

24     A.   Cali Coleone.

25     Q.   And you say he is a Rollin 60s out of state?

 1      A.   Yes.

 2      Q.   And this is between you and him?

 3      A.   Yes.

 4      Q.   Who starts the message?

 5      A.   He does.

 6      Q.   What does he say?

 7      A.   "U no my nikka thunderhead cuz".

 8      Q.   And if we can scroll down.

 9           At some point you responded?

10      A.   Yes.

11      Q.   How does he respond?

12      A.   "Small world". "Dats my nizzle".

13      Q.   What does that mean?

14      A.   That's his nigga.

15      Q.   And how did you respond?

16      A.   "Yea cuzz came n hollad at us before he got his

17  put on n we tooc him on a mission wit us."

18      Q.   And that mission that you're referencing was

19  what?

20      A.   Firebombing.

21      Q.   And then how did he respond?

22      A.   "Hes da truth."

23      Q.   So this was someone confirming whether you knew

24  him and you indicating what had happened?

25      A.   Yes.

1     Q.  And in front of you is what is marked as Barber

2  Facebook 33.  Do you recognize this item?

3     A.  Yes.

4     Q.  What is this?

5     A.  This is me having a conversation with a member in

6  California.

7     Q.  A member of the Rollin 60s in California?

8     A.  Yes.

9     Q.  And generally speaking, without talking about the

10  substance, this was related to gang activity?

11     A.  Yes, it was.

12     Q.  Specifically --

13          MR. CRALLE:  Well, Your Honor, I seek to

14  admit Government's Exhibit 33 -- Facebook 33 which is

15  part of Government's Exhibit 14.

16          THE COURT: Any objection?

17          MR. BERGER:  I'm sorry?

18          THE COURT:  Any objection to Exhibit 14,

19  Facebook 33?

20          MR. BERGER:  No, objection to that aspect,

21  no.

22          THE COURT:  It is admitted.

23  BY MR. CRALLE, CONTINUING:

24     Q.  Mr. Barber, starting at the top, can you read

25  what is stated there?

1    A.   "Fucc em cuzz. We trap treat dem niccas. Slobs

2    out here ce on da scary o lil wayne wannabes shit."  And

3    this -- and he responded with a laugh and said, "on

4    hood".

5    Q.   What does that mean, on hood?

6    A.   That means I'm telling the truth and he agrees.

7    Q.   And how did you respond to that?

8    A.   "Ayo on neighborhood we smoced a tramp n den

9    burned sum slops crib down in the same hour."  And said,

10   "o well, niccas was bored".

11   Q.   So what does that mean, we smoked a tramp?

12   A.   Well, that was when "Toon" was shot.

13   Q.   And then when you said, "burn some slobs crib

14   down", what that does mean?

15   A.   That is referring to the firebombing.

16   Q.   Did that take place the same day?

17   A.   Yes.

18   Q.   Why did you tell this member in California about

19   these incidents?

20   A.   Trying to gain credibility for the Detroit

21   section.

22   Q.   So this was how you were establishing you were a

23   legitimate gang?

24   A.   No, just to him personally.

25   Q.   In addition to the firebombing and the shooting

1    that you just described, were there other incidents in

2    which you or other members of the gang retaliated

3    against rival gangs?

4        A.   Yes.

5        Q.   Are you familiar with a rival gang known as the

6    Knockout Kings?

7        A.   Yes.

8        Q.   Was there an incident involving the Knockout

9    Kings at some point?

10       A.   Yes.

11       Q.   What was that?

12       A.   Some of the boneheads were at a park on the east

13   side, in the east side territory off of Van Dyke.  They

14   had gotten into an altercation with the Knockout Artists

15   of Knockout Kings.  I'm not sure what the altercation

16   was about or what the disagreement was about but it

17   ended up being a shoot-out.

18       Q.   Were you present for the shoot-out?

19       A.   No.

20       Q.   Were you informed of it by people?

21       A.   Yes.

22       Q.   How were you informed?

23       A.   By phone and Facebook.

24       Q.   In the packet in front of you is a document

25   marked Barber Facebook 34.  Do you recognize this

1    document?

2        A.   Yes.

3        Q.   What is this document?

4        A.   It is "2 hood" telling me about the shoot-out and

5    that he is looking for "0 Dog".

6             MR. CRALLE:   Your Honor, I seek to admit

7    Government's Exhibit 14, Barber Facebook 34.

8             THE COURT:   Any objection?

9             MR. BERGER:   Relevancy, Your Honor.

10            THE COURT:   How is it relevant?

11            MR. CRALLE:   It goes to an altercation with

12   a rival enterprise.

13            THE COURT:   Your objection is noted and

14   preserved and it is admitted.

15   BY MR. CRALLE, CONTINUING:

16       Q.   Mr. Barber, you mentioned this was a conversation

17   between you and who was the other member of the Rollin

18   60s?

19       A.   "2 Hood".

20       Q.   So this person, this account -- I can't determine

21   what that is actually.  Could you decode that for us?

22       A.   "Rest in peace chaise, rest in peace gangsta n

23   peace blake.  Rest in peace tdell.  RIPphaison."

24       Q.   You knew that to be "2 Hood"?

25       A.   Yes.

1      Q.   And this was a message sent from him to you when?

2   When did he send it to you?

3      A.   August 20, 2011.

4      Q.   This was around the time of the shooting?

5      A.   Yes.

6      Q.   And what does he say?

7      A.   "Cig i aint been able to get round no phone did o

8   dog show up".

9      Q.   And he referred to you as "Cig" why?

10      A.   Because I was a big homey.

11      Q.   And what did you say in response?

12      A.   "To where".

13      Q.   And how did he respond?

14      A.   "Im sayin hav yall heard from him since da shoot

15   out".

16      Q.   So he is trying to track him down after the

17   shoot-out you were referencing?

18      A.   Yes.

19      Q.   And do you know what firearms were used in that

20   shoot-out?

21      A.   I'm not sure exactly what other firearms that

22   were used, but I was told by "Ice" that he used a Glock

23   9.

24      Q.   Was that a gun that had been -- that you had some

25   connection to though?

1    A.   Yes.

2    Q.   So you were told that one of your guns had been

3  used in that shoot-out?

4    A.   Yes.

5    Q.   Was that a gun that you had supplied to one of

6  the people in your line?

7    A.   Yes.

8    Q.   I'd like to change topics if we could to drug

9  distribution.

10         Did members of the Rollin 60s sell narcotics?

11    A.   Yes.

12    Q.   Was there an expectation that members would sell

13  drugs?

14    A.   No.

15    Q.   But people could if they so desired?

16    A.   Yes.

17    Q.   Was there an expectation that some sort of

18  criminal activity however?

19    A.   Yes -- well, in a way, it's more of like it was

20  the basis would have been criminal activity, but if

21  someone were to have done something that wasn't illegal

22  but it benefited us, we would have accepted that as far

23  as being the defense attorney or something.  Or maybe

24  they know how to invest in the stock market or something

25  like that.  We wouldn't have turned down things like

1   that, but the bottom line was the main thing we were

2   doing was committing crimes in order to generate

3   revenue.

4       Q.  Main thing was you wanted money?

5       A.  Yes.

6       Q.  Didn't matter how it came in?

7       A.  Yes.

8       Q.  If a person didn't have a specialty, didn't have

9   a particular skill, how were they put to use?

10      A.  Well, if they didn't have a particular skillset?

11      Q.  Sure?

12      A.  As far as like stealing a car or something?

13      Q.  Sure.  If a person didn't know how to steal cars,

14  would you put them to work some other way?

15      A.  Yes.

16      Q.  How?

17      A.  They could -- maybe they knew people that used

18  drugs and gave us extra clients, extra customers.  Or

19  they can look for different sources of drugs and

20  weapons.

21          They don't necessarily have to be good at

22  stealing it as long as you know somebody that has access

23  to it, you know.

24      Q.  What was the primary drug sold by the Rollin 60s?

25      A.  Weed.

1     Q.   Is weed another term for marijuana?

2     A.   Yes.

3     Q.   Was this before marijuana dispensaries became

4     legal?

5     A.   Yes.

6     Q.   Did the sale of marijuana change after the

7     legalization of marijuana at least for medical purposes?

8     A.   Yes.

9     Q.   How so?

10    A.   It became harder to sell.  It became harder to

11    sell lower quality marijuana as far as what was common

12    at the time.  Not like the high-quality stuff that the

13    dispensaries had.

14    Q.   Were the dues paid by Rollin 60s used to purchase

15    narcotics?

16    A.   Yes.

17    Q.   How so?

18    A.   You mean they paid -- I don't understand what you

19    mean by that.  Do you mean that they sold drugs and then

20    paid dues with their proceeds or that we used the

21    proceeds to buy drugs for them to sell drugs.

22    Q.   Did you use the proceeds to buy drugs?

23    A.   Yes.

24    Q.   Why would you pool that money together to buy

25    drugs?

1    A.   To get a larger amount.

2    Q.   And why was it important to get a larger amount?

3    A.   It was more people -- the larger or the more --

4    the bigger the supply, the more money you make really.

5    Q.   And the more money you make, what would you do

6    with that more money that you would make?

7    A.   Use that to free supply with drugs or weapons.

8    Q.   So it is a cycle?

9    A.   Yes.

10   Q.   Did Rollin 60s members sell any other kind of

11   drugs other than marijuana?

12   A.   Yes.

13   Q.   What?

14   A.   Crack and Ecstasy.

15   Q.   Did William Steele sell drugs?

16   A.   Yes.

17   Q.   What did he sell?

18   A.   Weed, crack.

19   Q.   Anything else?

20   A.   That's it.

21   Q.   Did William Steele have connections to various

22   types of drugs?

23             MR. BERGER:  Objection, foundation, Your

24   Honor.

25             THE COURT:  Well, lay a foundation for how

1   he might know that.

2   BY MR. CRALLE, CONTINUING:

3      Q.   Mr. Barber, did you ever see William Steele in

4   the possession of drugs?

5      A.   Yes.

6      Q.   Did you ever witness him selling drugs?

7      A.   Yes.

8      Q.   Did you ever discuss the sale of drugs with

9   William Steele?

10     A.   Yes.

11     Q.   Did you ever see the location in which he sold

12   his drugs?

13     A.   Yes.

14     Q.   Did you know where he acquired his drugs from?

15     A.   Yes.

16     Q.   Did you ever supply him drugs?

17     A.   Yes.

18     Q.   Did William Steele have connections to various

19   types of drugs?

20     A.   Yes.

21     Q.   Is that commonly known as a plug?

22     A.   Yes.

23     Q.   And what was his source; what did you know about

24   his source?

25     A.   It wasn't somebody that I was involved with so I

1    didn't know him personally, but he was a pretty reliable

2    source.  He was never -- it was never a time when he was

3    out or he didn't have it.

4          He was located pretty close, you didn't have to

5    wait long.  And it was a pretty good quality from what I

6    could tell.

7    Q.   And what did he supply to Mr. Steele?

8    A.   Weed and crack.

9    Q.   Where did William Steele sell his drugs?

10   A.   House on Tracey.

11   Q.   And where in relationship to the gang area was

12   this house on Tracey?

13   A.   Same street.

14   Q.   This was in the area of the Rollin 60s?

15   A.   Yes.

16   Q.   This was in the territory we discussed earlier?

17   A.   Yes.

18              MR. CRALLE:  Your Honor, approach the

19   witness?

20              THE COURT:  You may.

21              MR. CRALLE:  And these are Exhibits 33-A and

22   B in the binder in front of you.

23              THE COURT:  33?

24              MR. CRALLE:  A and B.

25              THE COURT:  Exhibit 33?

 1          MR. CRALLE:  Yes, Exhibit 33-A, B.  They're

 2  not part of Facebook.

 3          THE COURT:  All right.

 4  BY MR. CRALLE, CONTINUING:

 5    Q.  Mr. Barber, do you recognize these items?

 6    A.  Yes, I do.

 7    Q.  And what are they?

 8    A.  Exhibit 33-A is the house where they sold drugs;

 9  and 33-B is the park where -- our main area.

10          MR. CRALLE:  Your Honor, I seek to admit

11  Government's Exhibits 33-A and 33-B.

12          THE COURT:  Any objection?

13          MR. BERGER:  No objections, Your Honor.

14          THE COURT: Very well, they're admitted.

15  BY MR. CRALLE, CONTINUING:

16    Q.  If we can start with 33-A, please.  What is

17  depicted in this photograph?

18    A.  That is the house we sold drugs from.

19    Q.  And when you say "we", who are you talking about?

20    A.  "Shotti" and I.

21    Q.  Anyone else?

22    A.  No.

23    Q.  This was the house you were describing in the

24  Rollin 60s territory?

25    A.  Yes.

1     Q.   What was the benefit of selling drugs in the

2   territory controlled by the Rollin 60s?

3     A.   It wasn't real easy to get to.  If there was a

4   rival that was to come looking for us, we would be

5   notified ahead of time.  Or if the police were to come,

6   we would be able to get out because we would be notified

7   ahead of time.

8     Q.   What type of drug sales are we talking about,

9   standing on a street corner or someone calling you?  Can

10   you describe a little bit more about how this process

11   worked.

12     A.   We didn't go stand on corners, we had phones, and

13   the customers would call the phones and we would set up

14   a location and meet them.

15     Q.   So your customers came to you?

16     A.   Yes.

17     Q.   Where did William Steele store his drugs?

18     A.   I believe it was in his room.  I haven't seen  --

19   I didn't see exactly where he put them, but they were in

20   the house somewhere.

21     Q.   It was in this house?

22     A.   Yes.

23     Q.   And when he had his drugs in the house, was he

24   armed --

25     A.   Yes.

1      Q.   And how was he armed?

2      A.   It was a shotgun, full-sized.

3      Q.   And do you know the type of shotgun; a 12 gauge

4  or do you know anything about it?

5      A.   It might have been a 10 gauge.  It was bigger

6  than a 12 gauge.

7      Q.   Where was this in relation to his drugs, do you

8  know?

9      A.   It was in the bedroom.  I don't know if that is

10  where he kept his drugs, but it was -- he was pretty

11  close to it.

12           It was in the same house I should say.

13      Q.   What was the purpose of that shotgun?

14      A.   Protection.

15      Q.   Protection for what?

16      A.   Protection for what or from what?

17      Q.   Either one.  Both.

18      A.   Protection from being robberies or maybe someone

19  would try to kill him or something.

20      Q.   Well, let me ask it a different way.  If you're

21  selling drugs, why do you need protection?

22      A.   In case someone tries to get over on you or run

23  off from you or someone might try to rob you.  And

24  someone might try to kill you because they want to take

25  that opportunity.  And for the most part that was, you

 1  know, it is there when you need it.

 2    Q.  Now, from what time period did William Steele use

 3  this house to sell drugs?

 4    A.  This was -- this was in 2010.  In 2010 to 2011.

 5  Early 2011.

 6    Q.  During this period was he a member of the Rollin

 7  60s Crips?

 8    A.  Yes.

 9    Q.  Did anyone else live in the house?

10    A.  His girlfriend.

11    Q.  Did he own the house?

12    A.  No.

13    Q.  Did he rent the house?

14    A.  Yes.

15    Q.  Do you know who he rented the house from?

16    A.  Drug user named Jamaican.

17    Q.  Do you know how he paid rent?

18    A.  With crack.

19          MR. BERGER:  Foundation, Your Honor.

20          THE COURT:  Yeah, lay a little foundation

21  for that, Mr. Cralle.

22          MR. CRALLE:  Be happy to.

23  BY MR. CRALLE, CONTINUING:

24    Q.  Mr. Barber, how did you know who he rented the

25  house from?

```
 1      A.   I was in the house with him.

 2      Q.   What do you mean you were in the house with him?

 3      A.   I sold drugs with him; right next to him.

 4      Q.   How did you know who he was renting the house

 5   from?  Did you ever see that person?  Did you ever meet

 6   the person he was renting the house from?

 7      A.   I never met him like one-on-one, but I have seen

 8   glimpses of him.

 9      Q.   Did you ever hear Mr. Steele talk about this

10   person?

11      A.   Yes.

12      Q.   Did you ever hear Mr. Steele talk about the way

13   in which he paid his rent?

14      A.   Yes.

15      Q.   Did you ever see him pay rent?

16      A.   No.

17      Q.   You just heard him talk about it?

18      A.   Yes.

19      Q.   Did he ever describe what he had to do to pay

20   rent?

21      A.   Yes.

22      Q.   And what was that?

23      A.   Give the guy some rocks.

24      Q.   By rocks, what do you mean?

25      A.   Crack.
```

 1     Q.  Have you ever known Mr. Steele to sell

 2  prescription pills?

 3     A.  On occasion.

 4     Q.  What kind of pills are we talking about?

 5     A.  I'm not sure, probably Norcos or Vicodin.

 6            THE COURT:  I'm sorry, what was the first

 7  one?

 8            THE WITNESS: I'm not sure, maybe Norcos or

 9  Vicodin.

10  BY MR. CRALLE, CONTINUING:

11     Q.  So to be clear, you're talking about some sort of

12  pain medicine?

13     A.  Yes.

14     Q.  In addition to the shotgun that we were just

15  discussing, have you ever seen William Steele with any

16  other firearms?

17     A.  Yes.

18     Q.  What?

19     A.  Glock handgun.

20     Q.  What kind of Glock?

21     A.  Nine millimeter.

22     Q.  Was there anything unique or identifiable about

23  that Glock?

24     A.  The generation three with an extendable magazine.

25            THE COURT:  I didn't hear the last part.

 1              THE WITNESS:  Generation three with an

 2   extended magazine.

 3   BY MR. CRALLE, CONTINUING

 4      Q.   If we can now pull up Government's Exhibit 33-B,

 5   please.

 6           Mr. Barber, what are we seeing in Government's

 7   Exhibit 33?

 8      A.   That is the park.

 9      Q.   That is the park on Tracey?

10      A.   Yes.

11      Q.   Is that the park you referenced earlier where

12   gang meetings were held?

13      A.   Yes.

14      Q.   And there are some buildings in the background?

15      A.   Yes.

16      Q.   Are any of these buildings significant?

17      A.   Yes.

18      Q.   Which one?

19      A.   Two of them.

20      Q.   Can you identify those, please, starting from

21   left to right.

22      A.   Well, you probably can't see it.  It is actually

23   about five houses in this picture.  So if we start from

24   the far left would be one, and then on the right, the

25   one to the right of that, that would be the first house

1    that's significant.

2       Q.   Why is it significant?

3       A.   That's Daryion's house.

4       Q.   So that second house, the first one sort of cut

5    off, is that what you're talking about?

6       A.   Yes.

7       Q.   So the second house before there is a gap?

8       A.   Yes.

9       Q.   Is that a street there?

10      A.   Yes.

11      Q.   The second house there before the street, that's

12   Daryion Mills' house?

13      A.   Yes.

14      Q.   And on the other side of the street there are a

15   number of houses?

16      A.   Yes.

17      Q.   Can you tell us which one of those is of

18   significance?

19      A.   The one with the silver van parked out front of

20   it.

21      Q.   And what is significant about that house?

22      A.   That's the house we sold drugs from.

23      Q.   So it is that close to the park?

24      A.   Yes.

25      Q.   Mr. Barber, have you ever supplied drugs to any

1    members of the Rollin 60s?

2        A.   Yes.

3        Q.   To whom?

4        A.   Daryion, Martel, "2 Hood", "Shotti", "T Murda"

5    "Hoodlum", "Kane", "Hoodsta Gooch".   "Thunderhead".

6    Pretty much everybody.

7        Q.   Why would Rollin 60s come to you for marijuana?

8        A.   I mean, I had better quality than a lot of other

9    people did.  And as well as I was consistent, had easy

10   access, and we were both members of the same gang.  So

11   maybe there was some kind of consideration.  Maybe

12   thought they could get some kind of, you know, decent

13   better price than the competition.

14       Q.   How does quality play into the sale of marijuana?

15       A.   I don't understand the question.

16       Q.   Well, what is significant about the fact -- you

17   said you had a better quality than other people selling

18   marijuana?

19       A.   Yes.

20       Q.   So why is that significant?

21       A.   Drug users don't just buy everything.  If they

22   know it's something better available, they're going to

23   go for that.

24            For the most part, though, I had a better quality

25   for not much -- for parts that wasn't much different

1    from what they were paying for the garbage and that made

2    the offer attractive I guess.  Made my product more

3    attractive I guess.

4              THE COURT:  Let's take a break.  Remember

5    that you're not permitted to talk about the case among

6    yourselves or with anyone else during the break and

7    let's take about 10 minutes.

8              You may step down.  Please rise for the

9    Jury.

10             (Jury excused at 11:39 a.m.)

11             Mr. Barber, you may step down, too, but

12   don't speak to anyone about your testimony during the

13   break, okay.

14             (Recess at 11:40 a.m.)

15             * * * * * * * * * *

16             (Back in session at 11:56 a.m.)

17             THE COURT:  Are we ready to bring out the

18   Jury?

19             MR. CRALLE:  Yes, Your Honor.

20             THE COURT:  Let's do that.

21             (Jury brought into the courtroom at 11:58

22   a.m.)

23             THE COURT:  Are you satisfied the Jury is

24   present and properly seated?

25             MR. CRALLE:  Yes, Your Honor.

```
1              MR. BERGER:  Yes, Your Honor.

2              THE COURT:  You're still under oath.

3              You may proceed.

4              So let's try, Mr. Barber, to speak up a

5     little bit and a little bit more slowly, okay?

6              THE WITNESS:  Okay.

7              THE COURT:  Did you hear me say you're still

8     under oath?

9              THE WITNESS:  Yes.

10             THE COURT:  If the Jurors can't hear, you

11    need to raise your hand and let me know, okay.

12             You may proceed, Mr. Cralle.

13    BY MR. CRALLE, CONTINUING:

14       Q.  Mr. Barber, before the break we were talking

15    about the sale of narcotics or specifically marijuana;

16    do you remember that?

17       A.  Yes.

18       Q.  And you were mentioning that you supplied

19    marijuana to other members of the Rollin 60s?

20       A.  Yes.

21       Q.  Did you supply that marijuana for them to sell

22    themselves?

23       A.  Yes.

24       Q.  And would some of those proceeds flow back to

25    you?
```

1      A.  Yes.

2      Q.  And how were those proceeds used?

3      A.  Those proceeds, in particular the ones that came

4   from my pocket, went back to my own pocket.  However,

5   the proceeds that were used from dues went back into

6   dues.  Went back into the gang.

7      Q.  Roughly speaking, how much did you earn a week

8   selling drugs?  Do you have an idea?

9      A.  Say between a 15 or $2,000 a week.

10      Q.  Now, earlier we discussed how certain gang

11   members were armed while they sold drugs.  Was that

12   common for gang members to be armed while they were

13   selling drugs?

14      A.  Yes.

15      Q.  Was everyone armed?

16      A.  Not everyone.

17      Q.  Why wasn't everyone armed?

18      A.  Because some people weren't in places where they

19   needed to be armed, like the suburbs or they be dealing

20   with someone that was part of the set or someone that

21   wouldn't try those things.

22      Q.  And when you say "those things", what do you mean

23   "try those things"?

24      A.   Try robbing you or setting you up or something.

25   Like maybe someone in the neighborhood that's not part

1    of, you know, gang life or anything but they have a

2    habit, so they use but you wouldn't suspect them of

3    anything because they just want what they need.

4        Q.  If you were with another gang member and they're

5    armed, does that impact whether or not you need to be

6    armed?

7        A.  No -- do you mean do I need to be armed if

8    someone else is armed or what.

9        Q.  Sure?

10       A.  If someone else is, I don't have to be.  Like, I

11   wouldn't go out of my way to make sure I was carrying,

12   too.

13       Q.  Why?

14       A.  Because I would expect for that person to react,

15   you know.  Had the need arise, I would trust that person

16   with my life as well and they trust me with theirs.

17       Q.  So if you're armed and with another person, you

18   have their back and it is not as important for them to

19   be armed; is that what you're saying?

20       A.  No, I mean  -- okay, it's like a bodyguard, you

21   know.  Kind of like a bodyguard, he has a gun, I don't

22   need a gun.

23       Q.  And because he is a member of the Rollin 60s,

24   that's why you trust him?

25       A.  Yes.

    1    Q.  Did you ever discuss the sale of drugs over

    2  Facebook?

    3    A.  Yes.

    4    Q.  In the packet in front of you there is a page

    5  marked Barber Facebook 36.  Do you recognize that item?

    6    A.  Yes.

    7    Q.  What is this item?

    8    A.  Marijuana.

    9          THE COURT:  I'm sorry?

   10          THE WITNESS:  Marijuana.

   11  BY MR. CRALLE, CONTINUING:

   12    Q.  It is a picture of marijuana?

   13    A.  Yes.

   14    Q.  Is this from your Facebook account?

   15    A.  Yes.

   16          MR. CRALLE:  Your Honor, the Government

   17  seeks to admit Government's Exhibit 14, Barber Facebook

   18  36.

   19          THE COURT:  Any objection?

   20          MR. BERGER:  Relevancy and prejudicial.

   21          THE COURT:  Do you want to speak to that?

   22          MR. CRALLE:  Yes, Your Honor.  It's relevant

   23  because the sale of narcotics is a racketeering act and

   24  it is probative because this is -- well, Mr. Barber

   25  hasn't spoken to this yet, but I could lay a further

1   foundation if it would help as to why it's probative.

2          THE COURT:  I'm satisfied it may be relevant

3   and I'm going to admit it because I don't think it is

4   more prejudicial than probative at this point.

5          Your objection is overruled and this is

6   admitted as Exhibit 14, Facebook page 36.

7   BY MR. CRALLE, CONTINUING:

8   Q.  Mr. Barber, you mentioned that this was

9   marijuana?

10  A.  Yes.

11  Q.  If we can zoom in a little bit.

12      Based on this picture, can you identify the type

13  of marijuana it is?

14  A.  Yes.

15  Q.  What type was it?

16  A.  OG perp or granddaddy perp.

17  Q.  That last word you're saying is "perp"?

18  A.  "Perp".

19  Q.  Is that short for "purple"?

20  A.  Purple, yes.

21  Q.  Is that a particular strain of marijuana?

22  A.  Yes.

23  Q.  Now, what was significant about this particular

24  strain of marijuana?

25  A.   It is of a high quality.  It is not what some

1    would consider regular or standard.

2          At the time it was hard to find and it was pretty

3    pricey.

4    Q.   So by having a higher quality strain of

5    marijuana, what did that mean for you and for the other

6    members of the Rollin 60s?

7    A.    We had better product than most others and we

8    could easily obtain it.

9    Q.   Would that impact the price you could charge for

10   marijuana?

11   A.   Yes.

12   Q.   How so?

13   A.   It is a lot more expensive than what the standard

14   strain would cost.

15   Q.   Did this impact the amount of profit you would

16   earn from the sale of marijuana?

17   A.   Yes.

18   Q.   How so?

19   A.   It increased my profit margin substantially.

20   Q.   And did you ever supply this strain of marijuana

21   to other members?

22   A.   Yes.

23   Q.   So did this also impact the amount of profit that

24   they earned as well?

25   A.   Yes.

1     Q.   And ultimately did those profits, at least in

2    part, flow back to the gang in some way through dues or

3    other ways?

4     A.   Yes.

5     Q.   Mr. Barber, could you explain how drugs like

6    marijuana are packaged; in other words, when you take a

7    larger quantity and go to a smaller quantity, can you

8    explain that process?  Cutting if you will?

9     A.   Okay.  Well, actually I'm going to use a pound as

10    a reference.  There's 16 ounces in a pound, 448 grams.

11    Now, each ounce is 28 grams, so you have 16 ounces.  If

12    one gram sells for $10.00, wouldn't you rather sell it

13    gram by a gram and get the full profit margin or would

14    you rather sell wholesale and get it going quicker but

15    you're making less money basically.

16         So you can choose to either sell a gram by a gram

17    and make -- pull out, you know, pull out the larger

18    profit or you can use wholesale, which would cost less

19    because you're buying in bulk or selling in bulk.  And

20    you would make less money, but you would be getting rid

21    of your product faster than if you were to try to pull

22    as much profit from it as possible.

23     Q.   Generally speaking, and without respect to a

24    particular strain, what does a pound of marijuana go

25    for?  And we're talking about back in that time period?

1    A.   This particular strain?

2    Q.   Sure?

3    A.   About 6,000.

4    Q.   And so a pound of marijuana of this strain would

5    be 6,000 and when you break it down -- break down in

6    ounce?

7    A.   Ounces, yes.

8    Q.   How much would an ounce go for?

9    A.   Ounces were like about $400.00 at that point in

10   time.  Yeah.

11   Q.   And then what is an individual user quantity for

12   marijuana?

13   A.   Maybe -- depends on if they were buying in bulk

14   for prolonged use or just for a quick high.  A quick

15   high would be like a gram, but for a prolonged use for

16   like a couple of days would be like seven grams, a

17   quarter ounce.

18   Q.   And an individual use would be approximately one

19   gram?

20   A.   Yes.

21   Q.   How much would that one gram sell for?

22   A.   At that point in time?

23   Q.   Sure?

24   A.   About $30.00.

25   Q.   And is there a phrase or a term that's commonly

```
 1   -- that that's commonly referred to?  That one gram
 2   quantity?
 3        A.   A G.
 4        Q.   A G?
 5        A.   Yes.
 6        Q.   Are you familiar with the term dime bag?
 7        A.   Those are for bags priced for $10.00.
 8        Q.   So that doesn't apply for this particular strain?
 9        A.   Yes.
10        Q.   But just generally speaking, a one-user quantity
11   is a dime bag?
12        A.   Yes.
13        Q.   Approximately $10.00?
14        A.   Yes.
15        Q.   So based on the economics, it's better to get the
16   big quantity and cut it down?
17        A.   Yes.
18        Q.   Is there, in the sale of narcotics like that, is
19   there more risk though when you're selling at the lower
20   level; the dime bags, if you will?
21        A.   Yes.
22        Q.   How so?
23        A.   Well, smaller amounts usually means that that
24   person is trafficking and not using.  So if you were to
25   be charged in court, there would need to be a possession
```

1    charge as well as a delivery and manufacturing charge,

2    whereas if it was maybe just the seven gram sack all in

3    one where it is not separately bagged, it would more

4    than likely just be a possession charge.

5        Q.   So if a person has multiple or small bags,

6    they're taking more risk and they can be charged with

7    distribution?

8        A.   Yes.

9        Q.   Do you need a bigger network of people or

10   affiliates in order to traffic down at the dime bag

11   level?

12       A.   Not necessarily if you have a correct amount of

13   customers.  If you have the correct amount of customers,

14   if you have the right amount of customers and they call

15   you frequently, you can handle it by yourself.  But the

16   most efficient thing would be to work with others.

17       Q.   Are there economy of sales that come into play

18   with drug trafficking; in other words, does it help to

19   have more people to help with the work?

20       A.   It helps, but you know, the more people means

21   more problems, you know.

22            I suppose that you wouldn't have to get -- I

23   mean, you wouldn't have to get your hands dirty as far

24   as doing things yourself if other people is selling it

25   for you.  I mean, you would still make your profit, but

1   you would have to deal with those complications that

2   come along with that as far as someone feels like

3   they're not getting their fair share or they're jealous

4   because someone is getting a better quality or they're

5   getting more because they can get rid of it faster.  Or

6   you know, so you have to take all of that into account

7   when you're dealing with multiple of people.

8       Q.  I believe you mentioned earlier that the members

9   of the Rollin 60s didn't stand on street corners to sell

10  the drugs?

11      A.  Yes.

12      Q.  People would call them?

13      A.  Yes.

14      Q.  If a person were contacted and they were out of

15  supply, what would happen?

16      A.  They would refer to them to someone who still had

17  a quantity to sell.  Maybe someone else close in the

18  area.  Someone that they trusted not to steal their

19  customers, you know.

20      Q.  So for example, if you were out, would you refer

21  them to someone like Mr. Steele?

22      A.  Yes.

23      Q.  And vice versa?

24      A.  Yes.

25      Q.  In the packet in front of you is what has been

 1   marked as Barber Facebook 37 as part of Government's

 2   Exhibit 14.  Do you recognize this item?

 3              THE COURT:  What page again is it?

 4              MR. CRALLE:  Barber Facebook 37.

 5              THE COURT:  Okay.

 6              THE WITNESS:  Yes, I do.

 7   BY MR. CRALLE, CONTINUING:

 8     Q.  And what is this item?

 9     A.  Purple rain.

10     Q.  Is this a photograph?

11     A.  Yes.

12     Q.  And is this from your Facebook account?

13              THE COURT:  Wait a minute.  You guess it is

14   a photograph?

15              THE WITNESS:  No, I say it is a photograph.

16              THE COURT:  Oh, okay.

17              THE WITNESS:  And yes, this is from my

18   Facebook account.

19              MR. CRALLE:  Your Honor, the Government

20   seeks to admit Government's Exhibit 14, Barber Facebook

21   37.

22              THE COURT:  Any objection?

23              MR. BERGER:  No objection.

24              THE COURT:  Very well, it's admitted.

25   BY MR. CRALLE, CONTINUING:

1    Q.  Mr. Barber, could you describe what is depicted

2    in this photograph?

3    A.  This is, I think it is about a half ounce of

4    another high-quality strain called purple rain.

5    Q.  And if we look at the title, what does the title

6    of this post say?

7    A.  "Purple rain Zip fo half a stacc So aint no

8    passin dat."

9    Q.  What does the word "zip" mean?

10   A.  Ounce.

11   Q.  And what does half a stacc mean?

12   A.  $500.00.

13   Q.  So was this an advertisement for the sale of

14   marijuana or is this talking about how much you paid for

15   it?

16   A.  That's how much I paid for it.

17   Q.  By posting images like this or the one we just

18   saw, does that help inform people of the quality that

19   you have?

20   A.  Yes.

21   Q.  Both potential clients as well as Rollin 60s

22   members?

23   A.  Yes.  I would get people who would request that

24   particular strain because they probably haven't had it

25   before or maybe they just wanted to try it out.

 1    Q.  Let's skip ahead in the packet to Barber Facebook

 2   39 and 39.2.  Do you recognize these items?  It's two

 3   pages there.

 4    A.  Yes.

 5    Q.  And what are these items?

 6    A.  This is a conversation between Bounty Hunter and

 7   I.

 8              THE COURT:  Between who?

 9              THE WITNESS:  A Bounty Hunter gang member

10   and I.

11   BY MR. CRALLE, CONTINUING:

12    Q.  On Facebook?

13    A.  Yes.

14    Q.  And does this pertain to drug sales?

15    A.  Yes.

16              MR. CRALLE:  Your Honor, the Government

17   seeks to admit Government's Exhibit 14, Barber Facebook

18   39 and 39.2.

19              THE COURT:  Any objection?

20              MR. BERGER:  No, Your Honor.

21              THE COURT:  It's admitted.

22   BY MR. CRALLE, CONTINUING:

23    Q.  If we can just start at the bottom.  Were these

24   the two people in this message string?

25    A.  Yes.

```
 1      Q.  And you were Sevenmile Looni?

 2      A.  Yes.

 3      Q.  And the other individual, who is this again?

 4      A.  Evan Johnson.

 5      Q.  And you said he is part of the Bounty Hunter

 6  Bloods?

 7      A.  Yes.

 8      Q.  If we can move to the next page, please.

 9          Starting at the top, what is this message?

10      A.  He asked me what's going on with my phone.  What

11  he said was, "watts up with yo phone bum."

12      Q.  And then the message at the bottom, does it say

13  why he is trying to reach you?

14      A.  Yes.

15      Q.  What does he say?

16      A.  He wants some loud, which is a term for

17  high-quality marijuana.

18      Q.  So is this an example of the way people would

19  contact you over Facebook in order to discuss or

20  purchase drugs?

21      A.  Yes.

22      Q.  If you turn to Barber Facebook 40, which is part

23  of Government's Exhibit 14.  Do you recognize this item?

24      A.  Yes.

25      Q.  What is this?
```

1    A.   Conversation with a person I went to school with.

2    He is looking for a particular strain of high-grade

3    marijuana.

4              MR. CRALLE:  Your Honor, the Government

5    seeks to admit Government's Exhibit 14 part of Facebook

6    40.

7              THE COURT:  Any objection?

8              MR. BERGER:  Relevancy, Your Honor.

9              THE COURT:  How is it relevant?

10             MR. CRALLE:  Your Honor, it goes to a

11   racketeering act.

12             THE COURT:  Is that the only way it's

13   relevant, whether this is one of the overt acts?

14             MR. CRALLE:  Your Honor, I do not know

15   specifically if this is identified in the Indictment,

16   but specifically it is a racketeering act because it

17   involves the sale of drugs.

18             THE COURT:  But you don't know whether it is

19   an over act in the Indictment?

20             MR. CRALLE:  Off the top of my head, I do

21   not.

22             THE COURT:  Your objection is noted and

23   preserved for the record.  It may be relevant and it's

24   admitted.

25   BY MR. CRALLE, CONTINUING:

1      Q.   Mr. Barber, the first message in this string,

2   what does that say?

3      A.   What are your prices for Kush.

4      Q.   What is Kush?

5      A.   Kush is a particular strain of high-quality

6   marijuana.

7      Q.   So this person is reaching out to you to know

8   what the price is?

9      A.   Yes.

10      Q.   How do you respond?

11      A.   Call me, I don't talk on the Internet.

12      Q.   And finally, if we can turn the next two pages.

13   These are Barber Facebook 41 and Barber Facebook 41.2.

14   Do you recognize these two items, Mr. Barber.

15      A.   Yes.

16      Q.   What are they?

17      A.   Conversation with a Bounty Hunter member about a

18   connection with high-grade marijuana.

19      Q.   And specifically are you discussing not only the

20   connection but also how much these items would go for?

21      A.   Yes.

22      Q.   And would this assist you in some say in your

23   sale of narcotics?

24      A.   Yes.

25            MR. CRALLE:  Your Honor, Government seeks to

1    admit Exhibit 14, Barber Facebook 41 and 41.2?

2              THE COURT:  Any objection?

3              MR. BERGER:  Relevancy, Your Honor.

4              THE COURT:  What is the relevancy, Mr.

5    Cralle?

6              MR. CRALLE:  Your Honor, Mr. Barber has

7    testified about the economics of drug trafficking.

8    These would be contemporaneous documents that would

9    allow the Jury to assess his credibility.

10             THE COURT:  They may be relevant.  Your

11   objection is overruled and it is admitted.

12   BY MR. CRALLE, CONTINUING:

13      Q.  Starting at the top, who is "Ikeep Them Bands"?

14      A.  Bounty Hunter member named "Coldblooded".

15      Q.  So that is separate gang, and what is he asking

16   you?  Or what are you asking him rather?

17      A.  I told him to call me because I need plug, I need

18   a plug with the quality that he has.

19      Q.  So you're looking for a connection of some sort

20   or narcotics?

21      A.  Yes.

22      Q.  And if we can stroll down a little further,

23   please to the message with the time stamp of 17:36:06.

24   Do you see that message on the screen?

25      A.  Yes.

1      Q.   Who sent that message?

2      A.   I did.

3      Q.   And what do you say?

4      A.   "I got the plug at the dispensary, I'm trying to

5   see what y'all working with".

6      Q.   And how did he respond?

7      A.   "What are you paying right now?"

8      Q.   And if you can turn to the next page.  Starting

9   at the top, how do you respond?

10     A.   250 a zip.

11     Q.   And again, a zip is what?

12     A.   An ounce.

13     Q.   Is that $250.00?

14     A.   Yes.

15     Q.   How did he respond?

16     A.   No, I can't beat that.

17     Q.   What does that mean, "I can't beat that"?

18     A.   His price is higher.

19     Q.   And how do you respond?

20     A.   I told you I got the dispensary ticket, what's

21   your text?

22     Q.   How does he respond?

23     A.   4500 a boe.

24     Q.   What is a boe?

25     A.   Pound.

1    Q.  So you're paying 250 an ounce?

2    A.  Yeah, 250 an ounce.

3    Q.  And how many ounces in a pound?

4    A.  Sixteen.

5    Q.  Scroll down.

6        And what are you asking him there in the message

7    with the time stamp of 23:37:15?

8    A.  I say "Loud."

9    Q.  So you're confirming he's paying 4500 a pound for

10   Loud?

11   A.  Yes.

12   Q.  How does it help you in the sale of narcotics to

13   know what other people are selling their drugs for or

14   purchasing their drugs for?

15   A.  I would be able to know if someone was

16   overpricing theirs based on the quality and the price

17   that other dealers are using and -- that the other

18   dealers are paying and advertising.

19   Q.  So that would affect the way you charge your --

20   that would affect the price that you charge for your

21   supply?

22   A.  Yes.

23   Q.  Next if we can turn to Barber Facebook 43.  Look

24   just at the three messages below the top line there,

25   please.

1          Do you see those?

2      A.   Yes.

3      Q.   Do you recognize them?

4      A.   Yes.

5      Q.   What is this item?

6      A.   I'm asking "2 Hood" if he is through with the

7  drugs I gave him.

8               MR. CRALLE:  Your Honor, the Government

9  seeks to admit Government Exhibit 14, Barber Facebook

10  43.

11              MR. BERGER:  Relevancy.

12              THE COURT:  How is it relevant?

13              MR. CRALLE:  Your Honor, Mr. Barber

14  testified earlier that he supplied drugs to people in

15  the Rollin 60s and this is a contemporaneous document in

16  which he is discussing that.

17              THE COURT:  Supplying to the Rollin 60s?

18              MR. CRALLE:  Yes.

19              THE COURT:  It may be relevant.  I'm going

20  to admit it.  Your objection is noted and preserved for

21  the record.

22  BY MR. CRALLE, CONTINUING:

23     Q.   Mr. Barber, I think we talked about this

24  individual, but can you explain again who that is, "RIP

25  chaise"?

1     A.   Chaise, no.

2     Q.   I'm sorry, who is the person you're talking with?

3     A.   That is "2 Hood".

4     Q.   That's "2 Hood".  Thank you.

5          And you sent him a message of some sort?

6     A.   Yes.

7     Q.   What do you say?

8     A.   What's up with that sac.

9     Q.   What do you mean by the phrase "sac"?

10    A.   The drugs I fronted him.

11    Q.   How does he respond?

12    A.   "Shit I had to use about 15 to get me an ID and

13   shit but other than that we're hood.  I'ma let you know

14   when I get that back."

15    Q.   And how do you respond to his message?

16    A.   "Naw cuzz it doesn't work that way. I give you

17   your pros to do what you need to do so I need mine by

18   Friday."

19    Q.   I need my --

20    A.   Forty-five.

21    Q.   What does 45 mean in that context?

22    A.   The amount of money he owes me.

23    Q.   For the amount of drugs you fronted him?

24    A.   Yes.

25    Q.   Did you front him those drugs because he was in

 1   your line?

 2      A.   Yes.

 3      Q.   Would you have provided drugs for him to sell if

 4   he was not a Rollin 60s member?

 5      A.   No.

 6      Q.   Pull up Barber Facebook 44.  This has been

 7   previously admitted.

 8           Starting at the bottom here, do you recognize

 9   this status post?

10      A.   Yes.

11      Q.   And what are you saying in this status post?

12      A.   "Tell me this, if everybody's got a plug and is

13   moving bricks, why is it $250.00 for a ball?"

14      Q.   And in that context, what does "brick" mean?

15      A.   Kilo.

16      Q.   And what is a ball?

17      A.   Eight ball of cocaine; 3.5 grams.

18      Q.   And who responds to your status post?

19      A.   "Staccs".

20      Q.   "Staccs" is Jerome Hamilton?

21      A.   Yes.

22      Q.   How does he respond?

23      A.   "Where are they paying 250?"

24      Q.   Now, is 250, is that overpriced, underpriced?

25      A.   Overpriced.

1    Q.  And how did you respond to Jerome Hamilton?

2    A.  "That's the lowest".

3    Q.  If we can turn to page 44.2, please.  How did

4  Jerome Hamilton respond?

5            THE COURT:  This is on which page?

6            MR. CRALLE:  Barber Facebook 44.2.

7  BY MR. CRALLE, CONTINUING:

8    Q.  Sorry, Mr. Barber, how did he respond?

9    A.  "Shit, I ain't heard it".

10    Q.  And then at some point does William Steele

11  respond to your status?

12    A.  Yeah.

13    Q.  How does he respond?

14    A.  "Cuz where I'm at it's 150".

15    Q.  So he is saying it's $150.00 for what?

16    A.  Eight ball of cocaine.

17    Q.  Is that high, low?

18    A.  That's the right price.

19    Q.  And does Mr. Steele continue to respond to this

20  message?

21    A.  Yes.

22    Q.  How does he respond?

23    A.  "And I guess that's why they got bricks they

24  shooting at da taxes, taxin ass niggas." "And I bet that

25  shit ain't as good as down here I'm talkin thrax."

1    Q.   What does that mean, "I guess that's why they got

2    bricks they shooting at the taxes"?

3    A.   Oh they're charging more -- since they charge

4    more for lower amounts, they're able to profit more and

5    buy larger amounts.

6              THE COURT:  I didn't hear that.

7              THE WITNESS:  Oh, I'm sorry.  They charge

8    more for a smaller amount so when they get their profits

9    they can buy a larger amount at a lower price.

10             THE COURT:  Is this page 44 already

11   admitted?

12             MR. CRALLE:  Yes, Your Honor.  On Monday.

13             THE COURT:  Okay.

14   BY MR. CRALLE, CONTINUING:

15   Q.   If we can turn to Barber Facebook 44 and 44.2.

16   If you can just look through them and see if you

17   recognize them.

18        Do you recognize those two pages?

19   A.   Yes.

20   Q.   What are they?  What is described in those two

21   pages?

22   A.   A member is asking me for the price of regular

23   marijuana or a low-grade marihuana.

24   Q.   So is this between you and other Rollin 60s

25   member?

1      A.   Yes.

2      Q.   About the price of marijuana?

3      A.   Yes.

4            MR. CRALLE:  Your Honor, the Government

5  seeks to admit Exhibit 14, Barber Facebook 45 and 45.2?

6            THE COURT:  Any objection, Mr. Berger?

7            MR. BERGER:  No objection, Your Honor.

8            THE COURT:  All right, it's admitted.

9  BY MR. CRALLE, CONTINUING:

10     Q.   If we can start at the bottom here.

11          Mr. Barber, who is this a conversation with?

12     A.   "Trigger".

13     Q.   Is that the use name "Trigger Trueblue Foster"?

14     A.   Yes.

15     Q.   And who starts the message?

16     A.   He does.

17     Q.   What does he say?

18     A.   "Cuz how much you gonna charge me for an ounce of

19  Reggis. I got to get on."

20     Q.   For an ounce of what?

21     A.   "Reggis".

22     Q.   What is that?

23     A.   Standard grade marijuana; low grade.

24     Q.   And how did you respond to Mr. Foster?

25     A.   "I need a hundred for the ones I have now but

1   give me 95 and I got you."

2      Q.   If we can turn to the next page.  How does Mr.

3   Foster respond to you?

4      A.   "Hk hey let me hold 95 I got you back cuz".   It

5   was a joke.

6      Q.   Next?

7      A.   Then he said, "Naw, real talk cuz put me on and

8   I'ma pay you back."

9      Q.   So is he asking to be fronted those drugs?

10     A.   Yes.

11     Q.   And fronting, does that generally mean you're

12  loaning him money?

13     A.   Yes.

14     Q.   And what do you say?

15     A.   "I can't do it nigga I'm working on my car I'm

16  buying shit for this bitch everyday and I already done

17  fronted niggas three zones."

18     Q.   So you have already fronted other people other

19  drugs?

20     A.   Yes.

21     Q.   Continue.

22     A.   He says, "dam it's hood cuz."

23     Q.   And how did you respond?

24     A.   "You gotta come with somethin because I can't

25  give you a zone and then I'm waiting for a month for it

1  to come back."

2      Q.  And then again, zone is how much quantity?

3      A.  An ounce.

4      Q.  Continue, please.

5      A.  I told him to get his clientele up first.

6      Q.  And how does Mr. Foster respond?

7      A.  "Hk, I'm trying to get my cheese coming in.  I

8  got the clientele.

9      Q.  And in that context, what does "cheese" mean?

10     A.  He has customers that are asking him for the

11  weed, so he has money, he is able to supply them and get

12  money.

13     Q.  And what is the next message in the string?

14     A.  "I gotta direct him to other niggas cause I ain't

15  got it."

16     Q.  And what does that mean, "I got to direct them to

17  other people because I don't have it"?

18     A.  He has to refer them to other people because he

19  doesn't have the supply.

20     Q.  And finally, how do you respond?

21     A.  I said, "That's why you hustle up on it, niggas

22  ain't front me shit to get where I'm at."

23     Q.  And Mr. Foster, he's a member of the Rollin 60s

24  Crips when you were a member?

25     A.  Yes.

1     Q.   We talked earlier about some of the other big

2  homies within the Detroit Rollin 60s Crips.

3  Approximately how many lines were there when you were a

4  member?

5     A.   Are you asking how many big homey lines there are

6  or how many lines altogether?  Because a big homey can

7  have more than one line.

8     Q.   Well, perhaps how many lines there are total?

9     A.   Seven.

10     Q.   There were seven.  Can you name them, please?

11     A.   It's the boneheads, bluebones, fatal heads,

12  maniacs, then murda heads.   Then siccos.

13          And the female line which is "Lady Mayhem's"

14  line.

15     Q.   Was there a kane head or a mac line?

16     A.   Yeah, kane head, sorry.

17          So that would be eight.

18     Q.   And how many people are in a line?

19     A.   About five.  A big homey and then four.

20     Q.   And what line was Mr. Steele in?

21     A.   Fatalheads.

22     Q.   So if they are eight lines and each one has at

23  least five people?

24     A.   Yes.  This was at the time after the power

25  struggle when everyone was spread out.  So it was --

1  they weren't like an official line, but they were

2  members that didn't join a line.  They are like a member

3  that didn't pick sides.

4      Q.  So at a minimum, there were 40 people?

5      A.  Yes.

6      Q.  And how big did it grow at its height?

7      A.  Over a hundred.  So I would say between a hundred

8  and 150.

9      Q.  A hundred to 150 Rollin 60s?

10     A.  Yes.

11     Q.  Here in Detroit?

12     A.  Yes.  Detroit and Southfield and other cities.

13  Pontiac and stuff.

14     Q.  Did members of the Rollin 60s -- well, first of

15  all, you mentioned earlier that you have some awareness

16  of firearms?

17     A.  Yes.

18     Q.  Can you describe that for a moment, your

19  familiarity with firearms?

20     A.  I'm pretty good with my hands.  I know how to

21  take them apart, repair parts, fix parts, swap parts.

22  Add accessories.

23         I can identify them.  I can change them from one

24  caliber to another.  Make them customizable.  Pretty

25  much whatever you ask me to do.  Pretty much what your

1   local gunsmiths would do.

2      Q.   Because of your familiarity, would people come to

3   you for guns?

4      A.   Yes.

5      Q.   And did you discuss the sale or changing of

6   firearms over Facebook?

7      A.   Yes.

8      Q.   Next in your packet I believe is what is marked

9   as Barber Facebook 16.  Do you recognize this item?

10     A.   Yes.

11     Q.   What is this item?

12     A.   Conversation with a guy I went to school with

13   about guns.  What price guns were.

14     Q.   You said this was a discussion about trying to

15   acquire firearms?

16     A.   Yes.  A guy from school wanted to know what the

17   prices were.

18     Q.   So he is coming to you to talk about firearms?

19     A.   Yes.

20             MR. CRALLE:  Your Honor, the Government

21   seeks to admit Barber Facebook 16.  This is part of

22   Government's Exhibit 14.

23             THE COURT:  Any objection?

24             MR. BERGER:  Objection as to relevancy to

25   Mr. Steele.

```
 1              THE COURT:  Mr. Cralle, this is an
 2  individual that's not part of the gang; is that right?
 3              THE WITNESS:  Yes.
 4              THE COURT:  So how is it relevant to
 5  Mr. Steele?
 6              MR. CRALLE:  Well, it is relevant because
 7  the gang was known to be an armed enterprise and
 8  specifically Mr. Barber was known to be armed and have
 9  familiarity with firearms so people turned to the
10  enterprise for this sort of information and access.
11              THE COURT:  Okay.  I'm going to allow it.
12  It may be relevant and I'm going to admit it.
13              Your objection is overruled.
14  BY MR. CRALLE, CONTINUING:
15    Q.  Mr. Barber, would you start out the top.  This is
16  a message from whom?
17    A.  Anthony Weathers.
18    Q.  What does it say here?
19    A.  "What heat you got for sale?"
20    Q.  And how did you respond?
21    A.  "I ain't got shit for sell except for weed."
22    Q.  When he says "heat", what is he referring to?
23    A.  Firearm.
24    Q.  And how does he respond?
25    A.  He says, "Oh, damn, cuz I'm trying to get on my
```

1   grind".

2      Q.   And what does he mean by get on my grind?

3      A.   Start to selling drugs or get into criminal

4   activity.

5      Q.   How do you respond to that?

6      A.   "My man's got akas for 350 and 9 millimeters for

7   175."

8      Q.   So this is a reference that you know of that

9   you're referring someone or talking about your

10  connections to firearms and the availability thereof?

11     A.   Yes.

12     Q.   And what was the next message there?

13     A.   "Oh, okay."

14     Q.   And again, how does he respond or how does he

15  message you?

16     A.   "What's good with the burner bro."

17     Q.   What's a burner?

18     A.   Gun.

19     Q.   But is there a significance to a burner versus a

20  regular gun?

21     A.   No -- well, I guess any gun can be a throw-away,

22  but maybe he was referring to something he can easily

23  get rid of.  It wouldn't, you know, take too much out of

24  his pocket.

25     Q.   There's a couple of phrases used there.  When

1   we're talking about these kind of guns, we're not

2   talking about going to Walmart or a sporting goods

3   store, are we?

4       A.   No.

5       Q.   What is a throw-away?

6       A.   Gun on the street that's not attached to your

7   name.

8       Q.   So when you're talking about a burner, are you

9   talking about that kind of gun?

10      A.   Yes.

11      Q.   So this is the sale of guns on the street?

12      A.   Yes.

13      Q.   And how did you respond to his message about what

14  is good with the burner?

15      A.   "I can get it but niggas can't talk on fedbook".

16      Q.   And what is that a reference to, "fed book"?

17      A.   It can be used as evidence against me.  Or in

18  court.

19      Q.   Would Rollin 60s members contact one another to

20  find a source for guns?

21      A.   Yes.

22      Q.   If we can turn to the next one, Barber Facebook

23  17 and 17.2.

24           Do you recognize this item?

25      A.   Yes.

1    Q.  What is it?

2    A.  I'm asking about shipment of guns.

3    Q.  You're asking about a shipment of guns?

4    A.  Yes.

5    Q.  For what purpose?

6    A.  To buy some.

7    Q.  For what purpose?

8    A.  To supply my line or supply myself as well as

9  others with guns.

10            MR. CRALLE:  Your Honor, the Government

11  seeks to admit Government's Exhibit 14, Facebook 17 and

12  17.2.

13            THE COURT:  Any objection?

14            MR. BERGER:  Objection as to relevancy to

15  Mr. Steele.

16            THE COURT:  So noted for the record and it

17  is admitted because it may be relevant.

18  BY MR. CRALLE, CONTINUING:

19    Q.  If we could start at the bottom here of page 17.

20  There is a conversation between who?

21    A.  Paris Johnson and I.

22    Q.  Who is Paris Johnson?

23    A.  "Kane's" best friend.

24    Q.  And "Kane", was he a higher-up or big homey

25  within the gang?

 1      A.  Yes.

 2      Q.  If we can turn to the next page.  What are you

 3  asking Mr. Johnson?

 4      A.  When the guns would arrive.

 5      Q.  And how does he respond?

 6      A.  "400 for 10 millimeter Glock, 350 for 40 caliber

 7  Glock."

 8      Q.  And those are the prices that they would cost?

 9      A.  Yes.

10      Q.  Again, these are the prices for sale on the

11  streets?

12      A.  Yes.

13      Q.  And how do you respond?

14      A.  "I'll take the 40 Glock, call me when you get it.

15  Call me when you can bring it."

16      Q.  So this is a conversation where you're trying to

17  purchase guns for your line?

18      A.  Yes.

19      Q.  Mr. Barber, what does it mean to earn your flag?

20      A.  Earn your flag means to putting some kind of --

21  done some kind of mission related to the gang.

22      Q.  What is the significance of earning your flag;

23  why is that important?

24      A.  It means that you're a member that has

25  participated in criminal activity.

1      Q.   Is there a sequence of events that takes place?

2   I mean, is this one of the first things you have to do?

3      A.   No.

4      Q.   When does this come after?

5      A.   After you get jumped in.

6      Q.   So after you get jumped in, you have to do

7   something in order to earn your flag?

8      A.   Yes.

9      Q.   And when we're talking about a flag, what

10  specifically are you referring to?

11     A.   Bandana or beads.

12            THE COURT:  Bandana or what?

13            THE WITNESS:  Beads.  The necklace beads I

14  was wearing.

15  BY MR. CRALLE, CONTINUING:

16     Q.   So the pictures we saw earlier?

17     A.   Yes.

18     Q.   You can't have that unless you have done

19  something for the gang?

20     A.   Yes.

21     Q.   In front of you are two documents marked Barber

22  Facebook 35 and 35.2.  Do you recognize those?

23     A.   Yes.

24     Q.   What are those items?

25     A.   Conversation with a new member about earning his

1    flag.

2              MR. CRALLE:  Your Honor, the Government

3    seeks to admit Government's Exhibit 14, Barber Facebook

4    35 and 35.2.

5              THE COURT:  I'm not there yet.

6              Do you have any objection, Mr. Berger?

7              MR. BERGER:  Relevancy, Your Honor.

8              THE COURT:  Do you want to respond to

9    relevancy?

10             MR. CRALLE:  Yes, Your Honor.  We talked

11   about the put-on process but we haven't talked about how

12   people acquired their flag and this is a contemporaneous

13   document to Mr. Barber on a fresh recruit, a fresh

14   member of the gang who will discuss that.

15             THE COURT:  I'm going to allow that.  Your

16   objection is noted for the record and it's admitted.

17   BY MR. CRALLE, CONTINUING:

18     Q.  Mr. Barber, could you start at the bottom here.

19   Who are the Facebook users in this message string?

20     A.  "Dark Caesar" and I.

21     Q.  And are you the first person in this message

22   string?

23     A.  First person listed or --

24     Q.  Did you start the message?

25     A.  Yes.

1    Q.   What do you say?

2    A.   "You still got to earn your flag I guess you

3    think I'm playing."

4    Q.   How does he respond?

5    A.   "Hoodlum and murda don't got them things for me,

6    you got something I can do it with?"

7    Q.   What is that a reference to "Hoodlum" and "Murda"

8    don't have them things for me?

9    A.   They don't have any firearms.

10   Q.   If you can turn to the next page.  How do you

11   respond?

12   A.   I told him, "You have a big homey with heat, get

13   one of his shit I'm not loaning mine out no more

14   whenever I put..."

15            THE COURT:  You're going to have to read

16   that a little louder.

17            THE WITNESS:  "You got a big homey with

18   heat..."

19   BY MR. CRALLE, CONTINUING:

20   Q.   Let me interrupt you there.

21        Who was his big homey?

22   A.   "Staccs".

23   Q.   Continue, please.

24   A.   "You got a big homey with heat, get one of his

25   shits, I'm not loaning my shit out no more.  Whenever I

1    put in work I got my own shit.  How you gonna bang and

2    you don't got a burner?"

3        Q.   How does he respond?

4        A.   "I'll get one myself then nigga."

5        Q.   Keep going?

6        A.   "Do it then and quit talking about it."

7        Q.   Next?

8        A.   "Staccs told me to tell you to get him a burner

9    for the koa mission."

10       Q.   What does that mean, the koa mission?

11       A.   Knockout Artist retaliation.

12       Q.   Is that the retaliation we discussed earlier

13   today?

14       A.   Yes.

15       Q.   How did you respond?

16       A.   "What do I look like a gun store?"

17       Q.   So this was a conversation about effectively

18   people reaching out to you for firearms to use for gang

19   activity?

20       A.   Yes.

21       Q.   Changing topics.

22            Mr. Barber, do you remember an incident during

23   which Mr. Steele was shot?

24       A.   Yes.

25       Q.   What happened?

```
 1      A.  I wasn't there at the time but what I was --

 2              MR. BERGER:  Objection, Your Honor.  If he

 3  wasn't there, there is no foundation for this testimony.

 4              MR. CRALLE:  I can lay a further foundation.

 5              THE COURT:  Well, try to lay a foundation

 6  then.

 7              That objection is sustained.

 8  BY MR. CRALLE, CONTINUING:

 9      Q.  Mr. Barber, what year are we talking about when

10  Mr. Steele was shot?

11      A.  2010.

12      Q.  Did you know Mr. Steele at that time?

13      A.  Yes.

14      Q.  Were you in contact with Mr. Steele at the time?

15      A.  Yes.

16      Q.  Was the discussion --  was the shooting of

17  Mr. Steele the conversation or a topic discussed within

18  the gang?

19      A.  Yes.

20      Q.  Did you participate in that discussion?

21      A.  Yes.

22      Q.  As a result of that shooting, did it lead to gang

23  activity?

24      A.  Yes.

25      Q.  Or was there a discussion leading to gang
```

 1   activity?

 2       A.   Yes.

 3              THE COURT:  Mr. Berger?

 4              MR. BERGER:  As far as it goes now, no

 5   objection.

 6              THE COURT:  All right, very well.  You may

 7   proceed with your questions.

 8   BY MR. CRALLE, CONTINUING:

 9       Q.   Mr. Barber, I believe you were starting to

10   describe what transcribed as you understood with the

11   shooting of Mr. Steele?

12       A.   There were some guys called the City Boys --

13              MR. BERGER:  Well, objection, Your Honor.

14   What transpired, if he has no personal knowledge, then

15   he is not qualified to testify.

16              THE COURT:  Do you want to respond to that?

17              MR. CRALLE:  Your Honor, Mr. Barber just

18   laid the foundation as to what he understood happened

19   and he also going to explain what they did in response

20   to that.

21              THE COURT:  Well, then, you can go to his

22   response if he has knows.

23              MR. CRALLE:  Well, Your Honor, they

24   discussed what happened and he's going to talk about

25   what they discussed as far as --

```
 1                  THE COURT:  Are you going to support why
 2   that can come it?
 3                  MR. CRALLE:  I believe I just did.  I'm not
 4   sure if you heard the foundation, but I will be happy to
 5   repeat it for him if you like.
 6                  THE COURT:  You may if you like.
 7   BY MR. CRALLE, CONTINUING:
 8     Q.  Mr. Barber, during this period when Mr. Steele
 9   was shot, was he a Rollin 60s member?
10     A.  Yes.
11     Q.  Were you a Rollin 60s member?
12     A.  Yes.
13     Q.  Was the discussion of his shooting amongst other
14   Rollin 60s members?
15     A.  Yes.
16     Q.  Was this a conversation of -- was this a topic of
17   frequent conversation during this time period of 2010?
18     A.  Yes.
19     Q.  Was there a discussion about how that was
20   potentially by a rival gang?
21     A.  Yes.
22     Q.  And was there a discussion about retaliating
23   against that rival gang?
24     A.  Yes.
25     Q.  Did the shooting of Mr. Steele prompt the gang to
```

1    plan how to respond because of how he had been shot?

2        A.   Yes.

3             THE COURT:  Mr. Berger, are you satisfied?

4             MR. BERGER:  Yes, as far as this goes.

5             THE COURT:  Okay.  Very good.

6    BY MR. CRALLE, CONTINUING:

7        Q.   Mr. Barber, you weren't present, were you?

8        A.   No.

9        Q.   After the shooting, people came back and told you

10   what happened?

11       A.   Yes.

12       Q.   What were you told happened?

13            MR. BERGER:  Objection.  That is hearsay,

14   Your Honor.

15            MR. CRALLE:  Your Honor, that is a

16   co-conspirator statement during the course of the

17   conspiracy, that is not hearsay.

18            THE COURT:  How does it further the

19   conspiracy?

20            MR. CRALLE:  Well, I think as Mr. Barber

21   just described, this was a purported act of a rival

22   enterprise and they discussed retaliating against the

23   enterprise.

24            THE COURT:  Go to the retaliation then.

25   BY MR. CRALLE, CONTINUING:

1     Q.   Mr. Barber, did you understand -- did you learn

2   who purportedly shot Mr. Steele?

3     A.   Yes.

4     Q.   Who was that?

5          MR. BERGER:   Objection.   That's hearsay by

6   any other name.

7          THE COURT:   But it might can come in under

8   co-conspirator, but I don't know that it is clear how it

9   is furthering it, Mr. Cralle.   That's why I asked you to

10  go to retaliation and maybe you can come back to that.

11  BY MR. CRALLE, CONTINUING:

12    Q.   Mr. Barber, was there a plan to retaliate against

13  the group?

14    A.   Yes.

15    Q.   What was that different group?

16    A.   The City Boys.

17    Q.   And the City Boys were a rival gang?

18    A.   There was only about two of them.

19    Q.   But this was another group?

20    A.   Yes.

21    Q.   And what was the plan as far as what to do with

22  the City Boys?   Was there going to be a confrontation or

23  can you describe that?

24    A.   Yes, there would be a confrontation had we found

25  their location.

1     Q.   Did you or other members of Rollin 60s look for

2     the City Boys?

3     A.   Yes, we did.

4     Q.   Where did you look for them?

5     A.   Vassar and Seven Mile area after the first side

6     street, which was Cambridge, Outer Drive turns into

7     Vassar.  Vassar is the street that we searched to look

8     for them.

9     Q.   Were you looking for them on foot?

10    A.   Yes.

11    Q.   What was the plan if you found them?

12    A.   To shoot them.

13    Q.   Why?

14           THE COURT:  I'm sorry, the plan was what?

15           THE WITNESS:  To shoot them.

16    BY MR. CRALLE, CONTINUING:

17    Q.   Why were you going to shoot them?

18    A.   They shot "Shotti".

19    Q.   Changing topics.  Did the Rollin 60s members

20    commit robberies as a way to make money?

21    A.   Yes.

22    Q.   During what time period did this happen?

23    A.   2009.

24    Q.   Only 2009?

25    A.   Well, this was my personal experience it was

1    during 2009 when we were constantly assigned to do

2    robberies.

3        Q.   Who assigned you to do robberies?

4        A.   Daryion.

5        Q.   Daryion Mills?

6        A.   Yes.

7        Q.   And was this a requirement?

8        A.   It wasn't like --  it wasn't something that

9    everyone did, but at the time period that was the main

10   thing we did.  Main think we focused on doing.

11       Q.   And when you say "we", who are you referring to?

12       A.   The group, the Rollin 60s.

13       Q.   So Daryion Mills would assign members to commit

14   robberies?

15       A.   Yes.

16       Q.   Were these robberies unarmed?

17       A.   No.

18       Q.   So they were armed?

19       A.   Yes.

20       Q.   How were members armed when committing these

21   robberies?

22       A.   Firearms.

23       Q.   Was there a particular firearm they would carry?

24       A.   A sawed-off shotgun and a 22 revolver.

25       Q.   Where did these firearms, sawed-off shotgun and

 1   22 revolver come from?

 2      A.  Daryion kept control of them.  I paid for the

 3   sawed-off.

 4      Q.  So these were gang guns?

 5      A.  Yes.

 6      Q.  And where did these robberies take place?

 7      A.  In our area; our territory.  Which would be the

 8   west side territory between -- within the range that I

 9   outlined earlier.

10      Q.  Were they on foot?

11      A.  Yes.

12      Q.  So you would just walk around the area?

13      A.  Yes.

14      Q.  Were you looking for anyone in particular when

15   you would commit these robberies?

16      A.  No.

17      Q.  Just anyone you saw?

18      A.  Yes.

19      Q.  What would happen to the proceeds of these

20   robberies?

21      A.  They went to Daryion.

22      Q.  Would they be used by the rest of the gang?

23      A.  No.

24      Q.  They would just go to his pocket?

25      A.  Yes.

1      Q.   But he was directing members to carry these out?

2      A.   Yes.

3      Q.   Did you ever participate in these armed

4  robberies?

5      A.   Yes.

6      Q.   Approximately how many armed robberies did you

7  commit as a member of the Rollin 60s?

8      A.   I can't count.  It is more than 10.

9      Q.   Did you ever commit an armed robbery with any

10 other members of the Rollin 60s?

11     A.   Yes.

12     Q.   Who?

13     A.   Me, it was Daryion -- not Daryion, I'm sorry.  "D

14 Loc", I.  "Shotti" would go out on occasion.  "Kane".

15 "Kane and "Shade Blue" and "Vicious".

16     Q.   And just to be clear, you're saying you committed

17 armed robberies with other Rollin 60s members including

18 William Steele?

19     A.   Yes.

20     Q.   Using a sawed-off shotgun?

21     A.   Yes.

22     Q.   What would happen if a Rollin 60s member did not

23 commit a robbery as ordered?

24     A.   They received a violation.

25     Q.   So it would be some sort of repercussion if they

1   did not do it?

2       A.  Yes.

3       Q.  Do you recall an incident that happened in August

4   of 2011 over on Harlan Street?

5       A.  Yes.

6       Q.  When did this --  how did this take place?  What

7   was the backdrop of this incident?

8       A.  "Hoodlum's" brother was --

9               THE COURT:  Whose brother?

10              THE WITNESS:  "Hoodlum's", who is a member

11  of the gang, his brother was robbed by a gang, a rival

12  gang in the area that they stayed in, which is Joy Road

13  and Schaefer.

14  BY MR. CRALLE, CONTINUING:

15      Q.  "Hoodlum's" brother had been robbed by a rival

16  gang?

17      A.  Yes.

18      Q.  And what happened after he was robbed?

19      A.  He told his brother, who told "T Murda", who is

20  the lil homey over him -- I'm not sure why he didn't

21  call me right then and there, but I wasn't told until

22  the next day when "Murda" caught the bus over to his

23  house.

24      Q.  What happened next?

25      A.  I got a call from "Murda" telling me that

1    "Hoodlum" wanted me to -- wanted to say something to me

2    and that I should come to his house.  At the time I was

3    working on my car, so I wasn't mobile so I was hanging

4    out with "Staccs".

5        Q.   Jerome Hamilton?

6        A.   Yes.

7        Q.   And so you and Jerome Hamilton or you get a call

8    when you're hanging out with Jerome Hamilton and what

9    happens?

10       A.   So we go over to "Hoodlum's" house on Joy Road

11   and see what's going on.  So "Murda" -- well, "Hoodlum"

12   didn't want to tell us at first but "Murda" made him

13   tell us and told us that his brother had gotten robbed

14   the day before by some guys around the corner.  And we

15   asked if he knew what they looked like, and he said he

16   can identify them and that they lived right on the

17   corner.  They were right around the corner.

18            So we drove around for a little bit and I asked

19   if those were the guys and he said those were the guys.

20       Q.   Let me stop you there.

21            So when you get over to "Hoodlum's" house, you

22   learned about what had happened.  Was there a discussion

23   as to whether there would be a response of some sort?

24       A.   Yes.

25       Q.   And what did you and "Hoodlum" and "T Murda" and

1    Jerome Hamilton plan to do?

2        A.   We were going to shoot them.

3        Q.   And at that time were you all armed?

4        A.   No, not at that particular moment.  We were still

5    sitting in the car talking about what we could do.

6        Q.   Please continue.  So you're driving around

7    looking for them?

8        A.   Yes.

9        Q.   And at some point you see them?

10       A.   Yes.

11       Q.   And what do you do after that?

12       A.   I told them those are the guys that we rode past

13   and they have been playing basketball in the street

14   since then.  And he said, yeah, those were those guys.

15            "Murda" said he had some guns stashed around the

16   corner when he caught the bus over there.  So we went

17   and got the guns.  They were in a plastic bag in a tall

18   filed of grass.  Tall grass.  Grabbed those guns and I

19   took a gun and "Murda" took one and "Hoodlum" took one

20   and then we went back around the corner.

21       Q.   Whose car were you in at that time?

22       A.   Jerome's.

23       Q.   Who is driving?

24       A.   Jerome.

25       Q.   Where are you sitting?

1    A.   In the passenger seat front.

2    Q.   So you're in the front passenger seat, whose in

3    the back?

4    A.   "Hoodlum" and "T Murda".

5    Q.   So you all are now driving around, you're now

6    armed?

7    A.   Yes.

8    Q.   What do you do next?

9    A.   We pull up -- we pull in -- they're playing

10   basketball in the street, so we pull up in the street

11   and start shooting.

12   Q.   You pulled into the street where those people

13   were?

14   A.   Yes.

15   Q.   And you started firing?

16   A.   Yes.

17   Q.   How many people were there?

18   A.   I couldn't tell.  It was a lot.

19   Q.   There were a lot of people there?

20   A.   It wasn't like a party, but it was more like

21   everybody's outside today and they all --everybody who

22   lives on the street is outside and they're all

23   congregating on the corner or something.  It wasn't a

24   party setting.

25   Q.   But there were a fair number of people?

1    A.  Yes.

2    Q.  And at the time were you wearing any particular

3  article of clothing?

4    A.  I had a bandana on my face.

5    Q.  What kind or bandana did you have on your face?

6    A.  A blue bandana.

7    Q.  Were you the only person wearing anything like

8  that?

9    A.  No.

10    Q.  Did everyone else have blue bandanas?

11    A.  Yes.

12    Q.  Was that because you were all Rollin 60s Crips?

13    A.  Yes.  And because we were trying to hide our

14  identities.

15    Q.  Did you have any other article of clothing of

16  significance?

17    A.  My hat.

18    Q.  What kind of hat were you wearing?

19    A.  The Seattle Mariners hat.

20    Q.  So you pulled down to where everyone was playing

21  basketball and then what happened?

22    A.  We started shooting.

23    Q.  Who were you shooting at?

24    A.  The guys that robbed "Hoodlum's" brother and

25  specifically the main guy that he pointed out.

1      Q.  All three of you were shooting?

2      A.  Yes, as are far as I know.  Well, I was looking

3   at the guy I'm shooting at.  I wasn't looking at them.

4              THE COURT:  We can't hear you.

5              THE WITNESS:  I wasn't looking at them, I

6   was looking at who I was shooting at and so I wasn't

7   looking at them shooting.  I'm not sure if they shot or

8   not, but.

9   BY MR. CRALLE, CONTINUING:

10     Q.  What kind of gun did you have at the time?

11     A.  A 9 mm Glock.

12     Q.  And for those of us who may not be familiar with

13   firearms, about how many rounds does a 9 mm Glock hold?

14     A.  Standard magazine is 17.

15             THE COURT:  Seventeen?

16             THE WITNESS:  Yes.

17   BY MR. CRALLE, CONTINUING:

18     Q.  And approximately how many rounds did you fire

19   that day?

20     A.  I'm not sure.  I didn't empty the whole thing.

21     Q.  Was it more than one?

22     A.  Yes.

23     Q.  Several?

24     A.  Yes.

25     Q.  Was that -- did everyone fire multiple rounds?

 1    A.   I believe so.  Like I said, I wasn't looking to

 2  see if they were firing.

 3    Q.   And after the three of you discharged your

 4  weapons, what happened next?

 5    A.   We drove back to my house and left the guns at my

 6  house and Jerome switched his plate with my car plate.

 7    Q.   Why did he do that?

 8    A.   Because he forgot he had his plate on.

 9    Q.   So someone wouldn't figure out he was the one?

10    A.   Yes.

11    Q.   And at some point did you realize that some

12  article of clothing had been left behind?

13    A.   Yes, my hat blew off.

14    Q.   Your hat blew off?

15    A.   Yes.

16    Q.   The Seattle Mariners hat?

17    A.   Yes.

18    Q.   What happened after that?

19    A.   "Murda" and "Hoodlum" got on the bus back to the

20  east side.

21    Q.   And --

22    A.   Oh, yeah, "Shotti" took me back over to Joy Road

23  to look for my hat.

24    Q.   Why were you and Mr. Steele looking for your hat

25  at this drive-by shooting?

1      A.   Because I lost it and I had hair at the time so

2   figure it might be DNA on it.

3      Q.   So you're trying to find the evidence?

4      A.   Yes.

5      Q.   Did you find it?

6      A.   No.

7           THE COURT:  This is good place to stop.  I

8   agree with you, Mr. Cralle.

9           I'm going to send the Jury home.  Remember

10  that you're not permitted to talk about the case among

11  yourselves or with anyone else until I submit it to you

12  for your deliberations.  And please don't do any

13  research about the case or anybody involved in the case

14  in any form whether it is book form or on social media.

15          I think you know you have some place to

16  leave your pads with Mr. Carroll and he will make sure

17  they're secured so that no one will take them.  And

18  we'll see you tomorrow morning at 9.

19          You may step down.

20          (Jury excused at 1:03 p.m.)

21          Anything else we need to take up before

22  tomorrow?

23          MR. CRALLE:  Your Honor, in the morning we

24  will seek to admit the three jail calls between

25  Mr. Steele and Daryion Mills.

1               THE COURT:  That I have the three packets

2      for and I had another one and they were given to Defense

3      Counsel; is that correct?

4               MR. CRALLE:  I believe in February they were

5      given to Defense Counsel.

6               Yes, it's actually five months, so we would

7      seek to play those through Mr. Barber.

8               THE COURT:  Mr. Barber, you're still

9      continuing under oath and please don't discuss your

10      testimony with anyone until you come back tomorrow

11      morning 9 o'clock, okay?

12               THE WITNESS:  Yes, Your Honor.

13               THE COURT:  Anything else, Mr. Berger?

14               MR. BERGER:  Nothing else, Your Honor.

15               THE COURT:  Thank you for giving us a

16      heads-up about the calls.

17               And I need you to remain here for a few

18      minutes so we can get the Jury down.  You as well, Mr.

19      Barber.  Just have a seat and when we're done, someone

20      will let you know and then you are free to go.

21               Court's in recess.

22               (Proceedings adjourned)

23               *  *  *  *  *  *  *

24

25

C E R T I F I C A T I O N

I, CHERYL E. DANIEL, Official Federal Court Reporter, after being first duly sworn, say that I stenographically reported the foregoing proceedings held on the day, date, time and place indicated.  That I caused those stenotype notes to be translated through Computer Assisted Transcription and that these pages constitute a true, full and complete transcription of those stenotype notes to the best of my knowledge and belief.

I further certify that I am not of counsel nor have any interest in the foregoing proceedings.

CHERYL E. DANIEL,

FEDERAL OFFICIAL COURT REPORTER

DATED:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25